**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 06-cv-00605-PAB-BNB

**CROCS, INC.,**

    Plaintiff,

v.

**EFFERVESCENT, INC.** *et al*,

    Defendants.

___

**CROCS, INC.'S OPPOSITION TO DAWG'S MOTION FOR PROTECTIVE ORDER;
CROSS-MOTION TO ENFORCE MAGISTRATE JUDGE TAFOYA'S PRIOR ORDER
GRANTING CROCS A SPECIAL DEPOSITION**
___

## I.  INTRODUCTION

This issue started because Crocs asked Dawgs to produce basic and straightforward information – summary sales and cost information by year, by customer, by product. Rather than do so, Dawgs took the position that such summaries did not "exist" and, instead, produced over 100,000 pages of unusable, unsearchable and incomplete invoices. After months of wrangling, Crocs asked the Court for assistance, and the Court agreed in early December that Crocs could take a deposition of Dawgs to test Dawgs's counsels' assertions of whether the summary information that Dawgs claimed did not exist actually did exist in Dawgs's systems.

After the Court issued its Order, Dawgs then began coughing up what it now characterizes as its available searchable summary sales and cost information. And, now, by this Motion, in reliance on its own characterizations of its new production, Dawgs has taken the

position that it has obviated the Court's Order. On that basis, Dawgs has unilaterally refused to appear for the ordered deposition.

As discussed below, the new production does not appear to be complete. And, Crocs has no confidence in whether the production is complete or not, because the only representation that the production is complete is the representation of Dawgs's counsel, who previously took the position that the records did not exist at all and could not be produced. In its Motion for a Protective Order, Dawgs has provided no fact declaration to support its new characterizations, and no evidence from anyone at the company as to what was produced or can be produced.

Crocs has no wish to take excess discovery. But, here, Dawgs's about-face about what records it possesses, which occurred only after the Court agreed that Crocs could take a deposition to ascertain the truth, has put Crocs in the position of having to take Dawgs's newest representations at face value, even as those new representations are unsupported by any declaration and are diametrically opposed to Dawgs's prior representations for almost six months.

Crocs submits that the uncertainty that has been created here is solely a product of Dawgs's own prior gamesmanship regarding its sales information. Thus, the circumstances have not changed, and Crocs is still justified in taking sworn discovery on this issue to ascertain what exactly is going on with Dawgs's records, and whether any additional information is either truly irretrievable, or simply continues to not be produced. On that basis, Crocs requests that the Court affirm its prior Order, and allow a deposition to proceed regarding Dawgs's sales systems.

## II. HISTORY OF DAWG'S MISREPRESENTATIONS AND PRODUCTIONS

### A. For Months, Dawgs Said Summary Records Did Not Exist.

On June 8, Crocs served its First Set of Requests For Production seeking summary sales and cost records from U.S.A. Dawgs, Inc., and Double Diamond Distribution Ltd. (collectively, "Dawgs"). *See* Dawgs's Motion for Protective Order ("Mot."), Ex. 1. From July through October, Dawgs said over and over again that such documents do not exist. The timeline of these statements are set forth in Exhibit 1 to the Callagy Declaration. The record is as follows:

- On **July 18**, after objecting to Crocs's requests, Dawgs counsel Dave Kaplan represented that "Dawgs and [Double Diamond] do not maintain information reflecting annual sales or costs on a product-by-product basis." Callagy Decl. Ex. 1.

- On **July 26**, Mr. Kaplan said: "Dawgs doesn't maintain records by product, channel, etc in the ordinary course of business. Dawgs doesn't break everything out to these discrete levels. But if we have reports that show the things you request, we will produce." *Id.*

- On **October 25**, Dawgs counsel Brian Elliott wrote that "after a diligent search, Dawgs was unable to locate existing documents that can readily show 'on an annual basis and by specific product, Defendants' sales to third parties, as well as direct and indirect costs and margins' as requested in RFP Nos. 4 and 5." *Id.*; Mot. Ex. 2 at 3. He said that "[t]o the extent any documents exist that relate to the subject matter of the request, or parts of this request, they have been produced." *Id.*

- On **October 27**, Mr. Kaplan again represented that "Dawgs doesn't keep documents that have information you seek in the ordinary course of business." Mot. Ex. 3 at 3.

Thus, before **November 1**, Dawgs had only produced a handful of purchase orders from a few customers, and no summary sales records at all. Callagy Decl. ¶2.

### B. In November, Dawgs Dumped Non-searchable Data On Crocs.

After months of Crocs requesting this information, between November 1 and 10 Dawgs produced approximately 53 non-searchable records of sales to customers, as well as two non-searchable "COGS Summaries" dated "as of October 31, 2016." *Id*. All were in .tiff format; none had been produced before. *Id.* Dawgs gave no explanation why these documents were not provided before, or not in its databases. *Id.* The documents collectively spanned over 100,000 pages. *Id.*

### C. When Crocs Sought Judicial Intervention, The Court Permitted Crocs To Take a Deposition Of Dawgs Concerning Its Sales Systems.

Because Dawgs had produced no summary information or searchable records to show its sales, and because there were significant gaps in sales data for certain time periods, Crocs initiated a discovery conference.

On **December 5,** following an hour-long discovery conference, Magistrate Judge Tafoya ordered that Crocs would be permitted take a Rule 30(b)(6) deposition to ascertain how Dawgs's sales records were kept and what reports could be generated. Mot. Ex. 5 at 37-40. The Court held that Crocs could seek fees and costs if it turned out that such records could have been produced sooner. *Id.* at 40-41. This was memorialized in a Minute Order. ECF No. 324 ("Crocs will be allowed to take one extra deposition of Dawgs' IT personnel as stated on the record. If Crocs can show to the court that the deposition was unnecessary and the information could have been provided through other means, the Court may award fees for the deposition.").

### D. After This Court's Order, Dawgs Finally Produced Searchable Sales and COGS—Without Explaining Why They Did Not Exist Before.

Dawgs began producing spreadsheets in MS-Excel format starting on **December 9**. The reports, which had never been produced before, are exports from Dawgs's sales databases, according to counsel for Dawgs. Callagy Decl. ¶ 3; Mot. Ex. 8. Dawgs also provided what appears to summary information for two customers—CVS and Walgreens. *Id.* Finally, Dawgs provided excel spreadsheets that are marked as showing COGS (Cost Of Goods Sold) data "as of Oct. 31, 2016," but no earlier COGS data. *Id.* Dawgs did not explain why none of these documents were provided sooner. *Id.* Dawgs also produced records that appear to fill in some of the gaps Crocs had pointed out before, including significant volumes of sales to CVS from 2008 to 2010. *Id.* Dawgs has not provided any factual support for its characterizations of its new production, either to Crocs or with its Motion for Protective Order.

### E. Dawgs Refused To Provide A Witness, In Violation of This Court's Order.

On December 12, Dawgs offered to provide a witness for a deposition on January 5 in Las Vegas. Mot. Ex. 6. Crocs accepted the date, and later served a formal notice of deposition. Mot. Ex. 10; Callagy Decl. ¶5. On the evening of December 31, five days before the deposition, Dawgs wrote that it "does not intend to provide a deposition witness" and "does not intend to proceed without further guidance from the Court." Mot. Ex. 11 at 5. That unilateral refusal to proceed left Crocs with no choice but to cancel the January 5 deposition. Mot. Ex. 12 at 3.

On January 2, Dawgs said it *would* provide a witness, but only if Crocs agreed that: "(i) there would be no basis for Crocs to subsequently seek costs and fees under the Court's December 5th order; and (ii) the deposition counts towards Crocs' limits." *Id.* at 2. Crocs

disagreed, and asked that Dawgs reconsider. Callagy Decl. Ex. 1. The parties met and conferred on January 4. Thirty minutes later, Dawgs filed its Motion.

## III. ARGUMENT

### A. Dawgs's December Production Only Confirms A Deposition Is Required To Ascertain Whether All Records Have In Fact Been Produced.

Dawgs's justification for refusing to follow the Order is that Dawgs's counsel now argues that all of its available records have been produced in Excel format. In reliance on this assertion, Dawgs says circumstances have thus "changed" and the deposition is not warranted. But, Dawgs has provided no factual support for its assertions anywhere, including in its Motion. For months, Dawgs represented that it had undertaken "diligent" efforts to determine whether summary records even existed at Dawgs, and certified that they did not. *See, e.g.*, Mot. Ex. 2 at 3 ("After a diligent search Dawgs was unable to locate existing documents that can readily show 'on an annual basis and by specific product, Defendants' sales made to third parties, as well as indirect costs and margins'[.]"). Then, only *after* Crocs sought judicial relief, and the Court expressed skepticism at the notion that such reports could not be run,[1] did Dawgs finally produce spreadsheets in MS-Excel format that appear to be exported from Dawgs's sales systems. Dawgs provided no explanation why these records were not produced before, and in fact offers nothing other than statements of counsel characterizing the newest production.

---

[1] Mot. Ex. 5 at 37-38 ("I don't know why you couldn't possibly do a database search that showed all products sold to a certain company during a certain time. I -- that seems to me to be so elementary that I don't understand why you couldn't do it. So if Dawgs is saying that you can't do it, then you probably need to talk to someone [a 30(b)(6) witness]. But here's the -- here's the caveat on that. If you -- if you make the Court order [the deposition], I'm going to give Crocs an extra deposition to do it."); *id.* at 38 ("I'm not telling you I don't believe you, when you says, we really can't do it the way they've asked for it [in excel form.] . . . Summary information should be simple. So since you say it isn't, apparently, I think [Crocs] should do that inquiry.").

In these circumstances, of course Crocs has questions about Dawgs's production and Dawgs's available information; it should be permitted to get them answered. The Court has already held as much, and has already ordered a deposition for exactly that reason. In seeking to unilaterally obviate the Ordered deposition, Dawgs has not provided any evidence as to what is or is not available in its systems, but simply did a 180-degree turn on its attorneys' representations as to what was actually available, and now asks everyone to take the new representation as true.[2] However, Dawgs's actions and inconsistent counsel representations have only created more uncertainty. And, Dawgs did nothing to ameliorate this by, for example, providing a declaration under oath to the Court as part of its Motion to for Protective Order actually verifying any of its newest characterizations.

Thus, the basis on which the Court ordered a deposition still exists – to ascertain from a person with knowledge what is or is not available and to square what has now been produced with Dawgs's prior representations. The Court has recognized that "in some circumstances, it is appropriate to allow discovery about a party's efforts to locate and produce discovery, electronic or otherwise. . . . In general, such discovery will be allowed if a party's efforts to comply with proper discovery requests are reasonably drawn into question." ECF No. 390 at 15. As the Court is likely aware, Crocs is not a proponent of discovery about discovery, absent extenuating circumstances. But, given Dawgs's prior representation about the state of its records and the

---

[2] As another example, Dawgs stated at the conference "we don't have that data" as to "particular products broken down by particular customers. . . . It's not the way our system maintains it." Mot. Ex. 5 at 11. Dawgs has since produced precisely this kind of information for CVS and Walgreens. Callagy Decl. ¶3. Even now, when Dawgs claims that its production is complete, it appears Dawgs still has not produced COGS information for years other than 2016. *Id.*

7
Crocs's Opposition To Dawgs's Motion For Protective Order and Cross-Motion To Enforce

lack of any evidentiary basis for Dawgs's Motion for Protective Order, this is such a circumstance.

And Dawgs's cases regarding "motions for reconsideration" are inapposite. *See, e.g.*, *Innovatier, Inc. v. CardXX Inc.*, No. 08-CV-00273-PAB-KLM, 2011 WL 93720, at *1 (D. Colo. Jan. 11, 2011). Here, there is no "new evidence or legal authority" that requires this Court to reconsider, nor was its "prior ruling . . . clearly in error." *Id.* If anything, Dawgs's productions in December underscore the need for the deposition that was previously ordered. In any event, to the extent Dawgs seeks reconsideration of the Court's Order, it has waived that right by not timely seeking relief.

### B. Dawgs's Post Hoc Production Does Not Obviate the Need For a Deposition.

Dawgs says it produced the searchable records following the Court's Order only because Crocs stated "for the first time" at the conference that it wanted searchable files. Mot. at 3. Crocs asked for searchable records before the conference. *See* Crocs's November 15 letter, Mot. Ex. 4 at 4 ("You generated reports that are nothing more than a dump of your entire sales system but not in native format and thus nearly impossible to search."). Even Dawgs conceded as much at the conference. Mot. Ex. 5 at 28 ("Instead what [Crocs] said is, give us your entire production is native format now, Dawgs."). Second, whether or not Dawgs produced searchable records misses the point. For months, Crocs asked whether *any* summary records existed; Dawgs said they did not.

Dawgs appears to argue that it previously refused to produce the very simple information requested on the basis that "it did not regularly maintain" the records. Mot. at 3; *id.* at 2 ("Dawgs has since *created* sales records in native, searchable format" ) (emphasis added); *id.* at

8 n.7 (claiming Dawgs has now "run reports in a manner other than as maintained in the ordinary course of business."). If Dawgs is suggesting that the records did not exist because they had not been previously output from the existing databases, that is a spurious distinction. Indeed, any Dawgs sales representative would likely concede that the "ordinary course of business" is to store and use the records in the databases. That is the point of a database. Regardless, this is an issue that can be explored in the ordered deposition, where Crocs should be able to obtain sworn testimony from a person with actual knowledge as to what the records are, and what is actually maintained in Dawgs's systems, rather than being forced to rely on argument in a motion that contradicts everything Dawgs has said to Crocs for six months about its sales records.

Further, Dawgs has not provided all of the information sought in Crocs's requests. It has not produced, for example, cost information for any year other than 2016. This is important information, considering that Dawgs has alleged antitrust violations on the theory that, *inter alia*, Crocs has conspired to "raise rivals' costs." Similarly, Crocs is entitled to confirm that the documents that Dawgs produced reflect all of the sales at issue, as well as to understand how that information is stored in Dawgs's database. As demonstrated above, Crocs should not be forced to accept unsupported representations about the data, when the confusion here is of Dawgs's own making.

### C. The Deposition Should Not Count Against Crocs's Limit, and Crocs Should Be Awarded Costs.

The Court encouraged Crocs to seek costs if the deposition proved that Dawgs had been cagey about what it could provide. Dawgs's December production appears to confirm that there has been caginess. But, that is not the basis for Crocs's need to take the deposition. The deposition, as ordered by the Court, was to verify what Dawgs has and can export from its

systems, by questioning a person with knowledge under oath.  That need still exists, and has not been answered by Dawgs's Motion.  For this reason, Crocs requests that the Court affirm that the deposition may go forward, at Dawgs's expense, and that it not count against Crocs's deposition limits.

## IV. CONCLUSION

Crocs respectfully requests that the Court deny Dawgs's Motion, enforce its December 5 Order, and order Dawgs to provide a witness for the deposition in San Francisco.

Dated: January 17, 2017	**Respectfully submitted by:**

　　*/s/ Sean M. Callagy*

Sean M. Callagy
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, Tenth Floor
San Francisco, CA 94111
Telephone:	(415) 471-3107
Facsimile:	(415) 471-3400
Email: sean.callagy@apks.com

*Attorneys for Crocs, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 17th day of January, the foregoing **CROCS, INC.'S OPPOSITION TO DAWGS'S MOTION FOR PROTECTIVE ORDER AND CROSS-MOTION TO ENFORCE MAGISTRATE JUDGE TAFOYA'S PRIOR ORDER GRANTING CROCS A SPECIAL DEPOSITION** was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *Sean M. Callagy*
Sean M. Callagy