IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 06-cv-00605-PAB-KMT
        (Consolidated with Civil Action No. 16-cv-02004-PAB-KMT)

---

Civil Action No. 06-cv-00605-PAB-KMT

CROCS, INC.,

        Plaintiff,

v.

EFFERVESCENT, INC.,
HOLEY SOLES HOLDINGS, LTD.,
DOUBLE DIAMOND DISTRIBUTION, LTD., and
U.S.A. DAWGS, INC.,

        Defendants.

---

Civil Action No. 16-cv-02004-PAB-KMT

U.S.A. DAWGS, INC. and
DOUBLE DIAMOND DISTRIBUTION, LTD.,

        Plaintiffs,

v.

RONALD SNYDER,
DANIEL HART,
THOMAS J. SMACH,
ANDREW REES,
GREGG RIBATT,
ANDREW REDDYHOFF,
GEORGE B. BOEDECKER, JR.,
LYNDON HANSON,
DONALD LOCOCO,
RAYMOND CROGHAN,
RONALD FRASCH,
MICHAEL MARGOLIS,
JEFFREY LASHER,
MICHAEL E. MARKS,
PRAKASH MELWANI,

JOHN P. MCCARVEL,
ERIK REBICH,
SARA HOVERSTOCK, and
JOHN AND JANE DOE DEFENDANTS 1-30,

     Defendants.

---

**ORDER**

---

     This matter is before the Court on Crocs, Inc.'s Motion to Dismiss Counterclaims V-XII [Docket No. 227] and Scott Seamans' Motion to Dismiss Counterclaims VI-IX [Docket No. 231].  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.  BACKGROUND[1]

### A.  Procedural Background

     Plaintiff Crocs, Inc. ("Crocs") filed Case No. 06-cv-00605-PAB-KMT on April 3, 2006, alleging, *inter alia*, infringement of United States Patent Nos. 6,993,858 (the "'858 patent") and D 517,789 (the "'789 patent").  Docket No. 1.

     On May 12, 2006, defendants Effervescent, Inc., Holey Soles Holdings, Ltd., and former defendant Collective Licensing International, LLC moved to stay this case pending proceedings under Section 337 of the Tariff Act of 1930 before the International Trade Commission ("ITC").  Docket No. 26.  The Court granted the motion on May 16, 2006 and administratively closed the case.  Docket No. 31.  In 2012, during a brief reopening of the case, Crocs added one of the Dawgs[2] entities as a named

---

[1]The facts are taken from the amended answer and counterclaims [Docket No. 209] and are presumed to be true for the purposes of this order.

[2]For simplicity, the Court adopts the convention of the parties in the underlying motions and refers to Double Diamond Distribution, Ltd. and U.S.A. Dawgs, Inc.,

defendant and Dawgs asserted counterclaims, Docket No. 119, before the action was stayed pending a reexamination of the patents-in-suit.  Docket No. 137.  In February 2016, Dawgs filed motions to reopen the case and lift the stay, Docket Nos. 167, 168, which the Court granted.  Docket No. 184.  On May 31, 2016, Dawgs filed its first amended answer to the amended complaint and counterclaims against Crocs, Scott Seamans, and John and Jane Does 1 through 100.  Docket No. 209.  On June 28, 2016, Crocs and Seamans moved to dismiss Dawgs' counterclaims.  Docket Nos. 227, 231.

On February 24, 2017, Crocs filed a second amended complaint, adding claims for infringement of U.S. Patent No. D632,465 ("'465 Patent").  Docket No. 473.  On March 10, 2017, Dawgs filed a second amended answer and counterclaims.  Docket No. 487.  The second amended answer and counterclaims added three claims for declaratory judgment relief related to the '465 Patent.  Docket No. 487 at 50-51, ¶¶ 130-33; 52, ¶¶ 143-46; 70-72, ¶¶ 223-35.  The second amended answer and counterclaims also added minor factual details to Crocs' remaining counterclaims. *Compare* Docket No. 209 at 39-83, ¶¶ 75-262 *with* Docket No. 487 at 49-108, ¶¶ 122-347.  The parties dispute the propriety of Dawgs' modifications of its counterclaims in response to the filing of a second amended complaint.  *See* Docket No. 448 at 4-6; Docket No. 493 at 5.

Because the modified factual allegations in the second amended counterclaims do not change the Court's analysis with respect to the pending motions to dismiss, the

_____

collectively as "Dawgs."

Court finds it appropriate to consider Crocs and Seamans' motions despite the fact that they are directed to the first amended answer and counterclaims. Where the second amended answer and counterclaims provides relevant additional factual detail, the Court notes as much. The findings of the Court apply to the equivalent counterclaims in the second amended answer and counterclaims.

### B.  Factual Allegations

Crocs is the leading manufacturer of "molded clog-type footwear products." *Id.* at 18, ¶ 20.  Dawgs is a competitor of Crocs and sells a variety of footwear, including molded clogs. *Id.* at 20, ¶ 24.  According to the counterclaims, Crocs had been manufacturing and selling clog-shaped shoes made from ethyl vinyl acetate ("EVA") since 2002. *Id.* at 18, ¶ 20.  At its inception, Crocs "decided to market the exact shoe that had already been developed and was already being manufactured and distributed by Foam Creations, Inc." *Id.*  That shoe, in turn, was made using molds designed by Ettore Battiston, an Italian inventor. *Id.*  The "Battiston Molded Clog" was sold in the United States as the "AquaClog," "Explorer," and "Waldies," among other names. *Id.*  In the early 2000s, other rubber clogs were available for sale in the United States.  For example, BIHOS S.R.L. ("BIHOS"), an Italian shoe designer and manufacturer, distributed and sold molded clog footwear under the brand name Calzuro starting in the mid-1980s. *Id.* at 19, ¶ 21.  By 2001, Calzuro was selling a molded clog that featured a "pivoting strap" in the United States. *Id.*

On February 7, 2006, the U.S. Patent and Trademark Office ("PTO") issued the '858 patent. *Id.* at 20, ¶ 25.  Crocs' co-founder, Scott Seamans, was listed as the sole

inventor.  *Id.*  Dawgs alleges that "[e]ach and every functional feature disclosed in the

['858] patent application, except the heel strap, already existed in the Battiston Molded

Clog."  *Id.* at 21, ¶ 26.  The '858 patent also contains diagrams and descriptions of the

Battiston molded clog, with the addition of a pivoting strap.  *Id.*  According to Dawgs,

"[s]traps have existed for many years on a wide variety of footwear."  *Id.*  By 2001,

Calzuro sold a molded clog with a pivoting strap attached by a rivet.  *Id.*  In addition, the

features identified in the '858 patent "were disclosed and described in Italian (utility)

Patent 00245068 filed in June 1998, published on December 22, 1999, and granted in

March 2002" ("the BIHOS Patent").  *Id.*

On March 28, 2006, the PTO issued the '789 design patent.  *Id.* at 22, ¶ 28.

Seamans was again listed as the sole inventor.  *Id.*  According to Dawgs, the '789

patent "contains diagrams of the base shoe that are substantially similar to the

diagrams that were created by Ettore Battiston in 2000 and assigned from Battiston to

[Foam Creations, Inc.], with a strap added that serves a functional purpose and such as

had previously existed for many years on a wide variety of footwear, including clogs."[3]

*Id.*  Accordingly, the shoe in the '789 patent is "not new and inventive nor invented and

designed by Seamans or by Crocs."  *Id.*

Crocs has been unable to secure patents similar to the '858 and '789 patents

outside the United States because of the "well-known existence of prior sales, the

widely-recognized existence of invalidating prior art, and the established identity of the

true and proper inventorship and origin of the shoe."  *Id.* at 24-25, ¶ 34; *see also id.*

---

[3]Foam Creations, Inc. is a predecessor or related entity to Crocs.  Docket No.
209 at 18, ¶ 20.

at 25-30, ¶¶ 35-49.

On March 31, 2006, just after the '789 patent issued, Crocs filed a complaint with the ITC against Double Diamond Distribution, Ltd. ("Double Diamond") and other respondents, alleging infringement and seeking a General Exclusion Order to ban the importation of molded clogs that infringed on Crocs' patents. *Id.* at 30, ¶ 50. The presiding Administrative Law Judge ("ALJ") and the ITC initially found that Double Diamond did not infringe the '789 patent and that the '858 patent was invalid as obvious in view of prior art. *Id.* at 31, ¶¶ 52-53. However, the Federal Circuit reversed the determination that the '858 patent was obvious and remanded the case to the ITC for further consideration. *Id.*, ¶ 54. The ALJ and the ITC then determined that Double Diamond and others had failed "to establish that the asserted patents were unenforceable." *Id.* at 32, ¶¶ 55-56. According to Dawgs, Crocs acted in the ITC proceedings "knowing that these patents were invalid and unenforceable." *Id.*, ¶ 57.

On April 3, 2006, Crocs filed the instant lawsuit alleging patent infringement even though Crocs "knew the patents identified incorrect inventorship and had been obtained by withholding material information from the patent examiner." *Id.* at 30, ¶ 51. On August 6, 2012, Crocs filed its first amended complaint, adding U.S.A. Dawgs, Inc. ("U.S.A. Dawgs") as a named defendant. *Id.* at 32, ¶ 58. Dawgs claims that this litigation is objectively baseless in light of the unenforceability of the patents and because, by the time Crocs filed the first amended complaint, it "knew or should have known" that the BIHOS patent "rendered the claims of at least the '858 patent" invalid. *Id.*

6

On August 3, 2012, Double Diamond filed an application for *inter partes* reexamination of the '858 patent with the PTO.  *Id.* at 33, ¶ 60.  On August 8, 2012, as retaliation for the filing of the application for reexamination, Crocs initiated a lawsuit against CVS Pharmacy, a retailer who sold USA Dawgs products.  *Id.* at 33-34, ¶¶ 61-62.  On August 24, 2012, USA Dawgs filed an application for *inter partes* reexamination with the PTO of the '789 patent.  *Id.* at 34, ¶ 63.  On April 29, 2013, the PTO issued a non-final Office Action rejecting the single claim of the '789 patent.  *Id.*, ¶ 64.  Crocs filed a response on July 29, 2013, which included a declaration from Scott Seamans stating that he is "the sole inventor" of the '789 patent.  *Id.* at 34-35, ¶ 65.  On February 11, 2016, the PTO once again rejected the sole claim of the '789 patent as unpatentable and closed the reexamination prosecution related to that patent.  *Id.* at 35, ¶ 66.

### C.  Dawgs' Counterclaims

Dawgs claims that, as a result of the foregoing conduct, Crocs has secured its own success, obtaining a market share for "molded clog-type footwear" in excess of 90%, and negatively impacted Dawgs.  *Id.* at 36-38, ¶¶ 69-74.

Dawgs brings twelve counterclaims against Crocs, Scott Seamans, and John and Jane Does 1-100.  Dawgs seeks several forms of declaratory relief against Crocs: a declaratory judgment for non-infringement of the '858 patent (first claim for relief); a declaratory judgment for non-infringement of the '789 patent (second claim for relief); a declaratory judgment of invalidity of the '858 patent (third claim for relief); a declaratory judgment of invalidity of the '789 patent (fourth claim for relief); and a declaratory

judgment of unenforceability of the '858 patent and the '789 patent based on inequitable conduct (fifth claim for relief). *Id.* at 39-54, ¶¶ 75-149.  In addition, Dawgs alleges claims related to anticompetitive conduct against, variously, Crocs, Seamans, and subsets of the John and Jane Does: actual monopolization in violation of § 2 of the Sherman Act (sixth claim for relief); attempted monopolization in violation of § 2 of the Sherman Act (seventh claim for relief); conspiracy to restrain trade in violation of § 1 of the Sherman Act (eighth claim for relief); conspiracy to monopolize in violation of § 2 of the Sherman Act (ninth claim for relief); unlawful exclusionary arrangements, agreements and conduct in violation of § 3 of the Clayton Act and §§ 1 and 2 of the Sherman Act (tenth claim for relief); intentional interference with business advantage (eleventh claim for relief); and violation of § 43(a) of the Lanham Act (twelfth claim for relief). *Id.* at 54-83, ¶¶ 150-262.

Crocs has moved to dismiss counterclaims five through twelve.[4]  Docket No. 227. Scott Seamans has moved to dismiss counterclaims six through nine[5] (the subset of counterclaims brought against him).  Docket No. 231.

## II.  STANDARD OF REVIEW

Dismissal of a claim under Rule 12(b)(6) is appropriate where a party fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to

---

[4]In the second amended answer and counterclaims, these claims for relief are counterclaims seven, and nine through fifteen.  Docket No. 487 at 53-70, ¶¶ 147-222; 72-108, ¶¶ 236-347.

[5]In the second amended answer and counterclaims these claims for relief are counterclaims nine through twelve.  Docket No. 487 at 72-100, ¶¶ 236-316.

relief." Fed. R. Civ. P. (8)(a)(2).  Rule 8(a)'s "short and plain statement" mandate

requires that a party allege enough factual matter that, taken as true, makes his "claim

to relief . . . plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir.

2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

      "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence

that the parties might present at trial, but to assess whether the plaintiff's complaint

alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v.*

*Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003).  In doing so, the Court "must

accept all the well-pleaded allegations of the complaint as true and must construe them

in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210,

1215 (10th Cir. 2007).

      Generally, "[s]pecific facts are not necessary; the statement need only 'give the

defendant fair notice of what the claim is and the grounds upon which it rests.'"

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at

555) (ellipses omitted).  The "plausibility" standard requires that relief must plausibly

follow from the facts alleged, not that the facts themselves be plausible. *Bryson*, 534

F.3d at 1286.

      However, "where the well-pleaded facts do not permit the court to infer more

than the mere possibility of misconduct, the complaint has alleged – but it has not

shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679

(2009) (internal quotation marks and alteration marks omitted).  Thus, even though

modern rules of pleading are somewhat forgiving, "a complaint still must contain either

direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (quotation marks and citation omitted).

## III. ANALYSIS

### A.  Inequitable Conduct (Fifth Claim for Relief)

Dawgs contends that the '789 patent and the '858 patent are unenforceable as a result of false declarations of inventorship and Crocs' failure to disclose information material to patentability.  The elements of inequitable conduct are: (1) an individual associated with the filing and prosecution of a patent application made an affirmative misrepresentation of a material fact, failed to disclose material information, or submitted false material information; and (2) the individual did so with a specific intent to deceive the PTO.  *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 n.3 (Fed. Cir. 2009) (citing *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008); *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178, 1181 (Fed. Cir. 1995); and 37 C.F.R. § 1.56 (2008)).  A heightened pleading standard applies to claims for inequitable conduct.  *Id.* at 1326.  It is therefore necessary for a party claiming inequitable conduct to "identify the specific who, what, when, where, and how of the material misrepresentation or omission [] before the PTO."  *Id.* at 1328.

#### 1. Inventorship

Dawgs argues that the '858 and '759 patents are unenforceable as a result of misrepresentations made by Seamans and Crocs in the patent applications.  According to Dawgs, Crocs filed U.S. Application No. 10/603,126 ("'126 application") on June 23,

10

2003.  Docket No. 209 at 41, ¶ 93.  The '126 application was granted as the '858

patent.  *Id.* at 45, ¶ 113.  The '126 application included a declaration from Scott

Seamans, which provided that:

> I/we believe that I/we am/are the original and first inventor(s) of the subject matter which is claimed and for which a patent is sought;
>
> I/we have reviewed and understand the contents of the above-identified application, including the claims, as amended by any amendment specifically referred to above;
>
> I/we acknowledge the duty to disclose to the United States Patent and Trademark Office all information known to me/us to be material to patentability as defined in 37 CFR 1.56, including for continuation-in-part applications, material information which became available between the filing date of the prior application and the national or PCT International filing date of the continuation-in-part application.
>
> All statements made herein of my/our own knowledge are true, all statements made herein on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and may jeopardize the validity of the application or any patent issuing thereon.

*Id.* at 43-44, ¶ 109.  Dawgs alleges that the Seamans declaration is false because

Seamans was not "the original and first inventor of the subject matter which is claimed."

*Id.* at 44, ¶ 110.  Dawgs does not specifically allege who should have been named as

an additional inventor on the '126 application.  Instead, the fifth counterclaim alleges

that the three independent claims of the '126 application were "directed to, intended to

cover, and [did] in fact cover" the molded clog designed by Ettore Battiston ("Battiston

molded clog") and the work-shoe created by Battiston ("Battiston work-shoe").  *Id.* at 42-

43 ¶¶ 96, 100, 102.  Dawgs goes on to allege that, "at the time the '126 application was

filed," both Seamans and Crocs were "aware" of the Battiston work-shoe, the Battiston

molded clog, and that Battiston conceived of the Battiston molded clog.  *Id.* at 43,

¶¶ 104-107.  In its response to the motion to dismiss, Dawgs reiterates that the claims

of the '858 patent "were directed to the Battiston Molded Clog and the Battiston work-

shoe" and that "Seamans was not the inventor of this subject matter."  Docket No. 249

at 5.  Dawgs asserts that the misrepresentation of inventorship was material to the

patentability of the '126 application.  Docket No. 209 at 46, ¶ 118.

On May 28, 2004, Crocs filed U.S. Application No. 29/206,427 ("'427

application"), which was granted as the '789 patent.  *Id.* at 47, ¶ 121; 49, ¶ 135.  Dawgs

states that, because the '427 application claimed priority to the '126 application, the

'427 application is infected by the Seamans declaration.  *Id.* at 47, ¶¶ 122-23.

Dawgs claims that Seamans also issued a false declaration during the

prosecution of the '858 patent, which Dawgs claims infected the '427 application.  *Id.* at

47, ¶¶ 121-23.  During the prosecution of the '858 patent, Seamans submitted a

declaration stating:

> I believe I am the original, first and sole inventor of the subject matter
> which is claimed and for which a patent is sought on the invention entitled:
> FOOTWEAR, which was filed on May 28, 2004, and assigned serial
> number 29/206,427.
>
> I have reviewed and understand the contents of the above identified
> specification, including the claims, as amended by any amendment
> referred to above.  I acknowledge the duty to disclose information which is
> material to patentability as defined in Title 37, Code of Federal
> Regulations, Section 1.56.

*Id.* at 48, ¶ 131.  As alleged in regard to the '126 application and the '858 patent,

Dawgs refers to the Battiston Molded Clog as being referenced by the claims of the

'427 application.  *Id*. at 47, ¶ 125.  According to Dawgs, the Seamans declaration was

false because Seamans was not "the original, first and sole inventor of the subject matter which is claimed and for which a patent [was] sought." *Id.*, ¶ 132.

During the reexamination of the '789 patent, Seamans and Crocs filed statements that Seamans is "the sole inventor of" the '789 patent and that the drawings contained in the '416 and '126 applications "were renderings of a strapped shoe that [Seamans] designed." *Id.* at 52, ¶ 145. Dawgs alleges that these statements were false. *Id.* at 53, ¶ 146.

In regard to the inventorship allegations of the fifth counterclaim, Crocs argues that Dawgs has not pled facts suggesting that Ettore Battiston was a joint inventor along with Scott Seamans and, therefore, Seamans' declarations were not false as a matter of law. Docket No. 227 at 3-4. The fifth counterclaim posits that, because the independent claims of the '126 application "cover" the Battiston molded clog and work-shoe, and the figures in the '427 application "depict" the Battiston molded clog, Seamans cannot be the sole inventor. Docket No. 209 at 42-43, ¶¶ 96-97, 99-100, 102-103; 47, ¶¶ 126-28. In other words, Dawgs claims that, because the Battiston molded clog and Battiston work-shoe are prior art, Seamans cannot be the named inventor for purposes of the '126 or '427 applications – or the '858 and '789 patents that were issued as a result. However, "[a] contribution of information in the prior art cannot give rise to joint inventorship because it is not a contribution to conception." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1362 (Fed. Cir. 2004). Accordingly, Dawgs does not sufficiently allege that Seamans was not the inventor, or the sole inventor, of the patents at issue. Dawgs also cannot show that Battiston and Seamans were joint

13

inventors of the relevant patents because the fifth counterclaim does not allege that

Seamans and Battiston collaborated or worked together to conceive of the relevant

invention.[6]  *Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1302 (Fed. Cir. 2010) ("A

joint invention is the product of collaboration of the inventive endeavors of two or more

persons working toward the same end and producing an invention by their aggregate

efforts.") (quoting *Monsanto Co. v. Kamp*, 269 F. Supp. 818, 824 (D.D.C. 1967)).

Dawgs' fifth counterclaim fails to state a claim for inequitable conduct based on

Seamans' allegedly false declarations regarding inventorship and that portion of its

counterclaim will be dismissed.

### 2.  Omissions

Dawgs also bases its claim for inequitable conduct on Crocs' failure to disclose

information material to patentability in the prosecution of the '858 and '789 patents.

Docket No. 209 at 49-52, ¶¶ 137-44.  Dawgs alleges that Crocs failed to disclose the

following: the identity and contributions of Ettore Battiston; correct inventorship; prior

sales of the patented shoes; prior art design and sales of "WALDIES"; prior art design

and sales of "EXPLORER"; Crocs' and/or Seamans' prior marketing sale and/or offer

for sale of the shoes relevant to the patents-in-suit; the BIHOS patent; and the Calzuro

molded clog.  *Id.* at 49-51, ¶ 137.  "[I]nequitable conduct, while a broader concept than

---

[6]The seventh counterclaim of the second amended answer and counterclaims states that "Seamans had met with Battiston prior to June 23, 2003," but does not allege that they collaborated.  Docket No. 487 at 57, ¶ 172.  Dawgs' theory – that Seamans is not the inventor of the relevant patents because he relied upon Battiston's prior art – remains the basis for Dawgs' claim in the seventh counterclaim.  *See* Docket No. 487 at 58, ¶ 180 ("[E]ven if Seamans did in fact conceive of the addition of a heel-strap to the Battiston Molded Clog . . . any contribution Seamans made later was in conjunction with Battiston's design.")

fraud, must be pled with particularity under Rule 9(b)." *Exergen*, 575 F.3d at 1326.

Crocs first argues that Dawgs' allegations of "intentional concealment are implausible because they contradict the ITC findings." Docket No. 227 at 5. Crocs does not argue that Dawgs' arguments are barred by res judicata or collateral estoppel. ITC findings related to the validity of patents do not have preclusive effect. *See Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1563-64 (Fed. Cir. 1996) (ITC decisions do not bind a subsequent federal court under the doctrine of claim preclusion); *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 851 F.2d 342, 344 (Fed. Cir. 1988) ("[T]his court has stated that the ITC's determinations regarding patent issues should be given no res judicata or collateral estoppel effect."). Moreover, Crocs cites no authority to use non-binding ITC findings to measure the "plausibility" of claims, although that may be true for certain allegations. The Court finds no basis to dismiss portions of the fifth counterclaim because ITC rulings are inconsistent with them.

Crocs next argues that, even if the information described by Dawgs was withheld from the PTO, Dawgs has failed to plead its claims with particularity. Docket No. 227 at 5. "[T]o plead the 'circumstances' of inequitable conduct with the requisite 'particularity' [required by Rule 9(b)] . . . the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen*, 575 F.3d at 1328. Dawgs' pleadings fail to meet this heightened standard.

Dawgs has failed to plead facts showing that the information withheld by Crocs was material. In the eight paragraphs in this portion of the fifth counterclaim, Docket

15

No. 209 at 49-52, ¶¶ 137-44, there is one reference to materiality, namely, that the "withheld references" were "clearly material." *Id.* at 51, ¶ 138.  In *Exergen*, the court considered the adequacy of a pleading that alleged inequitable conduct and stated that various withheld references were "material" and "not cumulative to the information already of record."  575 F.3d at 1329.  The Federal Circuit found that the allegations were deficient because they did not "identify the particular claim limitations, or combination of claim limitations, that are supposedly absent from the information of record."  *Id.*  The court stated that such allegations are necessary to explain why "withheld information is material" and how an examiner "would have used this information in assessing the patentability of the claims."  *Id.* at 1329-30.  Dawgs' allegations are similarly deficient.  The bare allegation that withheld references are "clearly material" does not explain why or how any withheld information was material to patentability as required by Rule 9(b).  Accordingly, Dawgs' fifth counterclaim is deficient.

Crocs also argues that Dawgs fails to plead the requisite scienter for the claimed omissions.  Docket No. 227 at 5.  While a party may allege "knowledge" and "intent" generally, the pleadings must allege facts "from which a court may reasonably infer that a party acted with the requisite state of mind." *Exergen*, 575 F.3d at 1327.  In alleging the elements of inequitable conduct, the pleading party must present facts from which it may be "plausibly inferred [that] . . . the intent to deceive is the single most likely explanation for the non-disclosure." *Pfizer Inc. v. Teva Pharm. USA, Inc.*, 803 F. Supp. 2d 409, 432 (E.D. Va. 2011).  A pattern of non-disclosures by a particular individual can

support an inference that non-disclosure was made with specific intent to deceive.  *See Sanders v. The Mosaic Co.*, 418 F. App'x 914, 919 (Fed. Cir. 2011) (unpublished) (affirming denial of a motion to dismiss where the pleadings alleged that an expert failed to disclose pertinent business relationships, omitted relevant publications from a curriculum vitae submitted to the PTO, and used an expert declaration written in significant part by an employee of another party).

The fifth counterclaim states that deceptive intent is evidenced by several facts: Crocs' withholding of references from the PTO, Crocs' sale of shoes in 2002 that fell within the scope of the '789 patent, Crocs' non-disclosure of a copyright agreement with a third party, Crocs' use of stickers to add a Crocs logo to another manufacturer's shoes it sold, Crocs' refusal to name additional inventors, and Crocs' decision not to enforce its patent against the Calzuro molded clog.  Docket No. 209 at 51-52, ¶¶ 138-143.  However, non-disclosure of facts, without more, does not show specific intent to deceive the PTO.  *Pfizer*, 803 F. Supp. 2d at 432.  Dawgs nowhere links the alleged non-disclosures to deceptive intent.[7]  For instance, Dawgs states that Crocs failed to disclose the existence of a copyright agreement, but does not state how or why the copyright agreement was material to patentability.  Docket No. 209 at 51, ¶ 140.  While

---

[7]In the seventh counterclaim of the second amended answer and counterclaims, Dawgs argues that prior sales were "widely known" within Crocs and Crocs knew "that if Crocs' own sales in 2002 were presented to the Patent Office that they would not be able to obtain the '789 patent."  Docket No. 487 at 67, ¶¶ 211-12.  To support this statement, Dawgs points out that "the Patent Office has repeatedly rejected the '789 patent during reexamination as unpatentable in view of a publication from Crocs' website promoting the footwear that it concedes is 'within the scope' of the patent."  Docket No. 487 at 67, ¶ 211.  This amended counterclaim is inadequate because it does not plausibly suggest intent to deceive; it merely shows knowledge and materiality.

Dawgs does allege that Crocs chose not to challenge the Calzuro molded clog because the BIHOS reference would have led to the invalidation of the '858 patent,[8] Docket No. 209 at 52, ¶ 143, there is no factual allegation that a specific individual with a duty to disclose information to the PTO believed that the Calzuro molded clog was an infringing product. *Exergen*, 575 F.3d at 1330 ("[O]ne cannot assume that an individual, who generally knew that a reference existed, also knew of the specific material information contained in that reference."); *id.* at 50-51, ¶ 137 (g-h) (describing the BIHOS patent and Calzuro Molded Clog without reference to individuals or subjective knowledge).

Accordingly, because Dawgs fails to allege facts supporting an inference of inequitable conduct for Crocs' alleged omissions, that portion of Dawgs' fifth counterclaim will be dismissed.

## B. Monopolization Counts (Sixth, Seventh, and Ninth Claims for Relief)

Dawgs' sixth, seventh, and ninth claims for relief all relate to violations of the Sherman Act by Crocs, Seamans, and the John and Jane Does. Docket No. 209 at 54-68, ¶¶ 150-194; 72-75, ¶¶ 213-231. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). Therefore, to state a claim for monopolization, Dawgs must plead power in a relevant market and anticompetitive

---

[8]According to the first amended answer and counterclaims, the Calzuro molded clog was made of rubber, not foam. Docket No. 209 at 19, ¶ 21. Crocs states that this fact puts the Calzuro molded clog outside the scope of its patents. Docket No. 227 at 5 n.6.

conduct. *Id.*

Both Crocs and Seamans raise identical arguments concerning Dawgs' monopoly claims, the sixth, seventh, and ninth claims for relief. *See* Docket No. 227 at 6-15, 18-19; Docket No. 231 at 3-10. Accordingly, the Court considers these claims together.

### 1. Anticompetitive Conduct

The anticompetitive conduct discussed in the first amended counterclaims relates to a pattern of sham litigation and the enforcement of fraudulently procured patents. Docket No. 209 at 61-62, ¶ 173. "Those who petition government for redress are generally immune from antitrust liability." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) ("*PRE*"). This protection stems from the First Amendment right to petition the Government. *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 379 (1991). Even if a party's motives in seeking redress from the government are anti-competitive, the *Noerr-Pennington* doctrine "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Id.* at 380 (citing *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 141 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965)). This immunity applies to individuals and entities who seek relief in the courts. *PRE*, 508 U.S. at 56-57 (discussing *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)). Because Crocs has invoked the *Noerr-Pennington* doctrine, the burden is on Dawgs to show that it does not apply. *Lala v. Frampton*, No. 07-cv-02144-MSK-CBS, 2008 WL 4059874, at *6 (D. Colo. Aug. 28, 2008) (citing *Aetna*

*U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 54 F. Supp. 2d 1042, 1053 (D. Kan. 1999)).

There are two relevant exceptions to the *Noerr-Pennington* doctrine.  First, under the so-called *Walker Process* exception, where a patent is procured by fraud, immunity does not apply to the enforcement of that patent.  *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965).   Second, immunity does not apply where petitioning the government "is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor."  *PRE*, 508 U.S. at 56 (citing *Noerr*, 365 U.S. at 144).

In order to prevail on a *Walker Process* claim, Dawgs must allege that the party seeking to enforce a patent "obtained the patent by knowing and willful fraud on the [PTO] and maintained and enforced the patent with knowledge of the fraudulent procurement."  *TransWeb, LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016).  In support of its monopoly allegations, Dawgs refers to the same allegations underlying its claims for inequitable conduct, namely, that Crocs, Seamans, and the John and Jane Does "fraudulently procured patents from the U.S. Patent Office by failing to disclose proper inventorship as well as known material, invalidating prior art, and prior sales."  Docket No. 209 at 58, ¶ 163.  This anticompetitive conduct relates to the same thing – procuring and enforcing patents.  *See id.* at 58-60, ¶¶ 163-70.

Crocs argues that Dawgs has failed to adequately allege fraud on the PTO as required to state a *Walker Process* claim.  Docket No. 227 at 13.  In response, Dawgs directs the Court to its arguments in support of its inequitable conduct claim.  Docket

No. 249 at 8 ("These arguments all fail for the same reasons that Crocs' criticism of the inequitable conduct claims fails."). "[T]he showing required for proving inequitable conduct and the showing required for proving the fraud component of *Walker Process* liability may be nearly identical." *Transweb*, 812 F.3d at 1307. However, the Court has already rejected Dawgs' inequitable conduct claim. For the reasons discussed above, Dawgs' allegations of anticompetitive conduct are factually inadequate and fail to plead the scienter required to support a *Walker Process* claim. Dawgs has not carried its burden of showing that Crocs' conduct falls within the *Walker Process* exception to *Noerr-Pennington* immunity. Accordingly, the Court considers whether Dawgs has adequately alleged a pattern of sham litigation.

The sham litigation exception consists of two parts. First, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." Second, from the subjective perspective of the accused party, the lawsuit must conceal "an attempt to interfere directly with the business relationships of a competitor." *PRE*, 508 U.S. at 60-61. The classic example of a sham lawsuit is the filing of frivolous objections to the license application of a competitor simply to impose expense and delay. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972). There is a "presumption that the assertion of infringement of a duly granted patent is made in good faith." *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1377 (Fed. Cir. 2011) (quoting *Brooks Furniture Mfg., Inc. v. Dutailier Int'l*, Inc., 393 F.3d 1378, 1382 (Fed. Cir. 2005)).

Crocs states that its patent lawsuits cannot be considered objectively baseless

because Crocs has prevailed against Dawgs in the Federal Circuit and the ITC.  Docket No. 227 at 10.  The Court agrees.  "A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."  *PRE*, 508 U.S. at 60 n.5.  The Federal Circuit considered and rejected the argument that the '858 patent was obvious in light of prior art.  Docket No. 209 at 31, ¶ 54; *see also Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1311 (Fed. Cir. 2010) ("In light of the prior art teaching away from the claimed invention and the claimed features that do not appear in the prior art, this court detects several reasons at the time of the invention that an ordinary artisan would not have been motivated even to try, let alone make, this inventive combination.").  These rulings establish that Crocs' lawsuits are not objectively baseless.  Dawgs argues that, because Crocs is engaged in a "pattern" of litigation, success on the merits on one occasion does not show it is not engaged in a sham litigation campaign.  Docket No. 249 at 9.  However, the series of lawsuits described in the sixth, seventh, and ninth counterclaims all relate to the enforcement of the same patents.  Docket No. 209 at 30-33, ¶¶ 50-59.  In light of Crocs' success before the ITC, Crocs' lawsuits had potential merit.  Dawgs does not overcome the presumption that Crocs' assertion of infringement of its patents is not made in good faith.

Dawgs has not pled sufficient facts to support a claim based on fraud on the PTO or demonstrated that Crocs is engaged in "sham" litigation sufficient to fit within an exception to *Noerr-Pennington* immunity.  Accordingly, the Court finds that Crocs is immune from antitrust liability for the conduct described in the sixth counterclaim, which

will be dismissed.[9]

### 2. Attempted Monopolization and Conspiracy to Monopolize

A claim for attempted monopolization must allege "(1) that the defendant has

engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize

and (3) a dangerous probability of achieving monopoly power." *Christy Sports*, 555

F.3d at 1192 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

To state a claim for conspiracy to monopolize, Dawgs must plead "conspiracy, specific

intent to monopolize, and overt acts in furtherance of the conspiracy." *Full Draw Prods.*

*v. Easton Sports, Inc.*, 182 F.3d 745, 756 (10th Cir. 1999) (quotation omitted).  A claim

that depends on specific intent to monopolize hinges on "'predatory conduct,' which is

'conduct that is in itself an independent violation of the antitrust laws or that has no

legitimate business justification other than to destroy or damage competition.'" *Re/Max*

*Int'l v. Realty One, Inc.*, 900 F. Supp. 132, 153 (N.D. Ohio 1995) (quoting *Great*

*Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986)).  Accordingly, in

order to state a claim for attempted monopolization or conspiracy to monopolize, Dawgs

must allege predatory conduct.

As discussed in the previous section, Crocs is immune from suit for seeking and

enforcing its patents.  *Boulware v. State of Nev., Dep't of Human Res.*, 960 F.2d 793,

796 (9th Cir. 1992) (dismissal is proper where "the defendant's allegedly anticompetitive

---

[9]Dawgs requests that the Court take judicial notice of materials from Crocs' website and from various SEC filings.  Docket No. 251.  The materials proffered by Dawgs relate to its descriptions of the relevant market for monopoly purposes.  *Id.* Because the Court finds that Crocs' allegedly anticompetitive conduct is subject to immunity pursuant to *Noerr-Pennington*, the Court denies Dawgs' motion for judicial notice as moot.

conduct is protected by the *Noerr-Pennington* doctrine.").  Such actions by Crocs are the only potentially predatory conduct described in the seventh and ninth counterclaims. *See* Docket No. 209 at 67-68, ¶ 193; 72, ¶ 216.  Accordingly, Dawgs' seventh and ninth counterclaims will be dismissed.[10]

### C.  Conspiracy to Restrain Trade (Eighth Claim for Relief)

Dawgs alleges that Crocs and Seamans violated § 1 of the Sherman Act by conspiring to restrain trade.  Docket No. 209 at 68-72, ¶¶ 195-212.  Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  To plead a claim for conspiracy to restrain trade, Dawgs must show: "(1) an agreement to enter a conspiracy (2) designed to achieve an unlawful objective."  *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993).  Crocs and Seamans argue that Dawgs' claim should be dismissed because the underlying conduct, the assertion of infringement of the '858 and '789 patents, is not anticompetitive.[11]  Docket No. 227 at 18-19; 231 at 8-9.

---

[10]Crocs and Seamans' motions to dismiss informed Crocs of the defects in the first amended answer and counterclaims.  Docket Nos. 227, 231.  Despite being on notice of these issues, Dawgs' second amended answer and counterclaims failed to add the requisite detail to state a claim for antitrust liability.  Due to Dawgs' failure to adequately amend the counterclaims and the clear deficiencies in the pleadings, the Court dismisses these claims with prejudice.  *See Radiancy, Inc. v. Viatek Consumer Prod. Grp., Inc.*, 138 F. Supp. 3d 303, 325 (S.D.N.Y. 2014).

[11]Dawgs does not respond to this argument.  Instead, Dawgs argues that the intracorporate conspiracy doctrine, which applies to corporate employees accused of conspiring, does not apply.  Docket No. 250 at 7-9.  The intracorporate conspiracy doctrine was not discussed by either Crocs or Seamans in their motions to dismiss and the Court does not consider its applicability here.

The eighth counterclaim states that "Crocs and Scott Seamans have and are continuing to conspire to assert the '858 patent and '789 patent against Double Diamond, USA Dawgs, and CVS, despite their knowledge that both patents are invalid and/or unenforceable."  Docket No. 209 at 68, ¶ 198.  Thus, the objective of the conspiracy between Seamans and Crocs is alleged to be the defense and enforcement of their patents.  As discussed above, such conduct is subject to immunity from antitrust liability.[12]  *See PRE*, 508 U.S. at 59 (applying *Noerr-Pennington* immunity to §§ 1 and 2 of the Sherman Act).

Accordingly, Dawgs' eighth claim for relief will be dismissed.

### D.  Unlawful Exclusionary Arrangements, Agreements, and Conduct (Tenth Claim for Relief)

Dawgs' tenth claim for relief alleges violations by Crocs and a subset of the John and Jane Doe defendants of §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act for entering into unlawful exclusionary arrangements and agreements with buyers and distributors.  Docket No. 209 at 76-80, ¶¶ 232-250.  Exclusive dealing arrangements are not unlawful in the absence of anticompetitive effects.  *Tampa Elec. Co. v. Nashville*

---

[12]Patent misuse, as opposed to the enforcement of patent rights, is not necessarily exempt from Sherman Act protections.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 136 (1969) ("[T]here are established limits which the patentee must not exceed in employing the leverage of his patent to control or limit the operations of the licensee.").  While the first amended counterclaims make occasional reference to "patent misuse," *see, e.g.,* Docket No. 209 at 56, ¶ 157, there are no factual allegations in the first amended complaint suggesting that Crocs has impermissibly expanded the scope of its patents.  Instead, the allegations in the complaint go to invalidity and enforceability, not to the scope of Crocs' patent assertions.  *See Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1339 (Fed. Cir. 2006) (noting that patent misuse cannot be shown where allegedly anticompetitive restrictions are "within the patent grant").

*Coal Co.*, 365 U.S. 320, 327 (1961).  In order to state a claim for unlawful use of exclusionary agreements under these provisions, Dawgs must show that Crocs' exclusive dealing arrangements foreclose competition in a substantial share of the line of commerce affected.  *Tampa Elec.*, 365 U.S. at 327.  In addition, Dawgs must show anticompetitive effects resulting from "a substantial foreclosure of their ability to compete in the relevant market."  *See Compliance Mktg., Inc. v. Drugtest, Inc., No. 09-cv-01241-JLK, 2010 WL 1416823, at *8 (D. Colo. Apr. 7, 2010) (citing *Tampa*, 365 U.S. at 328).  Dawgs states that the relevant market is "molded clog-type footwear." Docket No. 209 at 76, ¶ 235.

The tenth counterclaim is bereft of any facts suggesting that Crocs' actions substantially foreclosed a substantial share of the relevant market or Dawgs' ability to compete.  Dawgs states that Crocs and the relevant subset of John and Jane Does have engaged in the following actions:

> (a) Crocs and John and Jane Does 1 through 100, Subset E successfully threatened, intimidated, and coerced actual and potential purchasers of Counterclaim Plaintiffs' footwear products not to deal with Counterclaim Plaintiffs;
>
> (b) Crocs and John and Jane Does 1 through 100, Subset E induced, organized, and implemented a refusal to deal among buyers/distributors, including Academy Sports and others, not to distribute or purchase Counterclaim Plaintiffs' footwear products;
>
> (c) Crocs and John and Jane Does 1 through 100, Subset E conditioned the payment or allowance of discounts and rebates provided on the purchase of Crocs' footwear products, on an agreement not to deal with or purchase competitive products from Counterclaim Plaintiffs;
>
> (d) Crocs and John and Jane Does 1 through 100, Subset E entered into actual or de facto/implied exclusive dealing arrangements with various customers; and

(e) Crocs and John and Jane Does 1 through 100, Subset E have entered into agreements that prevent Crocs' customers from selling products "similar" to Crocs.

Docket No. 209 at 77-78, ¶ 240.[13]

The tenth counterclaim fails to allege a particular exclusive dealing agreement between Crocs and a buyer or distributor.  While the tenth counterclaim states that "Academy Sports, and others, [] informed Counterclaim Plaintiffs that the reason they would not carry Counterclaim Plaintiffs' products is because of agreements with Crocs," Docket No. 209 at 78-79, ¶ 243, nowhere in the counterclaim does Dawgs specify the nature of any such arrangement, e.g., whether the agreements bar purchases from Crocs' competitors, provide discounts for carrying a specified volume, or otherwise incentivize exclusivity.  Moreover, Dawgs fails to allege "any facts demonstrating the total volume of commerce involved" in the exclusive dealing agreements.  *Compliance*, 2010 WL 1416823, at *9.  There are, accordingly, no allegations in the tenth counterclaim plausibly suggesting that the exclusive dealing arrangements have a substantial effect on the total volume of commerce involved in the market for molded clog-type footwear.  *Tampa Elec.*, 365 U.S. at 329 (stating that substantiality requires a court "to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate

---

[13]The thirteenth counterclaim of the second amended answer and counterclaims adds additional detail regarding buyers and distributors who may have chosen not to distribute Dawgs' products as a result of exclusivity deals.  *See* Docket No. 487 at 101-103, ¶ 325.  However, while the thirteenth counterclaim states that Crocs' practices "have foreclosed competition in a substantial share of the relevant market," *id.* at 104, ¶ 332, there are no facts related to the scope of such arrangements or the total volume of commerce involved.  Dawgs' thirteenth counterclaim is accordingly deficient in an identical manner.

volume of commerce involved in relation to the total volume of commerce in the

relevant market area, and the probable immediate and future effects which pre-emption

of that share of the market might have on effective competition therein.").

In the absence of factual allegations related to the nature of Crocs' alleged

exclusive arrangements[14] or allegations related to how those agreements significantly

impair competition, Dawgs' tenth claim for relief is deficient and will be dismissed.

### E.  Intentional Interference With Business Advantage (Eleventh Claim for Relief)

Dawgs' eleventh claim for relief, presumably a state law claim, is brought against

Crocs and a subset of John and Jane Does alleging intentional interference with

business advantage.  Docket No, 209 at 80-82, ¶¶ 251-254.  Under Colorado law,

"[o]ne who intentionally and improperly interferes with another's prospective contractual

relation . . . is subject to liability to the other for the pecuniary harm resulting from loss

of the benefits of the relation, whether the interference consists of (a) inducing or

otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation." *Harris

Grp., Inc. v. Robinson*, 209 P.3d 1188, 1195-96 (Colo. App. 2009) (quoting

Restatement (Second) of Torts § 766B (1979)).  In order to qualify as a protected

relationship, "there [must be] a reasonable likelihood or probability that a contract would

have resulted; there must be something beyond a mere hope." *Klein v. Grynberg*, 44

---

[14]The second amended counterclaims attach a declaration from William H. Billings, Jr. stating that Crocs required him to sign an exclusivity contract and that, as a result, his company, lionfootweardirect.com, stopped selling competing molded-foam clogs.  Docket No. 487-3 at 4-5, ¶ 11.  These additional facts still fail to show how these exclusive dealing arrangements foreclosed competition in the relevant market.

F.3d 1497, 1506 (10th Cir. 1995).

The first amended counterclaims repeat the list of interfering conduct described in Dawgs' tenth counterclaim:

> (a) Crocs and John and Jane Does 1 through 100, Subset E successfully threatened, intimidated, and coerced actual and potential purchasers of Counterclaim Plaintiffs' footwear products not to deal with Counterclaim Plaintiffs;
>
> (b) Crocs and John and Jane Does 1 through 100, Subset E induced, organized, and implemented a refusal to deal among buyers/distributors, including Academy Sports and others, not to distribute or purchase Counterclaim Plaintiffs' footwear products;
>
> (c) Crocs and John and Jane Does 1 through 100, Subset E conditioned the payment or allowance of discounts and rebates provided on the purchase of Crocs' footwear products, on an agreement not to deal with or purchase competitive products from Counterclaim Plaintiffs;
>
> (d) Crocs and John and Jane Does 1 through 100, Subset E entered into actual or de facto/implied exclusive dealing arrangements with various customers; and
>
> (e) Crocs and John and Jane Does 1 through 100, Subset E have entered into agreements that prevent Crocs' customers from selling products "similar" to Crocs.

Docket No. 209 at 80-81, ¶ 252.  Dawgs does not plead facts plausibly suggesting a reasonable likelihood of contracting with a particular third party.[15]  *See Savant Homes, Inc. v. Collins*, No. 13-cv-02049-WJM-MEH, 2015 WL 899302, at *10 (D. Colo. Feb. 27, 2015) (granting summary judgment where there was no evidence related to individuals in the process of contracting with plaintiff).  In the absence of any allegations regarding such a relationship, Dawgs' claim is deficient.

---

[15]While the second amended counterclaims list additional buyers and distributors, there are no additional facts alleged related to the likelihood of a contractual relationship arising.  *See* Docket No. 487 at 105-106, ¶ 337.

The Court finds that Dawgs has failed to state a claim for intentional interference with business advantage.  Accordingly, Dawgs' eleventh claim for relief will be dismissed.

### F.  Violation of Section 43(a) of the Lanham Act (Twelfth Claim for Relief)

Dawgs' twelfth claim for relief is brought pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against Crocs.  Docket No. 209 at 82-83, ¶¶ 255-262.  Section 43(a)(1)(B) provides for liability against any person:

> who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . .  in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

15 U.S.C. § 1125(a)(1)(B).  The twelfth counterclaim states that "Crocs has been misleading the public and consumers by claiming that their [sic] footwear is made of an exclusive and proprietary closed-cell resin that they call 'Croslite.'" Docket No. 209 at 82, ¶ 256.  "Croslite" is in fact ethyl vinyl acetate, which is used by footwear companies around the world, including Dawgs.  *Id.*  Dawgs also claims that Crocs' promotional materials refer to "our patented Croslite$^{TM}$ material" and "our proprietary Croslite$^{TM}$ material," and that Croslite is a "revolutionary technology."  *Id.* at 19, ¶ 22.  Dawgs claims that, on information and belief, "Crocs does not own any exclusive proprietary or patent rights to the material from which its footwear is made."  *Id.*  Dawgs alleges that the descriptions of Croslite have misled consumers into believing that Crocs uses a different material from competitors and that Crocs owns the rights to such material.  *Id.*,

¶ 257.  As a result, Dawgs alleges that consumers are deceived into concluding that the products sold by Dawgs are "made of inferior material compared to Crocs' molded footwear."  *Id.* at 83, ¶ 260.  Dawgs claims that, in the absence of an injunction and a court-ordered retraction, Crocs' promotional activities will cause it to "suffer a loss of consumer confidence, sales, profits, and goodwill."  *Id.*, ¶ 262.

Crocs argues that Dawgs has failed to allege standing under the Lanham Act or a cognizable injury that was proximately caused by the alleged Lanham Act violation.  Docket No. 227 at 19-20.  The basis for Crocs' argument is *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).  In *Lexmark,* the Supreme Court laid out a two-step test to determine when a party can sue under § 43(a) of the Lanham Act.  *Id.* at 1388-90.  First, the party raising a Lanham Act claim must "fall within the zone of interests protected by the [Lanham Act]."  *Id*. at 1388.  Second, the injury alleged must be "proximately caused by violations of the statute."  *Id.* at 1390.

The Supreme Court held that the zone of interests for a false advertising claim under the Lanham Act encompasses plaintiffs who suffer "an injury to a commercial interest in reputation or sales."  *Id.*  In order to demonstrate proximate cause under the Lanham Act, a plaintiff "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff."  *Id.* at 1391.

*Lexmark* does not foreclose Dawgs' claim at the pleading stage.[16]  Dawgs fits

---

[16]Although Dawgs "has alleged an adequate basis to proceed under § 1125(a), it cannot obtain relief without evidence of injury" proximately caused by Crocs' alleged misrepresentations.  *Lexmark*, 134 S. Ct. at 1395.  Dawgs "is entitled to a chance to prove its case."  *Id.*

within the zone of interests of the Lanham Act because it is a direct competitor with

Crocs who alleges an injury to reputation or sales.  Docket No. 209 at 83, ¶ 260.  In

terms of causation, Dawgs alleges that Crocs' purportedly false descriptions of Croslite

have caused or will cause "a loss of consumer confidence, sales, profits, and goodwill."

*Id*., ¶ 262.  These injuries "flow[] directly from the deception" caused by Crocs'

advertising.  *Lexmark*, 134 S. Ct. at 1391.

Crocs cites *Critical Nurse Staffing, Inc. v. Four Corners Health Care Corp.*, 2014

WL 2739279 (D. Utah June 17, 2014), to show that Dawgs' pleadings are inadequate,

but the plaintiff in *Critical Nurse* failed to plead any facts to suggest "whether the [false

or misleading] statements were made in connection with commercial advertising, in

commerce, and caused confusion, or were likely to cause confusion, amongst Plaintiff's

clients."  *Id.* at *5.  Dawgs has pled facts to support its argument that Crocs has

advertised its products using the term "Croslite," that its descriptions of Croslite were

false, and that those descriptions have misled consumers about Dawgs' products.

Accordingly, Dawgs' twelfth claim for relief sufficiently states a claim at this stage

in the proceedings.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Crocs, Inc.'s Motion to Dismiss Counterclaims V-XII [Docket No.

227] is granted in part and denied in part and Scott Seamans' Motion to Dismiss

Counterclaims VI-IX [Docket No. 231] is granted.  It is further

**ORDERED** that Dawgs' seventh, ninth, tenth, eleventh, twelfth, thirteenth, and

fourteenth claims for relief are dismissed with prejudice.[17]   Docket No. 487.  It is further

**ORDERED** that defendants Scott Seamans and John and Jane Does 1-100 are

dismissed from this lawsuit.

DATED March 31, 2017.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

---

[17]These claims are the claims for relief in Dawgs' second amended answer and counterclaims equivalent to those discussed in this order.