IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 06-cv-00605-PAB-KMT
        (Consolidated with Civil Action No. 16-cv-02004-PAB-KMT)

Civil Action No. 06-cv-00605-PAB-KMT

CROCS, INC.,

        Plaintiff,

v.

EFFERVESCENT, INC.,
HOLEY SOLES HOLDINGS, LTD.,
DOUBLE DIAMOND DISTRIBUTION, LTD., and
U.S.A. DAWGS, INC.,

        Defendants.

Civil Action No. 16-cv-02004-PAB-KMT

U.S.A. DAWGS, INC. and
DOUBLE DIAMOND DISTRIBUTION, LTD.,

        Plaintiffs,

v.

RONALD SNYDER,
DANIEL HART,
THOMAS J. SMACH,
ANDREW REES,
GREGG RIBATT,
ANDREW REDDYHOFF,
GEORGE B. BOEDECKER, JR.,
LYNDON HANSON,
DONALD LOCOCO,
RAYMOND CROGHAN,
RONALD FRASCH,
MICHAEL MARGOLIS,
JEFFREY LASHER,
MICHAEL E. MARKS,
PRAKASH MELWANI,

JOHN P. MCCARVEL,
ERIK REBICH,
SARA HOVERSTOCK, and
JOHN AND JANE DOE DEFENDANTS 1-30,

      Defendants.

---

**ORDER**

---

This matter is before the Court for the construction of U.S. Patent No. 6,993,858 (the "'858 Patent") [Docket No. 312-1] and U.S. Patent No. D517,789 (the "'789 Patent") [Docket No. 312-2] (collectively, the "patents"). Crocs, Inc. ("Crocs") alleges that defendants Double Diamond Distribution, Ltd. and U.S.A. Dawgs, Inc. (collectively "Dawgs") have infringed the patents. The parties ask the Court to construe certain disputed terms in the patents. Docket No. 402. On June 6, 2017, the Court held a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), on these terms.

## I.  THE '858 PATENT

### A.  Background

The '858 Patent is related to footwear with ventilation. Docket No. 312-1, '858 Patent col. 1 ll. 20-21. The footwear is molded from a lofted material. *Id.* col. 1 l. 43. The footwear includes a strap section that is attached to the base "such that the strap pivots relative to the base section." *Id.* col. 2 ll. 1-2. The strap "serves the utilitarian purpose of lending support to the Achilles portion of the human foot." *Id.* col. 6 ll. 19-21. The "frictional force developed between strap [] and upper [] . . . is sufficient to

maintain [the] strap in place. . . . Without such friction, strap [] would succumb to gravity and fall to a position where the foot would not be supported." *Id.* col. 6 ll. 23-29.

The '858 Patent has two claims. Claim one of the '858 Patent describes:

A footwear piece comprising:

> a base section including an upper and a sole formed as a single part manufactured from a moldable foam material; and

> a strap section formed of a moldable material that is attached at opposite ends thereof to the upper of the base section with plastic connectors such that the moldable foam material of the strap section is in direct contact with the moldable material of the base section and pivots relative to the base section at the connectors;

> wherein the upper includes an open rear region defined by an upper opening perimeter, and wherein frictional forces developed by the contact between the strap section and the base section at the plastic connectors are sufficient to maintain the strap section in place in an intermediary position after pivoting, whereby the strap section lends support to the Achilles portion of the human foot inserted in the open rear region; and

> wherein the upper includes a substantially horizontal portion and a substantially vertical portion forming a toe region that generally follows the contour of a human foot, wherein the toe region tapers from an inner area of the base section where the larger toes exist to an outer area of the base section where the smaller toes exist; and

> wherein the sole includes a bottom surface having front and rear tread patters longitudinally connected by a flat section.

*Id.* col. 9 ll. 36-60; col. 10 ll. 1-3.

Claim two of the '858 Patent describes:

A footwear piece comprising:

> a base section including an upper and a sole formed as a single part manufactured from a moldable foam material; and

a strap section formed of a molded foam material attached at opposite ends thereof to the base section such that the strap section is in direct contact with the base section and pivots relative to the base section; and

wherein the upper includes an open rear region defined by an upper opening perimeter; and wherein the sole includes a rear perimeter; and wherein the strap section pivots between a first contact point on the upper opening perimeter and a second contact point on the rear perimeter, and wherein frictional forces developed by the contact between the strap section and the base section at the points of attachment are sufficient to maintain the strap section in place in an intermediary position after pivoting whereby the strap section lends support to the Achilles portion of a human foot inserted in the open rear region; and

wherein the upper includes a substantially horizontal portion and a substantially vertical portion forming a toe region that generally follows the contour of a human foot, wherein the toe region tapers from the inner area of the base section where the larger toes exist to the outer area of the base section where the smaller toes exist; and

wherein a decorative pattern of raised bumps is molded or otherwise created in the upper near to and extending the length of the upper opening perimeter; and

wherein a plurality of ventilators are formed in both the substantially vertical portion and the substantially horizontal portion, and wherein the ventilators extend up a majority of the height of the vertical portion;

wherein the vertical portion of the upper includes an upper strip, wherein the ventilators are formed in the upper strip, and wherein the upper strip extends from the toe region to the points of attachment for the strap section, and wherein the sole includes a lower strip that parallels the upper strip and is separated by a line that extends from the toe region to a heel of the footwear piece, and wherein the lower strip vertically rises in a direction toward the heel; and

wherein the sole includes a bottom surface having front and rear tread patters longitudinally connected by a flat section without tread patterns bounded by raised side portions; and

4

wherein the sole further includes a top surface having a support base including a raised pattern where a foot contacts the support base.

*Id.* col. 10 ll. 4-58.

### B.  Legal Standards for Claim Construction of Utility Patents

Claim construction is a question of law for the court, *see Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc), guided by Federal Circuit precedent.  *See SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1333 (Fed. Cir. 1999).  The Federal Circuit has made clear that "there is no magic formula or catechism for conducting claim construction."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc).  Nevertheless, there are several key sources and doctrines that should be consulted and applied, but "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law."  *Id.*

The starting point is the "bedrock principle" that "'the claims of the patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The words of the claims "'are generally given their ordinary and customary meaning,'" *id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)), which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," *id.* at 1313; *see CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("Generally

speaking, [courts] indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning."). In those instances when the claim language "involves little more than the application of the widely accepted meaning of commonly understood words," construction is relatively straightforward and "the ordinary meaning . . . may be readily apparent even to lay judges." *Phillips*, 415 F.3d at 1314. When the claim terms have a particular meaning in the field, however, courts "look[ ] to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (quoting *Innova*, 381 F.3d at 1116). These sources include "'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.*

The context in which a term is used, both in the asserted claim as well as in other claims of the patent, can be valuable and instructive. *Id.* at 1314. In addition, the patent specification – the text and figures of the patent that precede the claims – "'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). With that said, "the claim requirement presupposes that a patent applicant defines his invention in the claims, not in the specification." *Johnson & Johnston Associates Inc. v. R.E. Service Co., Inc.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002); *see PSC Computer Products, Inc. v. Foxconn Intern., Inc.*, 355 F.3d 1353, 1359 (Fed. Cir. 2004) ("'[T]he claims of a patent limit the invention, and specifications cannot

be utilized to expand the patent monopoly[.]'") (quoting *United States v. Adams*, 383
U.S. 39, 48-49 (1966)).

If necessary, courts may also consider the patent's prosecution history – the
official record of the patent application and subsequent process before the U.S. Patent
and Trademark Office, which "provides evidence of how the PTO and the inventor
understood the patent."  *Phillips*, 415 F.3d at 1317.  Nevertheless, "because the
prosecution history represents an ongoing negotiation between the PTO and the
applicant, . . . it often lacks the clarity of the specification and thus is less useful for
claim construction purposes."  *Id.*  And, although courts may consult extrinsic evidence
such as "expert and inventor testimony, dictionaries, and learned treatises," such
evidence is "'less significant than the intrinsic record,'" i.e., the specification and
prosecution history, and courts must be wary not to use extrinsic evidence to override
the meaning of the claim terms demonstrated by the intrinsic evidence.  *Id.* at 1317-19
(quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)).
That is, "extrinsic evidence may be useful to the court, but it is unlikely to result in a
reliable interpretation of patent claim scope unless considered in the context of the
intrinsic evidence."  *Id.* at 1319.

In short, a court must construe the claim terms as they would be viewed by "the
ordinary artisan after reading the entire patent."  *Id.* at 1321.  This is crucial in order to
respect the public notice function of patents:

> The patent system is based on the proposition that claims cover only the
> invented subject matter.  As the Supreme Court has stated, "[i]t seems to us
> that nothing can be more just and fair, both to the patentee and the public,

than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent."

*Id.* at 1321 (quoting *Merrill v. Yeomans*, 94 U.S. 568, 573-74 (1876)).

**C. Analysis**

On November 8, 2016, the parties submitted a joint disputed claim terms chart in which they identified nine claim terms that were disputed. Docket No. 307. The Court addresses these terms below.

### 1. Person of Ordinary Skill in the Art

Patent claims are to be construed through the eyes of a person of ordinary skill in the art in question at the time of the invention ("POSITA"). Dawgs offers the following definition of a POSITA:

> A person of ordinary skill in the art in the 2003-2004 timeframe (when both the '858 patent and the '789 patent were filed) would have had at least several years of hand-on experience with the design and development of footwear and various aspects of shoemaking from conception through product design, development, commercialization, and manufacturing. Such a person would have experienced numerous varied product cycles with projects representing varied constructions, and would have had a basic knowledge of functional requirements of footwear and an adequate understanding of processes and construction techniques needed to assemble and create various shoe parts and components.

Docket No. 312 at 9. In contrast, Crocs states that a POSITA would have "two to five years of hands-on experience in designing and developing products made out of molded foams, especially footwear." Docket No. 343 at 15.

The only apparent substantive difference between the two definitions is Crocs' suggestion that a POSITA have experience in working with molded foam products, not just footwear products. Dawgs' reply briefly argues that there is no basis to require

expertise in foam products because the '858 Patent "is directed to ventilated footwear, not foam." Docket No. 401 at 2. However, both of the '858 Patent's claims refer to "moldable foam material," '858 Patent col. 9 ll. 37-39; col. 10 ll. 6-8, and the specification describes a process for making molded foam footwear pieces. *Id.* col. 7 ll. 50-67; col. 8 ll. 1-7. In addition, Crocs' proposed definition was previously accepted by the Federal Circuit. *See Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1308-09 (Fed. Cir. 2010) (discussing testimony regarding the experience of "artisans of ordinary skill in this art" in designing "a strap for a shoe that is [] made of foam").

In light of the patent's focus on moldable foam, the Court sees no basis to modify Crocs' proposed definition. A POSITA with respect to the patents at issue is an individual with two to five years of hands-on experience in designing and developing products made out of molded foam, especially footwear.

### 2. *Moldable Foam Material, Moldable Material, Molded Foam Material*

Claim one of the '858 Patent refers to a footwear piece comprising:

> a base section including an upper and a sole formed as a single part manufactured from a moldable foam material; and a strap section formed of a moldable material that is attached . . . such that the moldable foam material of the strap section is in direct contact with the moldable material of the base section.

'858 Patent col. 9 ll. 36-44. Similarly, claim two describes a base section and sole "manufactured from a moldable foam material" and a strap "formed of a molded foam material." *Id.*, col. 10 ll. 6-10. Dawgs argues that "the plain and ordinary meaning of 'moldable' or 'molded' should suffice." Docket No. 312 at 22. At the claim construction hearing, Crocs stated that construction of these terms is necessary because a juror

might believe that the terms "molded" and "moldable" refer to characteristics of the foam, "as opposed to the result of the molding process." Docket No. 554 at 5. As a result, Crocs argues that the terms "molded" and "moldable" refer to foam material "capable of being manufactured using a mold into a three-dimensional shape." Docket No. 343 at 36. Dawgs does not disagree with Crocs' proposed interpretation of "moldable" and "molded." Docket No. 554 at 7.

The intrinsic evidence lends support to Crocs' argument that the reference to moldable foam and molded foam in the claim terms does not merely describe a characteristic of the foam material. The specification of the patent describes a method for manufacturing footwear pieces stating:

> [T]he footwear pieces disclosed herein can be made of a lofted foam material. Manufacturing footwear pieces using such a lofted foam material can include providing a resin that includes a pre-mixture of resin, pigment, and a growth additive. The resin, originally in pellet form, is heated to a liquid state. This liquid resin is screwed into a mold that has been heated prior to receiving the resin. The volume of resin injected into the mold is controlled by the pitch of the screw that drives the liquid resin into the mold. The liquid resin is allowed to set, at which time the mold is opened and the formed footwear piece is removed from the mold. The formed footwear piece is then placed on a cooling last, where it is allowed to air dry.

'858 Patent col. 7 ll. 50-62. During the drying process, the molded footwear expands when the mold opens and contracts as it is air cooled, "[t]hus, the process involves both an expansion characteristic and a contraction characteristic." *Id.*, col. 7-8, ll. 63-7. These statements in the specification tether the molding process to the manufacture of the foam material. Thus, Crocs' proposed construction, which relates the use of molds to the creation of the foam material, clarifies an aspect of the claim terms.

Ian Whatley, the expert retained by Crocs, states that a POSITA would understand that the terms moldable or molded "relate to the method of manufacture using a mold." Docket No. 343-7 at 14, ¶ 26. In other words, a POSITA would understand that, rather than simply describing a feature of the foam material used in the invention, the terms moldable and molded relate to the manufacturing process. Thus, the terms "moldable" and "molded," as used in the '858 Patent, refer to a specific process of using three-dimensional molds to manufacture a piece of footwear.

Accordingly, the Court finds that the claim terms "moldable foam material," "moldable material" and "molded foam material" shall be construed as "foam material capable of being manufactured using a mold into a three-dimensional shape."

### 3. Foam Material

Dawgs argues that the term "foam material," as used in the claim terms "moldable foam material" and "molded foam material," should be construed to mean "material that includes bubbles such that the density of the foam material is different than the true density of the material." Docket No. 312 at 22. Dawgs argues in favor of this construction because "'foam' has a scientific meaning that, without more, may not be readily understood by a jury." *Id.* Crocs argues that Dawgs' proposed construction should be rejected as inconsistent with the intrinsic evidence and unsupported.[1] Docket No. 343 at 37-38.

---

[1]Crocs additionally argued that Dawgs changed its position from "asserting indefiniteness to proposing a construction for 'foam material,'" and that Dawgs did not submit a proposed construction when the parties exchanged lists of claim terms to be construed. Docket No. 343 at 36. As a result, Crocs argued that Dawgs had waived the opportunity to propose a construction of "foam material." *Id.* at 36-37. The Court rejected Crocs' argument at the claim construction hearing. Docket No. 554 at 12.

As an initial matter, Dawgs' proposed construction is not specific to foam. Other materials, such as ice or glass, may include bubbles that affect the density of the material, but still do not constitute foam. In addition, Dawgs' proposed construction requires consideration of the "true density" of the original material and the end product. Docket No. 312 at 22. Density is not discussed in the claims or specification of the '858 Patent and introducing the concept opens unnecessary questions about how to measure "true density." *See* Docket No. 343-7 at 12-13, ¶ 23.

The words of the claim are given their customary and ordinary meaning unless the specification or the prosecution history warrants a different interpretation. *Phillips*, 415 F.3d at 1316, 1324. Dawgs does not provide any evidence from the specification or the prosecution history that the patent uses the term "foam material" in a narrow or specialized manner.

The Court finds that no construction of the term "foam material" is necessary and that it shall have its ordinary and customary meaning.

### 4. Strap Section Lends Support to the Achilles Portion of the Human Foot

Both claims of the '858 Patent state that the upper of the footwear includes an open rear region and that:

> frictional forces developed by the contact between the strap section and the base section . . . are sufficient to maintain the strap section in place in an intermediary position after pivoting[,] whereby the strap section lends support to the Achilles portion of [a] human foot inserted in the open rear region.

'858 Patent col. 9 ll. 46-53; col. 10 ll. 14-25. Both parties agree that the claim term "strap section lends support to the Achilles portion of the human foot" requires

construction, but they disagree over the appropriate scope.  Crocs argues that the term should be construed to clarify that the claim language does not require constant contact between the strap section and the Achilles portion of the human foot.  Docket No. 343 at 39.  Dawgs argues that the term should be construed as "helps to maintain the footwear in position on the human foot."  Docket No. 312 at 39.

The ambiguity in the claim term stems from the phrase "lends support," which does not clearly define the manner or extent of support provided by the strap.  For instance, a strap could help keep the foot in the shoe through constant contact with the back of the foot or a strap could act as a backstop for the foot, only coming into contact with the back of the foot if the foot started coming out of the back of the shoe.  The intrinsic evidence demonstrates that Crocs' argument correctly reflects the function of the strap.  The strap does not depend on constant contact between the human foot and the strap. For example, the specification states:

> [i]n some embodiments, a frictional force developed between strap **120** and upper **150** at the location of the rivets is sufficient to maintain strap **120** in place.  This helps to ensure that strap **120** remains in place even when the Achilles part of the foot is not pressing against strap **120**.  Without such friction, strap **120** would succumb to gravity and fall to a position where the foot would not be supported.

'858 Patent col. 6 ll. 22-29.  Thus, the specification establishes that the back of the foot is not always pressing against the strap.

In addition, this understanding of the strap's function accords with the Federal Circuit's discussion of the strap of the '858 Patent in a prior proceeding:

> Instead of pushing the foot forward into the shoe – like prior art straps that are elastic or length adjustable – the '858 patent's passive restraint system allows the strap to "lend support" only when necessary to keep the

shoe positioned correctly on the foot. This feature facilitates a loose anatomical fit that makes the claimed invention more comfortable than prior art products.

*Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1309 (Fed. Cir. 2010) (citation omitted). While the Court is not technically bound by this opinion of the Federal Circuit here, it constitutes persuasive authority.

The claim term "strap section lends support to the Achilles portion of the human foot" shall be construed as "strap section helps to maintain the footwear in position on the human foot without requiring constant contact between the strap and the foot."

### 5. Attached . . . With Plastic Connectors

Claim one of the '858 Patent describes a "strap section formed of a moldable material that is attached at opposite ends thereof to the upper of the base section with plastic connectors." '858 Patent col. 9 ll. 40-43. Claim two describes a "strap section . . . attached at opposite ends thereof to the base section." *Id*. col. 10 ll. 9-10. Crocs argues that the claim terms "attached . . . with plastic connectors" in claim one and "attached" in claim two should be construed as "attached so that the strap is not removable by ordinary consumer use." Docket No. 343 at 41. Crocs states that its proposed construction is appropriate because the specification discloses "that the strap is attached to the base section with rivets," *id.*, and that "[n]either a person of skill in the art, nor a lay juror, would expect something attached with rivets to be removable in the ordinary course of its use." Docket No. 343 at 42. Dawgs states that the claim terms should be given their plain and ordinary meanings and that Crocs is trying to read limitations from the specification into the claim terms. Docket No. 312 at 20-21.

Crocs' proposed construction fails in light of the intrinsic evidence. It is true that the specification describes a process of using rivets to attach the strap section to the base of the shoe. '858 Patent col. 2 ll. 20-33. However, "as a general rule claims of a patent are not limited to the preferred embodiment, or to the examples listed within the patent specification." *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1342 (Fed. Cir. 2000) (citations omitted). Crocs could have used the term "rivets" in its claims, but instead chose to draft claim one with reference to "plastic connectors" and claim two without a limitation as to the mode of attachment. Crocs' use of broader language in the claims compared to the specification suggests that the attachments at issue cannot be limited to "rivets" or to the connotations associated therewith. *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 807 (Fed. Cir. 2007) (refusing to limit claim terms where patent holder "chose a different term [from that used in the preferred embodiment] that implies a broader scope").

Crocs presents no basis, apart from the use of the term rivets in the specification, to find that the claim language should be limited. The Court finds no ambiguity in the terms. Accordingly, the terms "attached . . . with plastic connectors" and "attached" shall have their ordinary and customary meanings.

### 6. Substantially Horizontal Portion, Substantially Vertical Portion

Both claims of the '858 Patent describe a design "wherein the upper includes a substantially horizontal portion and a substantially vertical portion forming a toe region that generally follows the contour of [the] human foot." '858 Patent col. 9 ll. 54-57; col. 10 ll. 26-29. Dawgs argues that this term is indefinite because the term "substantially" is a "subjective term of degree" that cannot be understood. Docket

15

No. 312 at 13-15. Crocs argues that the scope of the terms "substantially horizontal" and "substantially vertical" is clear in light of the intrinsic and extrinsic evidence. Docket No. 343 at 17.

A claim term is indefinite if it fails "viewed in light of the specification and prosecution history, [to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "An accused infringer must [] demonstrate by clear and convincing evidence" that a claim term is indefinite. *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010) (citing *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008)). The key question is whether the intrinsic evidence provides "a general guideline and examples sufficient to enable a person of ordinary skill in the art to determine [the scope of the claims]." *Enzo Biochem, Inc. v. Applera Corp*., 599 F.3d 1325, 1335 (Fed. Cir. 2010).

The claims of the '858 Patent indicate that the "substantially vertical" and "substantially horizontal" portions involve the creation of a "toe region." '858 Patent col. 9 ll. 54-56 ("the upper includes a substantially horizontal portion and a substantially vertical portion forming a toe region"); col. 10 ll. 26-28 (same). Further, in regard to figure 1, the specification states:

> Upper **150** includes a substantially vertical region **151** that includes one or more ventilators **181.**
> . . .
> As depicted, upper **150** includes a substantially horizontal region **152** that rises toward an upper opening perimeter **170**.

'858 Patent col. 5 ll. 1-2, 32-33. Figure 1 appears as follows:



Fig. 1

'858 Patent fig. 1.

Although Dawgs is correct that only one figure, constituting one embodiment, depicts the "substantially" vertical and horizontal portions of the shoe, the Court agrees with Crocs that figure 1 and the descriptions of figure 1 would allow a POSITA to determine the scope of these claims. Mr. Whatley opines that a POSITA "would understand the word 'substantially' with regard to the horizontal or vertical portion of the upper to neither require a piece of foam footwear to be perfectly vertical nor perfectly horizontal, nor to meet at ninety degrees around the toe region." Docket No. 343-7 at 5-7, ¶ 13. According to Mr. Whatley, a POSITA would be informed both by the specification and the inherent limitations of molding, because ninety degree angles are a "problem point" in working with foam materials. *Id.* In addition, Mr. Whatley states

that "in the field of footwear, especially foam footwear, sharp angles and parallel-sided planar surfaces of an upper are almost non-existent." *Id.*

Dawgs argues that the term "substantially" is a term of degree and that the intrinsic evidence fails to describe how horizontal or how vertical the portions of the upper must be. Docket No. 312 at 13-15. Because the intrinsic evidence leaves the boundaries of the claim terms undefined, Dawgs states that the terms "substantially horizontal" and "substantially vertical" are left in a "zone of uncertainty" in violation of *Nautilus*. *Id.* at 14. Dawgs cites three cases to demonstrate that the terms "substantially vertical" and "substantially horizontal" are indefinite terms of degree. Docket No. 312 at 13-14. However, each of the cases cited by Dawgs acknowledges that it is permissible to use of a term of degree, such as "substantially," without rendering a claim term indefinite. *See Core Wireless Licensing S.A.R.L. v. Apple Inc*, 2016 WL 3124614, at *12 (N.D. Cal. June 3, 2016); *Cayenne Med., Inc. v. Medshape, Inc.*, 2016 WL 2606983, at *3 (D. Ariz. May 6, 2016); *Fairfield Indus., Inc. v. Wireless Seismic, Inc.*, 2015 WL 1034275, at *14 (S.D. Tex. Mar. 10, 2015). The cases offered by Dawgs do not provide a general prohibition against the use of the term "substantially" and, in any event, are distinguishable on their facts.

In *Core Wireless*, a patent dispute involving wireless communication systems, the court found that the claim term "substantially impair the quality of the user information" was indefinite. 2016 WL 3124614 at *3. The claim language in *Core Wireless* provided that "the sender must 'restrict[] the number of consecutive [stolen] frames . . . to a sufficiently low number so as not to substantially impair the quality of

the user information." *Id.* at *12. The construction of the claim term did not simply require consideration of the scope of "substantially impair," but also the relationship between impairment and an undefined "low number" of frames. The court found the term indefinite because the specification was "essentially silent" as to the number of frames that constituted a low number and offered contradictory descriptions regarding the potential interference associated with the loss of a single frame. *Id.* Unlike in *Core Wireless*, the specification of the '858 Patent provides an example of conforming footwear, '858 Patent fig. 1, and does not offer contradictory assessments of conforming and nonconforming products.

In *Cayenne Medical*, a patent dispute involving devices for attaching soft tissue to bone, the court found that the claim term "substantially different construction" was indefinite because "nothing in the [] patent specification [] would direct a skilled artisan" to focus on the figures that plaintiff identified as demonstrating a "substantially different construction" or what particular features of those embodiments fell within the meaning and scope of the claim limitation. 2016 WL 2606983 at *6. The court also noted that the term "substantially different construction" is problematic because it requires consideration of the degree of dissimilarity, but provides no framework for knowing when a product is sufficiently dissimilar. *Id.* The '858 Patent does not require consideration of a degree of dissimilarity.

Last, in *Fairfield Industries,* a patent dispute involving wireless technology used to transmit seismic data, the court found that the claim term "substantially prevent communication interference between the first and second pairs" of sensor units was

indefinite because the intrinsic evidence failed to describe the boundaries of possible interference and both sides' experts said it was possible to eliminate all interference between pairs of the relevant wireless devices. Thus, "substantially prevent" did not "serve to acknowledge a physical impossibility or imprecision." 2015 WL 1034275 at *16. *Fairfield Industries* is distinguishable because, as Mr. Whatley notes, the use of the terms "substantially vertical" and "substantially horizontal" relate to both aesthetic and practical limitations of the invention and would be known to a POSITA. Docket No. 343-7 at 5-7, ¶ 13.

Unlike in the cases cited by Dawgs, the '858 Patent relates the term "substantially" to the creation of a toe region and provides an example in the specification showing how a toe region can be formed from a substantially horizontal and substantially vertical portion. '858 Patent col. 5 ll. 1-2, 32-33. Moreover, a POSITA reading the '858 Patent would be familiar both with the aesthetics of footwear design and the practical constraints of working with foam. A POSITA would therefore understand that a toe region does not consist of strictly vertical and horizontal portions. A POSITA would be able to rely on principles of design and the specification of the patent to compare a potentially infringing product to the specification.

Accordingly, the Court finds that Dawgs has not presented clear and convincing evidence that the terms "substantially horizontal" and "substantially vertical" are indefinite. The claim terms shall have their ordinary and customary meaning.

### 7. *Generally Follow the Contour of a Human Foot*

As noted above, both claims of the '858 Patent describe a design "wherein the upper includes a substantially horizontal portion and a substantially vertical portion

forming a toe region that generally follows the contour of [the] human foot." '858 Patent col. 9 ll. 54-57; col. 10 ll. 26-29. Dawgs argues that the term "generally follows the contour of a human foot" is indefinite because the word "generally" is a subjective term of degree and because the patent fails to specify an approach for determining whether a toe region follows the contour of the human foot. Docket No. 312 at 19. Crocs argues that the claim term is sufficiently clear in light of the intrinsic and extrinsic evidence. Docket No. 343 at 16-17.

As noted above, the use of a subjective term of degree does not render a claim term indefinite. "When a 'word of degree' is used, the court must determine whether the patent provides some standard for measuring that degree." *Enzo*, 599 F.3d at 1332 (quotation omitted). A claim term is indefinite when the patent fails to provide sufficient guidance to enable a POSITA to compare potentially infringing products and determine "whether interference . . . is substantial." *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (quoting *Enzo*, 599 F. 3d at 1336).

Both claims of the '858 Patent state that the upper includes a "toe region that generally follows the contour of a human foot, wherein the toe region tapers from [an] inner area of the base section where the larger toes exist to [an] outer area of the base section where the smaller toes exist." '858 Patent col. 9 ll. 56-60; col. 10 ll. 28-32. The specification provides figures depicting tapering. *See id.* figs. 3, 6, 8. In addition, the specification discusses alternative embodiments:

> Upper **150** further includes a toe region **155** that surrounds the toes of a human foot inserted into base section **110**. In some embodiments, toe region **155** tapers from the inner area of base section **110** to the outer area of base section **110**, such that it generally follows the contour of a

> human foot where larger toes exist at the inside of the foot, and the foot tapers to smaller toes on the outside. . . . In other embodiments, toe region **155** is a square cross section that does not exhibit tapering, while yet other embodiments provide a rounded square where the toe section has its greatest extension near the [] central point of base section **110,** and tapers in both directions from the central point.

'858 Patent col. 5 ll. 15-29. Mr. Whatley argues that a POSITA would be able to rely on the claim language, the figures, and the written specification to "confirm and understand the plain meaning of the claim language." Docket No. 343-7 at 7, ¶ 14.

The claim language states that the footwear "generally follows the contours of the human foot" by tapering around the toes, the specification provides multiple examples of conforming shoes, and a POSITA would be able to use the specification to identify potentially infringing products. *See Edgewell Pers. Care Brands, LLC v. Albaad Massuot Yitzhak, Ltd.*, 2017 WL 1900736, at *3 (D. Del. May 9, 2017) (finding that the term "generally tapered" was sufficiently definite where the specification provided examples to show the meaning of the claim term). The Court finds that Dawgs has not provided clear and convincing evidence that the claim term "generally follow the contour of a human foot" is indefinite.

The claim term "generally follow the contour of the human foot" shall have its ordinary and customary meaning.

### 8. *In the Upper Near to . . . the Upper Opening Perimeter*

Claim two of the '858 Patent describes "a decorative pattern of raised bumps [] molded or otherwise created in the upper near to and extending the length of the upper opening perimeter." '858 Patent col. 10 ll. 34-36. Crocs argues that the specification provides sufficient guidance to establish the meaning of the claim term. Docket

No. 343 at 27.  Dawgs argues that the claim term is indefinite because the '858 Patent does not specify how close the decorative pattern must be to the upper opening perimeter.  Docket No. 312 at 16.

The claim language describes a "pattern of raised bumps."  '858 patent col. 10 l. 34.  A pattern of bumps is discontinuous and therefore cannot be perfectly contiguous with the upper opening perimeter.  Thus, the claim term "near" reflects a practical limitation of the decorative design.  Moreover, the specification states that "[a] decorative pattern **190** may or may not be molded or otherwise created near upper opening perimeter **170**."  '858 Patent col. 5 ll. 41-43.  The description refers the reader to figure 1, which shows the area of the decorative pattern in contact with the upper opening perimeter of the shoe.  *Id.* fig. 1.  The specification provides an example of conforming footwear.

Mr. Whatley states that a POSITA "would understand a decorative element, such as that claimed in Claim 2, may extend over various near distances from the upper opening perimeter for the claimed shoe to function."  Docket No. 343-7 at 8-9, ¶ 17. Because the purpose of the pattern is decorative, a POSITA would understand that the decorative element must be sufficiently near the upper opening perimeter such that the decorative upper and the upper opening perimeter are aesthetically associated.  *See Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1291 (Fed. Cir. 2017) (finding the term "near" definite where "a skilled artisan would understand 'near' [in reference to two objects, to require them] to be displayed in a manner that physically associates the two").

Dawgs' argument that the claim term is indefinite rests on three cases where terms of degree signifying physical proximity were found to be indefinite. Docket No. 312 at 15-16. Dawgs first cites *In re Neurografix ('360) Patent Litigation*, 201 F. Supp. 3d 206 (D. Mass. 2016), a case involving magnetic resonance imaging systems. *Id.* at 206. In *Neurografix,* the court found the claim term "near said exciting and output arrangement means" to be indefinite because there was no intrinsic evidence to describe the meaning of the term and the stated goals of the invention could be accomplished in "many possible" configurations. *Id.* at 222-23. Similarly, in *Advanced Aerospace Technologies, Inc. v. United States*, 124 Fed. Cl. 282 (2015), the court found that the claim term "near the point of engagement" was indefinite because the specification made no reference to the claim term and there was no functional or industry context in which to interpret the claim. *Id.* at 291-92. In *Abdou v. Alphatec Spine, Inc.*, 2014 WL 6611422 (S.D. Cal. Nov. 19, 2014), the court found the term "in proximity" to be indefinite because "nothing in the claims or specification tells a person of ordinary skill in the art what the anatomical position, anatomical relationship, spacial relationship, or proximity should be" for the claim term. *Id.* at *9.

Unlike in the cases offered by Dawgs, the term "near to" in the '858 Patent relates to forming a decorative pattern such that there is an aesthetic relationship between the pattern and the upper opening perimeter. A claim term need not be precise in order to be definite, so long as a POSITA would understand the boundary of the claim term. *See Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1382 (Fed. Cir. 2015) (finding "spaced relationship" definite where a "skilled artisan would be

able to determine [the] language requires the spaced relationship to be neither infinitesimally small nor greater than the width of a user's hand"). Dawgs has not shown that a POSITA would not understand the limits of such an aesthetic relationship. Accordingly, the Court finds that Dawgs has not presented clear and convincing evidence that the claim term "near to" is indefinite and it shall have its ordinary and customary meaning.

### 9. *Wherein the Ventilators Extend up a Majority of the Height of the Vertical Portion*

Claim two of the '858 Patent requires that "a plurality of ventilators are formed in both the substantially vertical portion and the substantially horizontal portion, and wherein the ventilators extend up a majority of the height of the vertical portion." '858 Patent col. 10 ll. 37-40. Dawgs claims that the last clause of the claim term is indefinite because the patent fails to define either the "height of the vertical portion" or provide a method for measuring whether a ventilator extends up a majority of that height. Docket No. 312 at 17-18. Crocs argues that the claim term should have its plain and ordinary meaning. Docket No. 343 at 31.

The term "majority" is unambiguous: it requires the ventilators extend up more than half of the vertical portion. *See*, *e.g., Advanced Aerospace Techs., Inc. v. United States*, 124 Fed. Cl. 282, 301 (2015) (noting that "more than half" and "a majority" are equivalent in construing the claim term "absorbs most of the energy"); *Medtronic, Inc. v. Edwards Lifesciences Corp.*, 2013 WL 2147909, at *36 (D. Minn. May 16, 2013) (construing "majority" to mean "more than fifty percent"); *Staples v. Johns Manville, Inc.*, 2010 WL 1006240, at *6 (E.D. Mo. Mar. 16, 2010) (construing "majority" as "more than

50%"); *Rattler Tools, Inc. v. Bilco Tools, Inc.*, 2007 WL 2008504, at *9 (E.D. La. July 6, 2007) (construing "majority" to mean "more than half"). However, Dawgs argues that, because the patent fails to specify a method for measuring the height of the vertical portion or comparing it to the height of the ventilator, a POSITA would be unable to determine the meaning of the term majority in the context of the '858 Patent.

Dawgs offers multiple theoretical methods to measure the height of the vertical portion:

> Does one use only "vertical" distance in this measurement? If the portion is "substantially" vertical, it will have non-vertical length to it. How is this accounted for?

> At what location on the footwear does one measure the "height of the vertical portion"? Does the patent claim require that the vertical portion must be consistently equal? If the vertical portion varies in height across the footwear, what is the appropriate place to measure it?

> Where is the top of the "vertical portion"? The patent figures appear to picture footwear with significant curvature. How does one know where the top of the vertical portion is?

Docket No. 312 at 18. Dawgs cites cases purportedly demonstrating that, where the invention allows several potential means to measure an aspect of the invention, a claim term is indefinite if it fails to specify the means used by the invention. Docket No. 312 at 18-19. However, in each case cited by Dawgs, the evidence demonstrated that a POSITA would be aware of multiple, equally-valid tests to perform measurements and that, depending on the test used, allegedly infringing technology may or may not fall within the scope of the patent. *See Dow Chem. Co. v. Nova Chems. Corp.*, 803 F.3d 620, 633 (Fed. Cir. 2015) (discussing three valid methods for calculating the maximum slope of a strain hardening coefficient); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789

F.3d 1335, 1344 (Fed. Cir. 2015) (finding patent indefinite where "one of skill in the art" would understand three methods of measuring molecular weight, but the claims and the specification failed to indicate which measure to use); *Otsuka Pharm. Co. v. Torrent Pharm. Ltd., Inc.*, 151 F. Supp. 3d 525, 546-47 (D.N.J. 2015) (finding the term "mean particle size" indefinite where it was undisputed that the method employed by the patent generated two possible measures of the mean particle size); *Butamax Advanced Biofuels LLC v. Gevo, Inc*., 117 F. Supp. 3d 632, 641 (D. Del. 2015) (finding the term "% identity" indefinite where the specification described five possible methods of calculation).

The Court has already found that a POSITA would be able to understand the meaning of the term "substantially vertical portion" in light of the claim language and the specification. Dawgs offers no evidence that a person with experience working with molded footwear would seriously consider Dawgs' proposed methodologies for measuring the height of the vertical portion of the shoe. Instead, Dawgs offers conjecture about ways in which an individual could theoretically decide to measure the height of a vertical portion. These methods do not persuade the Court that a POSITA would be unable to measure the height of the vertical portion.

Dawgs has not met its burden of providing clear and convincing evidence that a POSITA would be unable to discern the meaning of the claim term at issue because there is no showing that a POSITA would consider multiple methodologies to measure the height of the vertical portion. Accordingly, the claim term "wherein the ventilators extend up a majority of the height of the vertical portion" shall have its plain and ordinary meaning.

27

## II.  THE '789 PATENT

### A.  Background

The '789 Patent is a design patent and consists of seven figures depicting a shoe design.  Docket No. 312-2, '789 Patent fig. 1-7.  The seven figures provide multiple perspectives on the claimed design, including a front, right-side, left-side, top, bottom, and rear view.  *Id.* figs. 1-7.  The description contains the limiting statement that "[t]he broken line showing of the sole and surface treatment of the upper is for illustrative purpose only and forms no part of the claim design."  *Id.* description.

### B.  Legal Standards for Claim Construction of Design Patents

Trial courts have a duty to "conduct claim construction in design patent cases, as in utility patent cases."  *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (citation omitted).  However, there is no requirement that the trial court "provide a detailed verbal description of the claimed design," because design patents "typically are claimed as shown in drawings."  *Id.* (citations omitted).  Design patents are generally better represented by an illustration than by a verbal description; accordingly, the "preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design."  *Id.*

While the preferable course is not to provide a detailed verbal description, the Federal Circuit has noted that it may be appropriate to describe "various features of the claimed design as they relate to the accused design and the prior art" or to address issues that bear on the scope of a claim, such as conventions in design patent drafting

or distinguishing between functional and non-functional elements of the design. *Id.* at 680. Accordingly, the trial court may offer a verbal construction of a design patent where such construction would help to clarify the ornamental aspects of the design without unnecessarily supplanting the visual impression created by the illustrations contained in the design patent.

### C. The Claim of the '789 Patent

Dawgs does not propose a detailed verbal construction of the '789 Patent. Instead, Dawgs seeks to explain that the '789 Patent does not include certain functional features and that the broken lines used in the '789 Patent show that it "does not include the sole and the portions of the upper and strap depicted with dotted lines." Docket No. 312 at 24. Crocs argues that no construction of the '789 Patent is necessary. Docket No. 343 at 43.

"Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *OddzOn Prod., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404-05 (Fed. Cir. 1997). To determine whether a design claim is dictated by function, the Court considers:

> whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility; and whether there are any elements in the design or an overall appearance clearly not dictated by function.

*Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1322 (Fed. Cir. 2016) (quotation omitted). However, while it may be appropriate to note particular functional features of

a design, it is improper to wholly exclude structural elements of a design patent claim simply because they have functional aspects. *Id.* Instead, the Court should consider the manner in which the functional features of the design patent "contribute to the overall ornamentation of the design." *Id.* at 1323.

In *Sport Dimension*, the Federal Circuit reversed a district court's claim construction of a design patent that excluded "armbands and side torso tapering from the claim" entirely because the design "includes the shape of the armbands and side torso tapering, to the extent that they contribute to the overall ornamentation of the design." *Id.* at 1322-23. The district court had found that the armbands and tapering were part of a utility patent and the patent holder had touted the utility of those features in advertisements. *Id.* at 1322. Despite this, the Federal Circuit held that it would be inappropriate for a court to wholly exclude functional features that contribute to the overall ornamental design of the patent. *Id.*

Dawgs argues that two elements of the '789 Patent should be excluded as functional – the heel strap and the connectors that attach the heel strap to the upper. Docket No. 312 at 24. In this case, several factors suggest that the strap and attachments serve a functional purpose. There is a utility patent noting the importance of the heel strap. *See generally* '858 Patent. Crocs' advertising regularly discusses the useful features of the strap. *See, e.g.,* Docket No. 312-14 at 8 ("heel strap keeps shoe on foot"); Docket No. 312-22 at 2 ("The strap keeps the shoe in place on the foot, while giving plenty of space for the toes."). Moreover, while other types of straps could

potentially be used, the foam strap serves a unique function of staying in place without contact from the human foot.

Despite these factors militating in favor of finding that the strap is functional, the strap also plays an aesthetic role in the '789 Patent. Such a role is noted in Crocs' advertising, *see* Docket No. 312-32 at 2 ("we added a strap for utility, and gave it some flair"), and is evident from examining the figures contained in the design patent. *See generally* '789 Patent. As noted by the Federal Circuit:

> One of the overall effects of the design is the interaction between the strap assembly portion and the base portion of the shoes where the strap is attached to the base. Multiple major design lines and curves converge at that point creating a focal point attracting the eye of the ordinary observer when viewing the overall effect of the design. Another overall effect of the design is a visual theme of rounded curves and ellipses throughout the design, including the strap forming a sort of continuation of the sidewall of the base to create a visually continuous ring encircling the entire shoe. Other examples of rounded curves or ellipses in the design are the ellipses formed by the strap and the foot opening in the base.

*Crocs*, 598 F.3d at 1306. Accordingly, as the Federal Circuit observed in *Sport Dimension*, excluding the strap and the attachments does not simply excise a functional aspect of the '789 Patent.

The Court finds that Dawgs' proposed construction, which seeks to exclude "the existence of a heel strap and the connectors that attach the heel strap to the upper," Docket No. 312 at 24, would improperly eliminate features that contribute to the ornamental design of the '789 Patent.

Dawgs next requests that the Court provide a construction that "[t]he patent claim also does not include the sole and the portions of the upper and strap depicted with dotted lines." Docket No. 312 at 24. The '789 Patent already states that "[t]he

31

broken line showing of the sole and surface treatment of the upper is for illustrative purpose only and forms no part of the claim design." '789 Patent description. Dawgs does not argue that this statement is incorrect, but seeks to include a reference to the '789 Patent's use of dotted lines on the strap in its figures. Docket No. 312 at 24. The dotted lines shown on the strap are not mentioned in the description disclaimer. At the claim construction hearing, Crocs conceded that it would be appropriate to expand the disclaimer to incorporate the dotted lines shown on the strap because the use of dotted lines should be construed consistently. Docket No. 554 at 71. Accordingly, the Court finds that it is appropriate to instruct the jury that the broken line showing of the sole, surface treatment of the upper, and on the heel strap is for illustrative purpose only and forms no part of the claim design.

## III. CONCLUSION

Accordingly, the patent claim terms presently at issue shall be construed in accordance with the foregoing.

DATED June 27, 2017.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge