IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 06-cv-00605-PAB-KMT
     (Consolidated with Civil Action No. 16-cv-02004-PAB-KMT)

---

Civil Action No. 06-cv-00605-PAB-KMT

CROCS, INC.,

          Plaintiff,

v.

EFFERVESCENT, INC.,
HOLEY SOLES HOLDINGS, LTD.,
DOUBLE DIAMOND DISTRIBUTION, LTD., and
U.S.A. DAWGS, INC.,

          Defendants.

---

Civil Action No. 16-cv-02004-PAB-KMT

U.S.A. DAWGS, INC. and
DOUBLE DIAMOND DISTRIBUTION, LTD.,

          Plaintiffs,

v.

RONALD SNYDER,
DANIEL HART,
THOMAS J. SMACH,
ANDREW REES,
GREGG RIBATT,
ANDREW REDDYHOFF,
GEORGE B. BOEDECKER, JR.,
LYNDON HANSON,
DONALD LOCOCO,
RAYMOND CROGHAN,
RONALD FRASCH,
MICHAEL MARGOLIS,
JEFFREY LASHER,
MICHAEL E. MARKS,
PRAKASH MELWANI,

JOHN P. MCCARVEL,
ERIK REBICH,
SARA HOVERSTOCK, and
JOHN AND JANE DOE DEFENDANTS 1-30,

     Defendants.

---

**ORDER**

---

This matter is before the Court on Defendants' Motion to Dismiss. Case No. 16-cv-02004, Docket No. 31. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND[1]

### A. Procedural Background

Plaintiff Crocs, Inc. ("Crocs") filed Case No. 06-cv-00605-PAB-KMT on April 3, 2006, alleging, *inter alia*, infringement of United States Patent Nos. 6,993,858 (the "'858 patent") and D 517,789 (the "'789 patent"). Docket No. 1.

On May 12, 2006, defendants Effervescent, Inc., Holey Soles Holdings, Ltd., and former defendant Collective Licensing International, LLC moved to stay this case pending proceedings under Section 337 of the Tariff Act of 1930 before the International Trade Commission ("ITC"). Docket No. 26. The Court granted the motion on May 16, 2006 and administratively closed the case. Docket No. 31. In 2012, during a brief reopening of the case, Crocs added one of the Dawgs[2] entities as a named

---

[1]The facts are taken from the complaint [Case No. 16-cv-02004, Docket No. 1] and are presumed to be true for the purposes of this order.

[2]For simplicity, the Court adopts the convention of the parties in the underlying motions and refers to Double Diamond Distribution, Ltd. and U.S.A. Dawgs, Inc., collectively as "Dawgs."

defendant and Dawgs asserted counterclaims, Docket No. 119, before the action was stayed pending a reexamination of the patents-in-suit. Docket No. 137. In February 2016, Dawgs filed motions to reopen the case and lift the stay, Docket Nos. 167, 168, which the Court granted. Docket No. 184. On May 31, 2016, Dawgs filed its first amended answer to the amended complaint and counterclaims against Crocs, Scott Seamans, and John and Jane Does 1 through 100.[3] Docket No. 209.

On August 5, 2016, Dawgs filed its complaint in Case No. 16-cv-02004-PAB-KMT ("the 2016 lawsuit"). Case No. 16-cv-02004, Docket No. 1. The 2016 lawsuit named 18 individual defendants ("defendants"), all of whom were current or former employees of Crocs. *Id.* at 10-19, ¶¶ 9-14.

### B. Factual Allegations

Crocs is the leading manufacturer of "molded clog-type footwear products." *Id.* at 21-22, ¶ 20. Dawgs is a competitor of Crocs and sells a variety of footwear, including molded clogs. *Id.* at 24, ¶ 24. According to the complaint, Crocs had been manufacturing and selling clog-shaped shoes made from ethyl vinyl acetate ("EVA") since 2002. *Id.* at 21-22, ¶ 20. At its inception, Crocs "decided to market the exact shoe that had already been developed and was already being manufactured and distributed by Foam Creations, Inc." *Id.* That shoe, in turn, was made using molds designed by Ettore Battiston, an Italian inventor. *Id.* The "Battiston Molded Clog" was sold in the United States as the "AquaClog," "Explorer," and "Waldies," among other names. *Id.* In the early 2000s, other rubber clogs were available for sale in the United

---

[3]The Court dismissed Scott Seamans and John and Jane Does 1 through 100 from this case on March 31, 2017. *See* Docket No. 504.

States.  For example, BIHOS S.R.L. ("BIHOS"), an Italian shoe designer and manufacturer, distributed and sold molded clog footwear under the brand name Calzuro starting in the mid-1980s.  *Id.* at 22, ¶ 21.  By 2001, Calzuro was selling a molded clog that featured a "pivoting strap" in the United States.  *Id.*

On February 7, 2006, the U.S. Patent and Trademark Office ("PTO") issued the '858 patent.  *Id.* at 24-25, ¶ 25.  Crocs' co-founder, Scott Seamans, was listed as the sole inventor.  *Id.*  Dawgs alleges that "[e]ach and every functional feature disclosed in the ['858] patent application, except the heel strap, already existed in the Battiston Molded Clog."  *Id.* at 25-26, ¶ 26.  The '858 patent also contains diagrams and descriptions of the Battiston molded clog, with the addition of a pivoting strap.  *Id.*  According to Dawgs, "[s]traps have existed for many years on a wide variety of footwear."  *Id.*  By 2001, Calzuro sold a molded clog with a pivoting strap attached by a rivet.  *Id.*  In addition, the features identified in the '858 patent "were disclosed and described in Italian (utility) Patent 00245068 filed in June 1998, published on December 22, 1999, and granted in March 2002" ("the BIHOS Patent").  *Id.*

On March 28, 2006, the PTO issued the '789 design patent.  *Id.* at 27, ¶ 28. Seamans was again listed as the sole inventor.  *Id.*  According to Dawgs, the '789 patent "contains diagrams of the base shoe that are substantially similar to the diagrams that were created by Ettore Battiston in 2000 and assigned from Battiston to [Foam Creations, Inc.], with a strap added that serves a functional purpose and such as had previously existed for many years on a wide variety of footwear, including clogs."[4]

---

[4]Foam Creations, Inc. is a predecessor or related entity to Crocs.  Docket No. 209 at 18, ¶ 20.

*Id.*  Accordingly, the shoe in the '789 patent is "not new and inventive nor invented and designed by Seamans or by Crocs."  *Id.*

Crocs has been unable to secure patents similar to the '858 and '789 patents outside the United States because of the "well-known existence of prior sales, the widely-recognized existence of invalidating prior art, and the established identity of the true and proper inventorship and origin of the shoe."  *Id.* at 30, ¶ 34; *see also id.* at 30-36, ¶¶ 35-49.

On March 31, 2006, just after the '789 patent issued, Crocs filed a complaint with the ITC against Double Diamond Distribution, Ltd. ("Double Diamond") and other respondents, alleging infringement and seeking a General Exclusion Order to ban the importation of molded clogs that infringed on Crocs' patents.  *Id.* at 36, ¶ 50.  The presiding Administrative Law Judge ("ALJ") and the ITC initially found that Double Diamond did not infringe the '789 patent and that the '858 patent was invalid as obvious in view of prior art.  *Id.* at 37, ¶¶ 52-53.  However, the Federal Circuit reversed the determination that the '858 patent was obvious and remanded the case to the ITC for further consideration.  *Id.* at 37-38, ¶ 54.  The ALJ and the ITC then determined that Double Diamond and others had failed "to establish that the asserted patents were unenforceable."  *Id.* at 38, ¶¶ 55-56.  According to Dawgs, Crocs acted in the ITC proceedings "knowing that these patents were invalid and unenforceable."  *Id.,* ¶ 57.

On April 3, 2006, Crocs filed a lawsuit alleging patent infringement even though Crocs "knew the patents identified incorrect inventorship and had been obtained by withholding material information from the patent examiner."  *Id.* at 36-37, ¶ 51.  On

August 6, 2012, Crocs filed its first amended complaint, adding U.S.A. Dawgs, Inc. ("U.S.A. Dawgs") as a named defendant. *Id.* at 38-39, ¶ 58. Dawgs claims that this litigation is objectively baseless in light of the unenforceability of the patents and because, by the time Crocs filed the first amended complaint, it "knew or should have known" that the BIHOS patent "rendered the claims of at least the '858 patent" invalid. *Id.*

On August 3, 2012, Double Diamond filed an application for *inter partes* reexamination of the '858 patent with the PTO. *Id.* at 40, ¶ 60. On August 8, 2012, as retaliation for the filing of the application for reexamination, Crocs initiated a lawsuit against CVS Pharmacy, a retailer who sold USA Dawgs products. *Id.* at 40-41, ¶¶ 61-62. On August 24, 2012, USA Dawgs filed an application for *inter partes* reexamination with the PTO of the '789 patent. *Id.* at 41, ¶ 63. On April 29, 2013, the PTO issued a non-final Office Action rejecting the single claim of the '789 patent. *Id.* at 41-42, ¶ 64. Crocs filed a response on July 29, 2013, which included a declaration from Scott Seamans stating that he is "the sole inventor" of the '789 patent. *Id.* at 42, ¶ 65. On February 11, 2016, the PTO once again rejected the sole claim of the '789 patent as unpatentable and closed the reexamination prosecution related to that patent. *Id.* at 42-43, ¶ 66.

### C. Dawgs' Complaint

Dawgs claims that, as a result of the foregoing conduct, Crocs has secured its own success, obtaining a market share for "molded clog-type footwear" in excess of 90%, and negatively impacted Dawgs. *Id.* at 43-46, ¶¶ 68-74. According to Dawgs,

defendants "directed, participated in, sanctioned, ratified, or acquiesced" in the decision to sue Dawgs and to continue the 2006 lawsuit through the present. *Id.* at 10-18, ¶¶ 9-13.

Dawgs brings seven claims against defendants in Case No. 16-cv-02004: actual monopolization in violation of § 2 of the Sherman Act (first claim for relief); attempted monopolization in violation of § 2 of the Sherman Act (second claim for relief); conspiracy to restrain trade in violation of § 1 of the Sherman Act (third claim for relief); conspiracy to monopolize in violation of § 2 of the Sherman Act (fourth claim for relief); unlawful exclusionary arrangements, agreements and conduct in violation of § 3 of the Clayton Act and §§ 1 and 2 of the Sherman Act (fifth claim for relief); intentional interference with business advantage (sixth claim for relief); and violation of § 43(a) of the Lanham Act (seventh claim for relief). *Id.* at 61-107, ¶¶ 150-262.[5]

Defendants have moved to dismiss Dawgs' claims for lack of personal jurisdiction and for failure to state a claim. Case No. 16-cv-02004, Docket No. 31.

## II. STANDARD OF REVIEW

The purpose of a motion to dismiss under Rule 12(b)(2) is to determine whether the Court has personal jurisdiction. The plaintiff bears the burden of establishing personal jurisdiction over defendants. *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1417 (10th Cir. 1988). Where a district court considers a motion to dismiss for lack of personal jurisdiction and there has been no evidentiary hearing, the "plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." *AST Sports*

---

[5]The Court has ruled on counterclaims that are identical to many of these claims in Case No. 06-cv-00605. *See* Docket No. 504.

*Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1056-57 (10th Cir. 2008) (citations

omitted). The Court will accept the well-pleaded allegations of the complaint as true to

the extent they are uncontroverted by affidavits submitted by defendants. *Wenz v.*

*Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (citations omitted). "If the parties

present conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor,

and the plaintiff's prima facie showing is sufficient notwithstanding the contrary

presentation by the moving party." *Id.* (quotation omitted).

Dismissal of a claim under Rule 12(b)(6) is appropriate where a party fails to

state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Rule 8

requires "a short and plain statement of the claim showing that the pleader is entitled to

relief." Fed. R. Civ. P. (8)(a)(2). Rule 8(a)'s "short and plain statement" mandate

requires that a party allege enough factual matter that, taken as true, makes his "claim

to relief . . . plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir.

2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence

that the parties might present at trial, but to assess whether the plaintiff's complaint

alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v.*

*Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003). In doing so, the Court "must

accept all the well-pleaded allegations of the complaint as true and must construe them

in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210,

1215 (10th Cir. 2007).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (ellipses omitted). The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible. *Bryson*, 534 F.3d at 1286.

However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (quotation marks and citation omitted).

## III. ANALYSIS

### A. Personal Jurisdiction

Crocs argues that the Court lacks personal jurisdiction over defendants Raymond Croghan, Ronald Frasch, Prakash Melwani, Michael Marks, Thomas Smach, Andrew Rees, and Gregg Ribatt, all of whom reside outside the State of Colorado. Case No. 16-cv-02004, Docket No. 31 at 24 n.15. Dawgs argues that the Court has personal jurisdiction because the nonresident defendants purposefully directed their conduct at Colorado. Case No. 16-cv-02004, Docket No. 38 at 24.

To assert personal jurisdiction over a defendant in a federal question case, the Court must determine: "(1) whether the applicable statute potentially confers jurisdiction by authorizing service of process on the defendant and (2) whether the exercise of jurisdiction comports with due process." *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1209 (10th Cir. 2000) (quotations omitted). Because the Patent Act does not authorize nationwide service of process, the Court considers whether the exercise of jurisdiction satisfies due process standards. *See TechnoLines, LP v. GST AutoLeather, Inc.,* 799 F. Supp. 2d 871, 874 (N.D. Ill. 2011). "The Colorado long arm statute, Colo. Rev. Stat. § 13-1-124, has been construed to extend jurisdiction to the full extent of the Constitution, so the jurisdictional analysis here reduces to a single inquiry of whether jurisdiction offends due process."[6] *Klein Frank, P.C. v. Girards*, 932 F. Supp. 2d 1203, 1209 (D. Colo. 2013) (citing *Pro Axess, Inc. v. Orlux Distrib., Inc.,* 428 F.3d 1270, 1276 (10th Cir. 2005)); *Classic Auto Sales, Inc. v. Schocket*, 832 P.2d 233, 235 (Colo. 1992); *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005)).

---

[6]Where a party raises issues such as "patent infringement and patent validity, it is appropriate to look to the law of the Federal Circuit, 'because the jurisdictional issue is intimately involved with the substance of the patent laws.'" *SpaceCo Bus. Sols., Inc. v. Mass Engineered Design, Inc.*, 942 F. Supp. 2d 1148, 1153 (D. Colo. 2013) (quoting *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1016 (Fed. Cir. 2009)). However, while the claims in the complaint relate to violations of the patent laws, the Court finds that Tenth Circuit law governs the personal jurisdiction determination because the claims primarily present antitrust and tort violations, not infringement claims. *See id.* (finding that malicious prosecution claims related to patent enforcement should be addressed under Tenth Circuit law, rather than Federal Circuit law, for purposes of determining personal jurisdiction).

"Personal jurisdiction comports with due process where a defendant has minimum contacts with the forum state and where those contacts are such that jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *Interstate Restoration, LLC v. Wilson Assocs.*, No. 13-cv-03423-REB-MJW, 2014 WL 1395466, at *2 (D. Colo. Apr. 8, 2014) (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).  Minimum contacts may be established under the doctrines of general jurisdiction or specific jurisdiction.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011).  Where general jurisdiction is asserted over a non-resident defendant who has not consented to suit in the forum, minimum contacts exist if the plaintiff demonstrates that the defendant's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."  *Id.* at 919.  Specific jurisdiction, in contrast, is present only if the lawsuit "aris[es] out of or relat[es] to the defendant's contacts with the forum."  *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017).  Dawgs does not assert general jurisdiction; thus, the Court will analyze the relevant defendants' contacts with Colorado as they relate to specific jurisdiction.

The specific jurisdiction analysis is two-fold.  First, the Court must determine whether defendants have such minimum contacts with Colorado that defendants "should reasonably anticipate being haled into court" here.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  Within this inquiry, the Court must determine whether defendants "purposefully directed [their] activities at residents of the forum," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985), and whether

plaintiff's claims arise out of or result from "actions by . . . defendant . . . that create a substantial connection with the forum State." *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 109 (1987) (internal quotations omitted). Second, if defendants' actions create sufficient minimum contacts, the Court must consider whether the exercise of personal jurisdiction over defendants offends "traditional notions of fair play and substantial justice." *Id*. at 113. This latter inquiry requires a determination of whether the Court's exercise of personal jurisdiction over defendants is "reasonable" in light of the circumstances of the case. *Id*.

Dawgs argues that the out-of-state defendants have minimum contacts with the state by virtue of their purported participation in sham patent litigation, intentional interference with business advantage, and false advertising, which was "expressly aimed to benefit Crocs – a business that is headquartered within this very District." Case No. 16-cv-02004, Docket No. 38 at 25. The fact that Crocs is headquartered in Colorado and conducts business in the forum is not relevant to the minimum contacts analysis. *Calder v. Jones*, 465 U.S. 783, 790 (1984). Instead, "each defendant's contacts with the forum State must be assessed individually." *Id.* (citation omitted).

The complaint alleges that each of the out-of-state defendants ordered or authorized Crocs to assert the '858 Patent and the '789 Patent against Dawgs. Case No. 16-cv-02004, Docket No. 1 at 10-17, ¶¶ 9-12. While the complaint also alleges that the out-of-state defendants interfered with Dawgs' business opportunities and violated the Lanham Act, the complaint does not allege that these actions were purposefully directed at the forum state. *See Allison v. Wise*, 621 F. Supp. 2d 1114, 1120 (D. Colo.

2007) (finding no personal jurisdiction where out-of-state conduct was not "expressly aimed" at the forum state, despite causing injuries in the forum state).  The out-of-state defendants' alleged authorization of this lawsuit is therefore the only relevant conduct directed at the forum state.

"[T]he act of authorizing and directing a lawsuit [may] be enough to establish jurisdiction over officers of a corporation."  *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1101 (10th Cir. 2009).  In the Tenth Circuit, "it must be true that those who support and authorize funding of intentional tortious conduct must be subject to personal jurisdiction in the state where the tort took place and where they committed the acts that supported the tort."  *Id.*  Dawgs alleges that each of the out-of-state defendants authorized the enforcement of the '858 Patent and '789 Patent and the filing of this lawsuit.  Docket No. 38 at 24-25.  Based on these allegations, each defendant has the requisite minimum contacts with the forum.

The Court must still consider whether the exercise of personal jurisdiction over defendants offends "traditional notions of fair play and substantial justice."  *Asahi*, 480 U.S. at 113.  As the Tenth Circuit has noted, "[i]t is scarcely unfair to make those who have initiated a lawsuit in a particular state undergo suit in that state to determine whether the lawsuit was tortious."  *Rusakiewicz*, 556 F.3d at 1102.  Based on the allegations in the complaint, which the Court takes as true for purposes of this motion, the exercise of personal jurisdiction over the out-of-state defendants does not offend traditional notions of fair play and substantial justice.

Accordingly, the Court finds that it has personal jurisdiction over the out-of-state defendants.

13

**B. Claim Splitting**

Defendants argue that this lawsuit should be dismissed because it is "an impermissible collateral attack on a prior court order" and the "subject matter of the two actions is virtually identical." Case No. 16-cv-02004, Docket No. 31 at 9 (citation omitted). Dawgs argues that filing a second lawsuit was appropriate because "the two cases do not name the same parties."[7] Case No. 16-cv-02004, Docket No. 38 at 8-9.

Defendants' first argument assumes that Dawgs' conduct violated the scheduling order in the 2006 lawsuit. However, even where a plaintiff is denied leave to amend its complaint, it is permitted to file a second lawsuit so long as the second lawsuit does not run afoul of the doctrine of claim splitting. *Hartsel Springs Ranch of Colorado, Inc. v. Bluegreen Corp.*, 296 F.3d 982, 989 (10th Cir. 2002) ("[F]rom the standpoint of policy and logic, the fact that [a plaintiff's] motion to amend was denied on the ground of disruptiveness should have no bearing on the question whether plaintiff should be permitted to assert such claim in a separate lawsuit."); *see also Zisumbo v. Ogden Reg'l Med. Ctr.*, 2012 WL 4795655, at *3 (D. Utah Oct. 9, 2012) (holding that, where a plaintiff files a separate lawsuit after being denied leave to amend, the question is appropriately resolved through the doctrine of claim splitting). Even if Dawgs filed this

---

[7]Dawgs raises several additional arguments, including that it "did not move for leave [to] amend in the 2006 Lawsuit as the delay inherent in such a motion would have risked having certain Conspirator Defendants argue that an applicable statute of limitation had expired" and that the filing of the separate lawsuit was the result of Crocs' discovery misconduct. Case No. 16-cv-02004, Docket No. 38 at 8-9. Because the Court finds that Dawgs' filing of a separate lawsuit was proper, the Court does not consider these alternative arguments.

lawsuit in order to avoid the scheduling order, such conduct is permissible unless the separate litigation is duplicative.

The doctrine of claim splitting "requires a plaintiff to assert all of its causes of action arising from a common set of facts in one lawsuit." *Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011). The rule is meant to ensure an efficient allocation of "scarce judicial resources" and to ensure "the efficient and comprehensive disposition of cases." *Id.* Where a party runs afoul of the doctrine of claim splitting, the district court has discretion to dismiss duplicative cases. *Id.*

Claim splitting is an aspect of res judicata and is relevant where two lawsuits have been filed "involving the same subject matter, seeking the same claims for relief against the same defendants." *Katz*, 655 F.3d at 1219. Unlike res judicata, however, there is no requirement that a final judgment be obtained in the first lawsuit. Instead, "the test for claim splitting is not whether there is finality of judgment, but whether the first suit, assuming it were final, would preclude the second suit." *Katz*, 655 F.3d at 1218.

Defendants argue that the second-filed lawsuit violates the doctrine of claim splitting because the second lawsuit alleges the same conduct, the same causes of action, and the defendants are "the same individuals represented by the 'Does' in the Crocs action." Case No. 16-cv-02004, Docket No. 31 at 9. Dawgs argues that the second lawsuit in this case does not run afoul of the doctrine of claim splitting because "[n]one of the defendants in [the 2016 lawsuit] were ever named in the 2006 Lawsuit, let alone served with a complaint in that case." Case No. 16-cv-02004, Docket No. 38 at 8. While defendants are correct that the named defendants "fit within the categories of

John Doe defendants . . . in the 2006 lawsuit," Case No. 16-cv-02004, Docket No. 1 at 3, ¶ 2 n.1, defendants do not cite any authority to show that later identified Doe defendants constitute the "same parties" for res judicata purposes.

Generally, the substitution of a named defendant for a "John Doe" is the equivalent of adding a new party to a case. *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) ("replacing a 'John Doe' with a named party in effect constitutes a change in the party sued.") (citation omitted). Res judicata – and therefore claim splitting – requires "identity of the parties or their privies in both suits." *Yapp v. Excel Corp.*, 186 F.3d 1222, 1226 (10th Cir. 1999). Because defendants were not parties to the 2006 lawsuit, the doctrine of claim splitting applies only if defendants were in privity with the defendants to the 2006 lawsuit. Defendants do not argue that they were in privity with the named defendants in the 2006 lawsuit and there is no basis to conclude that defendants' interests are adequately represented by Crocs in that litigation. *See Hartsel Springs*, 296 F.3d at 987-88 (finding that claim splitting did not apply despite the fact that "the claims in both cases arise from a single wrong, . . . [defendants] maintained identical boards of directors and officers, and that 'the parties in both cases are represented by the same attorneys,'" because the corporate defendants did not share "identical" interests).

Because final judgment in the 2006 lawsuit would not bar Dawgs' complaint under principles of res judicata, Dawgs' complaint does not run afoul of the doctrine of claim splitting.

16

## C.  Statute of Limitations

Another preliminary issue presented by defendants is the applicability of the statute of limitations.  Defendants claim that the statute of limitations has run for each of Dawgs' causes of action.  Case No. 16-cv-02004, Docket No. 31 at 22-24.

A statute of limitations argument constitutes an affirmative defense.  However, "Rule 12(b)(6) is a proper vehicle for dismissing a complaint that, on its face, indicates the existence of an affirmative defense such as noncompliance with the limitations period." *Bullington v. United Air Lines Co.*, 186 F.3d 1301, 1310 n.3 (10th Cir. 1999) (citation omitted), *implicitly overruled on other grounds as recognized by Boyer v. Cordant Technologies, Inc.*, 316 F.3d 1137, 1140 (10th Cir. 2003).  "[W]hen the dates given in the complaint make clear that the right sued upon has been extinguished, the plaintiff has the burden of establishing a factual basis for tolling the statute." *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980).

Dawgs argues that the statute of limitations has not run because the complaint alleges continuing violations of the antitrust laws and ongoing torts.  Case No. 16-cv-02004, Docket No. 38 at 23-24.  Specifically, Dawgs alleges that defendants' violations of the antitrust laws are ongoing.  *Id.* at 23.  "In the context of a continuing conspiracy to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act . . .  as to those damages, the statute of limitations runs from the commission of the act." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  Similarly, for Dawgs' intentional interference and Lanham Act claims, the statute of limitations runs

from the date of the last injury. *Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1430-31 (10th Cir. 1996) ("[T]he statute of limitations does not begin to run until the wrong is over and done with.") (quoting *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir. 1983)). Because the face of the complaint does not show that the violations of the antitrust laws, interference with Dawgs' business, and violations of the Lanham Act occurred outside the statute of limitations period, defendants' statute of limitations argument is premature. *See* Case No. 16-cv-02004, Docket No. 1 at 61-107, ¶¶ 150-262.

### D. Monopolization Claims (First, Second, and Fourth Claims for Relief)

Dawgs' first, second, and fourth claims for relief all relate to violations of § 2 of the Sherman Act by defendants.[8] Case No. 16-cv-02004, Docket No. 1 at 61-86, 91-97; ¶¶ 150-194, 213-231. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). Therefore, to state a claim for monopolization, Dawgs must plead "power in a relevant market and anticompetitive conduct." *Id.*

---

[8]Dawgs' first and second claims for relief are brought against defendants Boedecker, Croghan, Frasch, Hanson, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, Snyder, and John and Jane Does 1 through 30. Case No. 16-cv-02004, Docket No. 1 at 61, 82. Defendants' fourth claim for relief is brought only against Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis. *Id.* at 91.

### 1. Anticompetitive Conduct

The anticompetitive conduct discussed in the complaint relates to a pattern of sham litigation and the enforcement of fraudulently procured patents. Case No. 16-cv-02004, Docket No. 1 at 70-75, ¶¶ 162-63. "Those who petition government for redress are generally immune from antitrust liability." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) ("*PRE*"). This protection stems from the First Amendment right to petition the Government. *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 379 (1991). Even if a party's motives in seeking redress from the government are anti-competitive, the *Noerr-Pennington* doctrine "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Id.* at 380 (citing *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 141 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965)). This immunity applies to individuals and entities who seek relief in the courts. *PRE*, 508 U.S. at 56-57 (discussing *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)). Because defendants have invoked the *Noerr-Pennington* doctrine, the burden is on Dawgs to show that it does not apply. *Lala v. Frampton*, No. 07-cv-02144-MSK-CBS, 2008 WL 4059874, at *6 (D. Colo. Aug. 28, 2008) (citing *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 54 F. Supp. 2d 1042, 1053 (D. Kan. 1999)).

There are two relevant exceptions to the *Noerr-Pennington* doctrine. First, under the so-called *Walker Process* exception, where a patent is procured by fraud, immunity does not apply to the enforcement of that patent. *See Walker Process Equip., Inc. v.*

*Food Mach. & Chem. Corp.,* 382 U.S. 172 (1965). Second, immunity does not apply where petitioning the government "is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." *PRE*, 508 U.S. at 56 (citing *Noerr*, 365 U.S. at 144).

In order to prevail on a *Walker Process* claim, Dawgs must allege that the party seeking to enforce a patent "obtained the patent by knowing and willful fraud on the [PTO] and maintained and enforced the patent with knowledge of the fraudulent procurement." *TransWeb, LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016). Walker Process allegations are subject to the pleading requirements of Fed. R. Civ. P. 9(b). *Medimmune, Inc. v. Genentech, Inc.*, 427 F.3d 958, 967 (Fed. Cir. 2005), *overruled on other grounds by Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007). In support of its monopoly allegations, Dawgs states that Crocs and Seamans, with the assistance of defendants, "fraudulently procured patents from the U.S. Patent Office by failing to disclose proper inventorship as well as known material, invalidating prior art, and prior sales." Case No. 16-cv-02004, Docket No. 1 at 74-75, ¶ 163. This anticompetitive conduct relates to the same thing – procuring and enforcing patents.

Defendants argue that Dawgs cannot allege a *Walker Process* claim against defendants because defendants did not themselves procure a patent, interact with a patent examiner, or enforce a patent. Case No. 16-cv-02004, Docket No. 31 at 14-15. The complaint alleges that each defendant "knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the initiation and maintenance" of

various lawsuits.  Case No. 16-cv-02004, Docket No. 1 at 70-74, ¶ 162.  Dawgs does not allege, however, that any of the defendants made a false representation to a patent examiner, nor does Dawgs provide any facts surrounding defendants' alleged knowledge that their actions were unlawful.  *See generally id.*  Moreover, the Court previously found that Dawgs failed to allege a *Walker Process* claim as to Crocs and Seamans.  *See* Docket No. 504 at 20-21.  Dawgs' *Walker Process* claim against defendants must fail if the conduct they "assisted" was not wrongful.  Case No. 16-cv-02004, Docket No. 1 at 70-74, ¶ 162.  Dawgs states that "[m]ore details of the extent of each individual's participation will undoubtedly be discovered from the files of Crocs and the Conspirator Defendants," Docket No. 38 at 10, but Dawgs is not entitled to a fishing expedition to make its case.  Because Dawgs does not allege specific wrongful conduct by defendants, it cannot state a *Walker Process* claim.  Accordingly, the Court considers whether Dawgs has adequately alleged a pattern of sham litigation.

The sham litigation exception consists of two parts.  First, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  Second, from the subjective perspective of the accused party, the lawsuit must conceal "an attempt to interfere directly with the business relationships of a competitor."  *PRE*, 508 U.S. at 60-61.  The classic example of a sham lawsuit is the filing of frivolous objections to the license application of a competitor simply to impose expense and delay.  *See California Motor Transport*, 404 U.S. at 513.

Defendants state that Crocs' patent lawsuits cannot be considered objectively baseless because Crocs has prevailed against Dawgs in the Federal Circuit and the

ITC.  Case No. 16-cv-02004, Docket No. 31 at 13-14.  The Court agrees.  "A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."  *PRE*, 508 U.S. at 60 n.5.  The Federal Circuit considered and rejected the argument that the '858 patent was obvious in light of prior art.  Case No. 16-cv-02004, Docket No. 1 at 37-38, ¶ 54; *see also Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1311 (Fed. Cir. 2010) ("In light of the prior art teaching away from the claimed invention and the claimed features that do not appear in the prior art, this court detects several reasons at the time of the invention that an ordinary artisan would not have been motivated even to try, let alone make, this inventive combination.").  These rulings establish that Crocs' lawsuits are not objectively baseless.  Dawgs argues that, because Crocs is engaged in a "pattern" of litigation, success on the merits on one occasion does not show it is not engaged in a sham litigation campaign.  Case No. 16-cv-02004, Docket No. 38 at 15-16.  However, the series of lawsuits described in the first, second, and fourth claims all relate to the enforcement of the same patents.  Case No. 16-cv-02004, Docket No. 1 at 36-40, ¶¶ 50-59.  In light of Crocs' success before the ITC, Crocs' lawsuits had potential merit.  Dawgs' pleadings demonstrate that Crocs' assertion of infringement of its patents does not constitute sham litigation.

Dawgs has not pled sufficient facts to support a claim based on fraud on the PTO or demonstrated that Crocs is engaged in "sham" litigation sufficient to fit within an exception to *Noerr-Pennington* immunity.  Accordingly, the Court finds that defendants are immune from antitrust liability for the conduct described in the first claim for relief, which will be dismissed.

### 2. *Attempted Monopolization and Conspiracy to Monopolize*

A claim for attempted monopolization must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Christy Sports*, 555 F.3d at 1192 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). To state a claim for conspiracy to monopolize, Dawgs must plead "conspiracy, specific intent to monopolize, and overt acts in furtherance of the conspiracy." *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 756 (10th Cir. 1999) (quotation omitted). A claim that depends on specific intent to monopolize hinges on "'predatory conduct,' which is 'conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition.'" *Re/Max Int'l v. Realty One, Inc.*, 900 F. Supp. 132, 153 (N.D. Ohio 1995) (quoting *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986)). Accordingly, in order to state a claim for attempted monopolization or conspiracy to monopolize, Dawgs must allege predatory conduct.

As discussed in the previous section, defendants are immune from suit for seeking and enforcing Crocs' patents. *Boulware v. State of Nev., Dep't of Human Res.*, 960 F.2d 793, 796 (9th Cir. 1992) (dismissal is proper where "the defendant's allegedly anticompetitive conduct is protected by the *Noerr-Pennington* doctrine."). Such actions by defendants are the only potentially predatory conduct described in the second and fourth claims for relief. *See* Case No. 16-cv-02004, Docket No. 1 at 85, ¶ 193; 92-93, ¶ 216. Accordingly, Dawgs' second and fourth claims for relief will be dismissed.

## E.  Conspiracy to Restrain Trade (Third Claim for Relief)

Dawgs alleges that defendants violated § 1 of the Sherman Act by conspiring to restrain trade.  Case No. 16-cv-02004, Docket No. 1 at 86-91, ¶¶ 195-212.  Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  To plead a claim for conspiracy to restrain trade, Dawgs must show: "(1) an agreement to enter a conspiracy (2) designed to achieve an unlawful objective."  *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993).  Defendants argue that Dawgs' claim should be dismissed because the underlying conduct, the assertion of infringement of the '858 and '789 patents, is not anticompetitive.[9]  Case No. 16-cv-02004, Docket No. 31 at 17-18.

The third claim for relief states that "Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis have and are continuing to conspire to continue to assert the '858 patent and '789 patent against Double Diamond, USA Dawgs, and CVS, despite their knowledge that both patents are invalid and/or unenforceable."  Case No. 16-cv-02004, Docket No. 1 at 86, ¶ 198.  Thus, the objective of the conspiracy among defendants is alleged to be the defense and enforcement of their patents.  As discussed above, such conduct is subject to

---

[9]Defendants claim that the "single entity rule" bars this claim.  Case No. 16-cv-02004, Docket No. 31 at 16-17.  Because Dawgs has failed to allege any anticompetitive conduct, the Court does not consider whether the single entity rule also bars this claim.

immunity from antitrust liability.[10]  *See PRE*, 508 U.S. at 59 (applying *Noerr-Pennington* immunity to §§ 1 and 2 of the Sherman Act).

Accordingly, Dawgs' third claim for relief will be dismissed.

### F.  Unlawful Exclusionary Arrangements, Agreements, and Conduct (Fifth Claim for Relief)

Dawgs' fifth claim for relief alleges violations by defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder for entering into unlawful exclusionary arrangements and agreements with buyers and distributors. Case No. 16-cv-02004, Docket No. 1 at 97-103, ¶¶ 232-250.  Exclusive dealing arrangements are not unlawful in the absence of anticompetitive effects.  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  In order to state a claim for unlawful use of exclusionary agreements under these provisions, Dawgs must show that defendants' exclusive dealing arrangements foreclose competition in a substantial share of the line of commerce affected.  *Tampa Elec.*, 365 U.S. at 327.  In addition, Dawgs must show anticompetitive effects resulting from "a substantial foreclosure of

---

[10]Patent misuse, as opposed to the enforcement of patent rights, is not necessarily exempt from Sherman Act protections.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 136 (1969) ("[T]here are established limits which the patentee must not exceed in employing the leverage of his patent to control or limit the operations of the licensee.").  While the complaint makes occasional reference to "patent misuse," *see, e.g.,* Case No. 16-cv-02004, Docket No. 1 at 68-69, ¶ 157, there are no factual allegations in the complaint suggesting that defendants have impermissibly expanded the scope of the patents.  Instead, the allegations in the complaint go to invalidity and enforceability, not to the scope of Crocs' patent assertions.  *See Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1339 (Fed. Cir. 2006) (noting that patent misuse cannot be shown where allegedly anticompetitive restrictions are "within the patent grant").

their ability to compete in the relevant market." *See Compliance Mktg., Inc. v. Drugtest, Inc., No.* 09-cv-01241-JLK, 2010 WL 1416823, at *8 (D. Colo. Apr. 7, 2010) (citing *Tampa*, 365 U.S. at 328). Dawgs states that the relevant market is "molded clog-type footwear." Case No. 16-cv-02004, Docket No. 1 at 97-98, ¶ 235.

The fifth claim is bereft of any facts suggesting that defendants' actions substantially foreclosed a substantial share of the relevant market or Dawgs' ability to compete. Dawgs states that defendants have engaged in the following actions:

(a) Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder successfully threatened, intimidated, and coerced actual and potential purchasers of Plaintiffs' footwear products not to deal with Plaintiffs or participated in, ratified, or acquiesced in the decision to threaten, intimidate, or coerce actual and potential purchasers of Plaintiffs' footwear products not to deal with Plaintiffs;

(b) Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder induced, organized, and implemented a refusal to deal among buyers/distributors, including Academy Sports and others, not to distribute or purchase Plaintiffs' footwear products, or participated in, ratified, or acquiesced in the decision to induce, organize, or implement a refusal to deal among buyers/distributors, including Academy Sports and others, not to distribute or purchase Plaintiffs' footwear products;

(c) Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder conditioned the payment or allowance of discounts and rebates provided on the purchase of Crocs' footwear products, on an agreement not to deal with or purchase competitive products from Plaintiffs, or or [sic] participated in, ratified, or acquiesced in the decision to condition the payment or allowance of discounts and rebates provided on the purchase of Crocs' footwear products, on an agreement not to deal with or purchase competitive products from Plaintiffs;

(d) Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder entered into actual or de facto/implied exclusive dealing arrangements with various customers, or participated in, ratified, or acquiesced in the decision to enter into actual or de facto/implied exclusive dealing arrangements with various customers; and

(e) Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder have entered into agreements that prevent Crocs' customers from selling products "similar" to Crocs, or participated in, ratified, or acquiesced in the decision to enter into agreements that prevent Crocs' customers from selling products "similar" to Crocs.

Case No. 16-cv-02004, Docket No. 1 at 98-100, ¶ 240.

The fifth claim for relief fails to allege a particular exclusive dealing arrangement between Crocs and a buyer or distributor. While the fifth claim states that "Academy Sports, and others, [] informed Plaintiffs that the reason they would not carry Plaintiffs' products is because of agreements with Crocs," Case No. 16-cv-02004, Docket No. 1 at 100-101, ¶ 243, nowhere in the claim does Dawgs specify the nature of any such arrangement, e.g., whether the agreements bar purchases from Crocs' competitors, provide discounts for carrying a specified volume, or otherwise incentivize exclusivity. Moreover, Dawgs fails to allege "any facts demonstrating the total volume of commerce involved" in the exclusive dealing arrangements. *Compliance*, 2010 WL 1416823, at *9. There are, accordingly, no allegations in the fifth claim for relief plausibly suggesting that the exclusive dealing arrangements have a substantial effect on the total volume of commerce involved in the market for molded clog-type footwear. *Tampa Elec.*, 365 U.S. at 329 (stating that substantiality requires a court "to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the

27

relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.").

In the absence of factual allegations related to the nature of defendants' alleged exclusive arrangements or allegations related to how those agreements significantly impair competition, Dawgs' fifth claim for relief is deficient and will be dismissed.

### G.  Intentional Interference With Business Advantage (Sixth Claim for Relief)

Dawgs' sixth claim for relief, presumably a state law claim, is brought against Crocs, Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder, and alleges intentional interference with business advantage.  Case No. 16-cv-02004, Docket No. 1 at 103-105, ¶¶ 251-254.  Under Colorado law, "[o]ne who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation." *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1195-96 (Colo. App. 2009) (quoting Restatement (Second) of Torts § 766B (1979)).  In order to qualify as a protected relationship, "there [must be] a reasonable likelihood or probability that a contract would have resulted;

there must be something beyond a mere hope." *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995).

The first amended counterclaims repeat the list of interfering conduct described in Dawgs' sixth claim, quoted in the previous section. Case No. 16-cv-02004, Docket No. 1 at 103-105, ¶ 252. Dawgs does not plead facts plausibly suggesting a reasonable likelihood of contracting with a particular third party.[11] *See Savant Homes, Inc. v. Collins*, No. 13-cv-02049-WJM-MEH, 2015 WL 899302, at *10 (D. Colo. Feb. 27, 2015) (granting summary judgment where there was no evidence related to individuals in the process of contracting with plaintiff). In the absence of any allegations regarding such a relationship, Dawgs' claim is deficient.

The Court finds that Dawgs has failed to state a claim for intentional interference with business advantage. Accordingly, Dawgs' sixth claim for relief will be dismissed.

### H. Violation of Section 43(a) of the Lanham Act (Seventh Claim for Relief)

Dawgs' seventh claim for relief is brought pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Case No. 16-cv-02004, Docket No. 1 at 105-107, ¶¶ 255-262. Section 43(a)(1)(B) provides for liability against any person:

> who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

---

[11]Dawgs has moved for reconsideration of the dismissal of this claim in the 2006 lawsuit. Docket No. 520. However, Dawgs has not moved to amend the complaint in the 2016 lawsuit. Accordingly, the Court does not consider the supplemental information offered by Dawgs here.

15 U.S.C. § 1125(a)(1)(B). The seventh claim states that "Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder have been misleading the public and consumers by claiming that Crocs footwear is made of an exclusive and proprietary closed-cell resin that they call 'Croslite.'" Case No. 16-cv-02004, Docket No. 1 at 106-107, ¶ 256. "Croslite" is in fact ethyl vinyl acetate, which is used by footwear companies around the world, including Dawgs. *Id.* Dawgs also claims that Crocs' promotional materials refer to "our patented Croslite<sup>TM</sup> material" and "our proprietary Croslite<sup>TM</sup> material," and that Croslite is a "revolutionary technology." *Id.* at 22-24, ¶ 22. Dawgs claims that, on information and belief, "Crocs does not own any exclusive, proprietary, or patent rights to the materials from which its footwear are made." *Id.* Dawgs alleges that the descriptions of Croslite have misled consumers into believing that Crocs uses a different material from competitors and that Crocs owns the rights to such material. *Id.* at 106, ¶ 257. As a result, Dawgs alleges that consumers are deceived into concluding that the products sold by Dawgs are "made of inferior material compared to Crocs' molded footwear." *Id.* at 107, ¶ 260. Dawgs claims that, in the absence of an injunction and a court-ordered retraction, Crocs' promotional activities will cause it to "suffer a loss of consumer confidence, sales, profits, and goodwill." *Id.*, ¶ 262.

Defendants argue that Dawgs' Lanham Act claim fails because "Dawgs must allege that *each Defendant* made a false statement of fact in commerce." Case No. 16-cv-02004, Docket No. 31 at 22 (citing 15 U.S.C. § 1125(a)(1). The statute itself does

not insulate individuals from liability who authorize the use of false statements in commerce, and defendants cite no authority barring Lanham Act liability where a defendant approves promotional statements that he or she knows are false.

Defendants additionally argue that Dawgs has failed to allege standing under the Lanham Act or a cognizable injury that was proximately caused by the alleged Lanham Act violation. Case No. 16-cv-02004, Docket No. 31 at 21-22. The basis for defendants' argument is *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). In *Lexmark,* the Supreme Court laid out a two-step test to determine when a party can sue under § 43(a) of the Lanham Act. *Id.* at 1388-90. First, the party raising a Lanham Act claim must "fall within the zone of interests protected by the [Lanham Act]." *Id*. at 1388. Second, the injury alleged must be "proximately caused by violations of the statute." *Id.* at 1390.

The Supreme Court held that the zone of interests for a false advertising claim under the Lanham Act encompasses plaintiffs who suffer "an injury to a commercial interest in reputation or sales." *Id.* In order to demonstrate proximate cause under the Lanham Act, a plaintiff "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 1391.

*Lexmark* does not foreclose Dawgs' claim at the pleading stage.[12] Dawgs fits within the zone of interests of the Lanham Act because it is a direct competitor with

---

[12]Although Dawgs "has alleged an adequate basis to proceed under § 1125(a), it cannot obtain relief without evidence of injury" proximately caused by Crocs' alleged misrepresentations. *Lexmark*, 134 S. Ct. at 1395. Dawgs "is entitled to a chance to prove its case." *Id.*

Crocs who alleges an injury to reputation or sales. Docket No. 209 at 83, ¶ 260. In terms of causation, Dawgs alleges that Crocs' purportedly false descriptions of Croslite have caused or will cause "a loss of consumer confidence, sales, profits, and goodwill." *Id.*, ¶ 262. These injuries "flow[] directly from the deception" caused by Crocs' advertising. *Lexmark*, 134 S. Ct. at 1391.

Accordingly, Dawgs' seventh claim for relief sufficiently states a claim at this stage in the proceedings.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendants' Motion to Dismiss [Case No. 16-cv-02004, Docket No. 31] is granted in part and denied in part. It is further

**ORDERED** that Dawgs' first, second, third, fourth, fifth, and sixth claims for relief are dismissed with prejudice. Case No. 16-cv-02004, Docket No. 1. It is further

**ORDERED** that defendants John and Jane Does 1-30 are dismissed from this lawsuit.

DATED September 25, 2017.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge