## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-00605-PAB-KMT
    (Consolidated with Civil Action No. 16-cv-02004-PAB-KMT)

Civil Action No. 06-cv-00605-PAB-KMT

CROCS, INC.,

        Plaintiff,

v.

EFFERVESCENT, INC., ET AL.,

        Defendants.

Civil Action No. 16-cv-02004-PAB-KMT

U.S.A. DAWGS, INC.,
DOUBLE DIAMOND DISTRIBUTION, LTD., and
MOJAVE DESERT HOLDINGS, LLC,

        Plaintiffs,

v.

RONALD SNYDER, ET AL.

        Defendants.

## CROCS, INC.'S MOTION TO EXCLUDE EXPERT OPINIONS OF
## JAMES E. MALACKOWSKI

Pursuant to Federal Rule of Evidence 702, plaintiff Crocs, Inc. ("Crocs"), through its

undersigned counsel, hereby moves to exclude each of the opinions of James Malackowski.

## I.      STATEMENT OF COMPLIANCE WITH D.C.COLO.L.CIV.R. 7.1

Undersigned counsel certifies that he has conferred with counsel for U.S.A. Dawgs, Inc.,

Double Diamond Distribution Ltd., and Mojave Desert Holdings, LLC (collectively, "Dawgs")

about the substance of this motion.  Dawgs opposes the relief requested herein.

## II.    INTRODUCTION

Dawgs's proposed damages expert, James Malackowski, offers three basic damages opinions.  He opines that (1) Dawgs is entitled to "lost profits" from allegedly false statements that the material in Crocs's footwear, branded as Croslite, is "patented," "proprietary," or "exclusive"; (2) Dawgs is entitled to disgorgement of a portion of Crocs's profits due to such allegedly false statements about Croslite; and (3) Dawgs is entitled to "corrective advertising" damages for remediating such statements about Croslite in the marketplace.  In addition, Mr. Malackowski purports to offer an opinion concerning whether Croslite is, in fact, "proprietary" or "exclusive."  Each of these opinions rests on unreliable assumptions, unfounded logical inferences, shoddy and unreliable methods, or unfounded say-so.  For the reasons stated below, Crocs respectfully requests that these opinions be excluded.

## III.    LEGAL STANDARD

Under Rule 702 of the Federal Rules of Evidence, the Court exercises a gatekeeper function to ensure that expert testimony is admitted only if it is reliable and relevant.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016).  "The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence."  *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).  When an expert's opinion is challenged, the Court's gatekeeper function requires it to examine "the reasoning and methodology underlying the expert's opinion, and determine whether it is scientifically valid and applicable to a particular set of facts."  *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

The Tenth Circuit has established a two-step analytical framework to determine the admissibility of an expert's testimony.  At the first step, the Court must determine whether the

CROCS, INC.'S MOTION TO EXCLUDE

expert is qualified by "knowledge, skill, experience, training, or education" to render the

proffered opinion. *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006)

(quoting Fed. R. Evid. 702). In making this determination, the Court may consider various

factors, including "whether the witness proposes to testify about matters growing naturally and

directly out of research he or she conducted independent of the litigation, . . . and whether the

field of expertise claimed by the witness is known to reach reliable results for the type of opinion

the witness intends to express." *Crabbe*, 556 F. Supp. 2d at 1221.

At the second step, if the expert is sufficiently qualified to offer a particular opinion, the

Court must determine whether the opinion itself is reliable. *Id.* "For this purpose, [Rule 702]

sets out three specific requirements: (i) a showing that the method or principle used by the

witness is reliable; (ii) a showing that the witness used sufficient facts and data as required by the

method or principle; and (iii) a showing that the witness properly applied the method or principle

to the collected facts and data." *Id.*

To satisfy these requirements, the proponent of the expert opinion must first show that

the expert's methodology is scientifically valid, meaning that the process used is a "scientific or

logical method that can be replicated and validated." *Id.* at 1222. Next, the proponent must

show that the expert gathered "sufficient facts and data" to form the proffered opinion. *Id.* at

1223. This is a quantitative analysis whereby the Court examines whether the expert "obtained

the amount of data that the methodology itself demands." *Id.* Lastly, the Court must determine

whether the expert reliably applied the methodology to the facts and data. *Id.* In doing so, it

may consider a variety of non-exclusive factors, including whether the expert gave adequate

consideration to obvious alternative explanations or unjustifiably extrapolated from a premise to

draw an unfounded conclusion. *Id.* at 1223-24. An opinion need not be admitted where there is

CROCS, INC.'S MOTION TO EXCLUDE

"too great an analytical gap" between the expert's opinion and the facts relied upon, such as

where they are connected only by the *ipse dixit* of the expert.  *Dodge v. Cotter Corp.*, 328 F.3d

1212, 1222 (10th Cir. 2003) (quoting *General Elec. Co. v. Joiner*, 552 U.S. 136, 146 (1997)).

Finally, even if a qualified expert's opinion is deemed reliable, the Court must determine

whether the proffered opinion is relevant.  *Daubert*, 509 U.S. at 591; *Barnett v. Surefire Medical,*

*Inc.*, No. 17-cv-02470-PAB-KLM, 2021 WL 1015983, at *3 (D. Colo. Mar. 16, 2021).  To be

relevant, it "must logically advance a material aspect of the case, and be sufficiently tied to the

facts of the case that it will aid the jury in resolving a factual dispute."  *United States v. Garcia*,

635 F.3d 472, 476 (10th Cir. 2011) (cleaned up).  If the opinion does not "fit" the facts and

issues at hand, it must be excluded.  *BancFirst v. Ford Motor Co.*, 489 F. App'x 264, 266 (10th

Cir. 2012); *Jaffrey v. PorterCare Adventist Health Sys.*, No. 15-CV-02297-NYW, 2017 WL

5624572, at *6 (D. Colo. Nov. 22, 2017); *see also* Fed. R. Evid. 702(a).

## IV.    ARGUMENT

### A.    Mr. Malackowski's Opinion Concerning Dawgs's Actual Damages Lacks Evidentiary Support and Rests on a Flawed Market Share Analysis.

Mr. Malackowski first opines that Dawgs has sustained lost profits damages.  Ex. 1, at 40

(citing 15 U.S.C. § 1117).  He calculates Dawgs's purported lost profits as either $512,000 at the

low end, or $1,775,000 at the high end.  This opinion is inadmissible for several reasons.

1. No Causation.  First, there is no evidence that Crocs's statements about the materials in

Crocs's own footwear caused *Dawgs* to lose a single sale or customer.  Dawgs's own CEO and

Rule 30(b)(6) designee Steven Mann was unable to identify a single customer or sale, actual or

potential, that Dawgs lost because of such statements.  Ex. 4 at 359:23-361:7, 369:20-373:6.

And, neither Mr. Malackowski nor any other proposed experts offers an opinion on causation.

Ex. 3 at 109:17-24.  Consequently, there is no support for the assumption that the alleged false

CROCS, INC.'S MOTION TO EXCLUDE

statements *caused* Dawgs to lose sales.  Mr. Malackowski does not cite any factual basis or methodology to support his assumption that, but for Crocs making the statements in question, Dawgs would have captured a portion of Crocs's sales.  *See* Ex. 1 at 41 (claiming, without citation, that "it is likely that, but-for Crocs' false and/or misleading advertising, Crocs would not have made these sales and they would have been made by another competitor in the industry").  His lost profits opinion should therefore be excluded as lacking any evidentiary or methodological foundation.  *See Am. Aerial Servs., Inc. v. Terex USA, LLC*, No. 2:12-cv-00361-JDL, 2015 WL 1947265, at *5 (D. Me. Apr. 29, 2015) (excluding expert's lost revenue opinion as "untethered from any data or methodology that provides insight" into factors affecting plaintiff's business).

2. Baseless Market Definition.  Second, Mr. Malackowski relies on the assumption that Crocs and Dawgs are "direct competitors" in the so-called "molded EVA footwear market." Ex. 1 at 41.  Mr. Malackowski claims that this "market" consists of less than twenty companies, and that Dawgs would have had an approximate 20-25% market share from 2005 to 2021 but for the challenged statements by Crocs.  *Id.* at 41 & App'x 5.4.  Mr. Malackowski's main basis for positing the existence of this "market" was the say-so of Dawgs's CEO.  *Id.* at 41; Ex. 3 at 84:15-85:16.  Mr. Malackowski cited no academic studies positing such a market, nor any analysis of the cross-elasticity of demand between products in this market and casual shoes generally.  Ex. 3 at 85:17-86:3.

3. Fake Data.  Third, even were there such a thing as a separate "molded EVA footwear market" with just twenty companies in it, the market "shares" that Mr. Malackowski applies derive entirely from Dawgs's CEO estimating the relative sizes of such companies.  Ex. 1, App'x 5.4 & 9.  Mr. Mann provided to Mr. Malackowski a list of companies and his estimate of their

CROCS, INC.'S MOTION TO EXCLUDE

size relative to Dawgs.  *Id.* App'x 9.  This list is rife with subjective and nonsensical assertions.

For instance, Mr. Mann asserted that Skechers was only in the relevant market from 2007 to

2008, and as for its size, he wrote only: "Large competitor."  *Id.*  Mr. Malackowski duly assumed

that Skechers—a company that exceeded $1 billion in revenue per year during this time[1]—was

the same size as Dawgs, when in fact, Dawgs was less than 1% of Skechers's size.  *See id.* App'x

5.4 (assigning same market share to Dawgs and Skechers for 2007 and 2008, and zero market

share to Skechers thereafter); *cf. id.* App'x 8.2 (reflecting Dawgs's revenues of less than $10

million per year from 2007–10).  Further, Mr. Mann estimates that Birkenstock is "60% smaller

than Dawgs as there are only a few classic recent models," and estimates that Shein is "95%-

98% smaller than Dawgs."  *Id.*, App. 9.  These estimates are not based on data, as the "Sales"

column of the chart is left empty, and the "Approx Retail" pricing column is complete for just

four companies.  *Id.*  In other words, the numbers are fake.

Yet Mr. Malackowski's market share calculations, and thus his lost profits opinion, rely

entirely on the information provided to him by Mr. Mann, without independent market research.

Ex. 1, App. 5.4.  Mr. Malackowski even ignores market realities reflected elsewhere in his own

report, for example, that Teva sells EVA footwear.  Ex. 1 at 20.  But Teva is not included as a

competitor in his analysis.  Ex. 1, App'x 5.4.  Asked about this, Mr. Malackowski stated:  "The

reason for the distinction would be the competitive assessment of Mr. Mann as of the date of,

approximately, the ITC hearing.  I don't believe Teva was party to the ITC action."  Ex. 3 at

89:1-6.  This is nonsensical, because Mr. Mann's list includes companies that began selling as

---

[1] *See* Skechers 2010 Annual Report at 3, Business Highlights (reflecting revenues from 2006–
10), *available at* https://d1io3yog0oux5.cloudfront.net/_a26fa376c2a3649ae4076d427454d75e/
skx/db/437/2978/annual_report/2010+Annual+Report.pdf (accessed Aug. 16, 2021).

CROCS, INC.'S MOTION TO EXCLUDE

recently as 2021 (*e.g.*, Sootheez), and were not part of the ITC action (*e.g.*, Birkenstock), while excluding others that were (*e.g.*, Gen-X Sports). *See* Ex. 1, App'x. 9.

An opinion that rests solely on the unsupported approximations of an interested party, as Mr. Malackowski does here, is unreliable. *SF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663, 667 (D. Del. 2009) (excluding damages testimony where expert "relied on the [party's] estimates without knowing . . . the validity of the underlying data and assumptions upon which the [party's] estimates were based"); *see also Jacoby Donner, P.C. v. Aristone Realty Capital, LLC*, No. 17-2206, 2020 WL 5095499, at *21 (E.D. Pa. Aug. 28, 2020) ("A proposed expert's failure to take any measures to verify data provided by an interested party further weighs against admissibility under the reliability prong of Rule 702"); *MasForce Eur., BVBA v. MEC3 Co.*, No. 11-cv-1814-T-24AEP, 2013 WL 12156469, at *5 (M.D. Fla. Dec. 4, 2013) ("Expert testimony which has no methodology and simply conveys information provided to the expert by an interested party is improper."). Indeed, one of Mr. Malackowski's opinions was recently excluded by another court for this very same reason. *CareDx, Inc. v. Natera, Inc.*, No. 19-662-CFC-CJB, 2021 WL 1840646, at *1-4 (D. Del. May 7, 2021) (excluding proposed damages opinion resting on deposition testimony of plaintiff's CEO). Mr. Mann's arbitrary inclusion or exclusion of companies in this "market," which Mr. Malackowski failed to validate, further renders his method unreliable. *See TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 834 (C.D. Cal. 2010) (excluding opinion where expert failed to consider other market participants in calculating market shares).

4. Inapplicable Methodology. Fourth, Mr. Malackowski's methodology is unreliable because he uses a "Mor-Flo" market share reapportionment theory derived from *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573 (Fed. Cir. 1989), which has historically been

CROCS, INC.'S MOTION TO EXCLUDE

applied to cases of patent infringement.  *See, e.g.*, *All Plastic, Inc. v. SamDan LLC*, No. 20-cv-01318, 2021 WL 2979005, at *6 (D. Colo. Feb. 15, 2021); *see also* Ex. 3 at 33:4-22 (explaining Mor-Flo market assessment).  This methodology is inappropriate here.  In an infringement case, an expert can plausibly assume that a product would not have been sold but for the infringement.  As such, the infringer's market share can be taken out and reapportioned among the remaining competitors.  However, in false advertising, there is no basis to assume that, but for the false statements, the defendant would not have made *any* sales at all.  And, in this case, Dawgs does not contend that Crocs would have made zero sales but for the challenged statements.  Mr. Malackowski recognized this during his deposition, asserting only that Crocs could not have sustained a price premium but for the alleged statements.  Ex. 3 at 33:23-34:17.  Despite this, Mr. Malackowski's market share calculations in Appendix 5.4 remove Crocs from the market entirely.  Thus, the methodology is unreliable because it assumes that, but for the alleged false advertising, Crocs would have sold no shoes at all, a premise that cannot be reconciled with Mr. Malackowski's own admissions.

     5. Failure to Consider Real-World Events.  Finally, Mr. Malackowski fails to consider real-world events negating Dawgs's claim for lost profits.  In 2011, the ITC found that Dawgs had infringed two of Crocs's patents.  Yet, those infringing sales form the basis for Mr. Malackowski's calculation of Dawgs's market share from 2005 to 2010, and hence its lost profits.  Ex. 1 at 40.  It is nonsensical for Dawgs's claim to be premised on its infringement of Crocs's intellectual property.  Furthermore, U.S.A. Dawgs went bankrupt and exited the market from mid–2018 until late 2019.  Yet Mr. Malackowski attributes market shares of over 20% to Dawgs in each of those years.  *Id.*, App'x. 5.4.  Mr. Malackowski's failure to account for such

CROCS, INC.'S MOTION TO EXCLUDE

real-world events bearing on Dawgs's claimed damages and market share further bespeaks the unreliability of his opinion. *See id.* at 40-42.

For these reasons, Mr. Malackowski's opinion on Dawgs's lost profits in unreliable and should be excluded.

**B.      Mr. Malackowski's Opinion that Dawgs Is Entitled to Disgorgement of Between 1.7% and 5.9% of Crocs's Profits Is Unreliable.**

Mr. Malackowski also opines that Dawgs is entitled to disgorgement of between 1.7% and 5.9% of Crocs's profits, running from June 7, 2005 (the date of Double Diamond's formation) to March 31, 2021, and future profits for the next four years, *i.e.*, through March 2025. Ex. 1, at 35-40. This opinion relies on apportionment factor derived from a survey by Dawgs's proposed survey expert, Dr. Lynne Weber, as well as the opinion of Dawgs's marketing expert, Steven Shuster, that "Crocs used its false and/or misleading advertising for more than a decade before [Dr. Weber's] survey to establish a premium brand reputation for its material, similar to Gore-Tex." *Id.* at 37. As explained in separate motions, Dr. Weber's survey from which the asserted apportionment factor was derived is not reliable, and Mr. Shuster's opinions concerning Crocs's marketing and brand reputation are not based on adequate data or a reliable methodology. Should either of these opinions be excluded, Mr. Malackowski's disgorgement opinion must necessarily be excluded as well.

Furthermore, as with his opinion concerning Dawgs's lost profits, Mr. Malackowski again assumes, without basis, that the apportionment factor represents a portion of Crocs's profits attributable to the claimed false statements. Ex. 1, at 36. There is zero evidence—from Dawgs's proposed experts, objective sales data, or even anecdotal reports—that any consumers (1) actually encountered such "patented" messaging, or (2) that "patented" messaging caused a single consumer to purchase Crocs footwear. Dr. Weber's survey does not distinguish between

CROCS, INC.'S MOTION TO EXCLUDE

consumers who have and have not been exposed to such messaging.  Yet, Mr. Malackowski

assumes on the basis of this survey that either 1.7% or 5.9% of the entirety of Crocs's profits

from 2005 to 2025 were made as a causal result of such messaging.  *See id.* at 37-40.  In so

doing, Mr. Malackowski exceeded the bounds of Dr. Weber's survey, which did not seek to

apportion or calculate sales resulting from the messaging in question.  *See Rodman v. Otsuka*

*Am. Pharm., Inc.*, 2020 WL 2525032, at *6 (N.D. Cal. May 18, 2020) (excluding testimony by

expert that "exceed[ed] the boundaries of the sources she relie[d] on by going beyond what the

sources concluded"); *In re Accutane Products Liability*, No. 8:04-md-2523-T-30TBM, 2009 WL

2496444, at *2 (M.D. Fla. Aug. 11, 2009) ("[W]hen an expert relies on the studies of others, he

must not exceed the limitations the authors themselves place on the study.").

Further, Mr. Malackowski fails to discuss any alternative explanations as to what drove

Crocs's profits over this twenty-year span, such as its celebrity endorsements or the appeal of its

designs, or its actual advertising campaigns like "Ugly Can Be Beautiful" and "Come As You

Are."  Mr. Malackowski only says his figures are conservative because they do not account for

past claims that Crocs footwear is "antimicrobial."  Ex. 1 at 38.  Putting aside that Dawgs also

described its footwear as "antimicrobial" for many years, this statement is irrelevant because

"antimicrobial" is not a part of Dawgs's Lanham Act claim.  Fatally, Mr. Malackowski cites no

evidence that, but for "patented" statements that never appeared in a single Crocs advertisement,

1.7%, 5.9%, or any other proportion of customers would not have purchased shoes from Crocs.

For this additional reason, Mr. Malackowski's disgorgement opinion is speculative, untethered to

real-world evidence, and should be excluded.  *See Am. Aerial Servs.*, 2015 WL 1947265, at *5.

For these reasons, Mr. Malackowski's opinion that Dawgs is entitled to disgorgement of

Crocs's past and future profits is unreliable and should be excluded.

CROCS, INC.'S MOTION TO EXCLUDE

C.     **Mr. Malackowski's Corrective Advertising Opinion Is an Unreliable and Arbitrary Exercise in Multiplication.**

Next, Mr. Malackowski asserts that "Dawgs can recover an award of any damages it has sustained," including "an award for corrective advertising."  Ex. 1 at 42.  Mr. Malackowski calculates such an award at either $4.721 million or $11.189 million.  *Id.* at 43.  To arrive that this number, Mr. Malackowski begins not with any damage incurred by Dawgs, but rather with *Crocs's* "companywide marketing expense" from 2005 to 2021 ($758 million), applies the 5.9% "apportionment factor" from Dr. Weber's survey, and then concludes that Dawgs should be awarded 25% of that amount.  *Id.*  This opinion is inadmissible for several reasons.

First, Mr. Malackowski again relies on an apportionment factor derived from Dr. Weber's flawed survey.  For the reasons discussed above and in Crocs's concurrent motion to exclude Dr. Weber's opinions, this figure is flawed and cannot serve as the basis for a damages award.

Second, Mr. Malackowski relies on discussions with Dawgs's marketing expert, Steven Shuster, for the proposition that "a corrective advertising campaign limited to the United States would be insufficient to correct the impressions made by Crocs' false and/or misleading advertising . . . ."  Ex. 1 at 43.  As explained separately, Mr. Shuster has no experience with corrective advertising, and does not apply a reliable method in claiming that a global corrective campaign is needed, least of all because there is zero evidence concerning the "impressions" from "patented" statements in the first place.  Mr. Malackowski's reliance on Mr. Shuster's baseless *ipse dixit* that there is a marketplace "impression" to correct in the first place is a separate ground for exclusion.

Third, Mr. Malackowski points to no connection between Crocs's "companywide marketing expense" over a seventeen-year period and the propagation of the allegedly false

CROCS, INC.'S MOTION TO EXCLUDE

statements.  There is zero evidence that Crocs spent a single cent to promote or propagate

messaging that its material was "patented."  It is therefore arbitrary to use Crocs's top-line

marketing figures, which were devoted to separate messaging—*i.e.*, celebrity endorsements,

"Ugly Can Be Beautiful," "Come As You Are"—as a starting point for assessing corrective

advertising damages.  With no nexus between the alleged harm and the so-called remedy,

Mr. Malackowski's opinion would yield an unfair windfall to Dawgs completely untied to the

facts and allegations at issue here.

Fourth, Dawgs itself spent nothing to counteract any of the alleged false messages.  Ex. 3

at 103:9-11, 104:9-106:17.  Consequently, there are no "damages" to speak of.  Recognizing this,

Mr. Malackowski cites *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365,

1375 (10th Cir. 1977), for the proposition that "where the plaintiff was not able to spend money

on a corrective advertising campaign concurrently with the defendant's false and/or misleading

advertising, courts have found that the recovery of advertising expenses should not be limited to

those actually incurred prior to trial and that a plaintiff may be entitled to 'recover a reasonable

amount equivalent to that of a concurrent corrective advertising campaign.'"  Ex. 1 at 42.

Mr. Malackowski's reasoning turns the holding of *Big O Tires* on its head.

In *Big O Tires*, the Tenth Circuit took an initial award of $2.8 million, or 28% of the

"approximately $10 million [defendant] Goodyear spent infringing Big O's mark," and further

reduced it by 75%, allowing a final award of $678,302.  561 F.2d at 1375-76.  In other words,

the remedial award was directly tied to, and less than one-tenth of, what the defendant *actually*

*spent* to propagate a "devastating" marketing campaign.  *Id.* at 1375.  Here, by contrast, Crocs

has never spent a single dollar to disseminate a message that Croslite is "patented," and Dawgs

has shown no evidence that consumers were aware of such messaging.  Yet Mr. Malackowski

CROCS, INC.'S MOTION TO EXCLUDE

concludes that Dawgs is owed millions as a proxy for the cost to "correct" this non-existent

marketplace perception world-wide.  *Big O Tires* provides no support here for using Crocs's

completely unrelated, multi-decade, companywide marketing budget as the starting point for

such alleged "corrective advertising" damages.  Because there is no nexus between money spent

by Crocs to disseminate the challenged messaging and Mr. Malackowski's calculation, the figure

is utterly arbitrary, and not based on a reliable methodology.

Mr. Malackowski has previously been precluded from offering corrective advertising

opinions where he simply engaged in an arbitrary exercise of multiplication without applying

reliable methods, just as he does here.  *See CareDx, Inc.*, 2021 WL 1840646, at *3-4 (excluding

Mr. Malackowski's "simple math calculations" for lack of a reliable basis, and as likely to cause

prejudice by giving the "imprimatur of an expert" on an "undocumented and dubious damages

calculation"); *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 CIV. 7203 (DLC), 2006 WL

1359955, at *2 (S.D.N.Y. May 19, 2006) (excluding Mr. Malackowski's proposed opinion on

corrective advertising as a proportion of defendant's marketing budget due to failure to explain

"the relationship between [defendant's] advertising expenses and plaintiff's corrective

advertising costs").  The same result should obtain here.

For these reasons, Mr. Malackowski's opinion that Dawgs is entitled to corrective

advertising "damages" is unreliable and should be excluded.

### D.    The Opinion that Croslite Is Not "Patented," "Proprietary," or "Exclusive" Is Unreliable, and Mr. Malackowski Is Not Qualified to Render It.

Mr. Malackowski is an accountant.  He nevertheless opines that Croslite is not

"proprietary" or "exclusive" because (1) Croslite is not patented, and (2) Croslite is reverse

engineerable.  Ex. 1 at 31.  The "methodology" he uses to reach this conclusion derives from his

review of a single online dictionary, and his claimed experience as a business licensing

CROCS, INC.'S MOTION TO EXCLUDE

professional.  *Id.*  Mr. Malackowski is not an engineer, attorney, or linguist, and his background

in accounting and business licensing do not allow him to opine on the definition of such terms,

especially where doing so risks the giving the appearance of expert imprimatur to ultimate issues

of law.  *See Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) ("testimony which articulates

and applies the relevant law, however, circumvents the jury's decision-making function by

telling it how to decide the case"); *Skepnek v. Roper & Twardowsky, LLC*, 2015 WL 4496301, at

*1 (D. Kan. July 23, 2015) ("Although Federal Rule of Evidence 704 permits experts to testify

about ultimate issues of *fact*, they may not give opinions on ultimate issues of *law*.").  This

opinion should be excluded.

Furthermore, as explained in the separate motion to exclude the opinions of Bowdie

Isanhart, the issue of hypothetical reverse engineerability is irrelevant to this case and unhelpful

to the trier of fact, as there is no evidence that any other company has sold footwear with the

same formula or specifications as Croslite.  Thus, a fundamental premise underlying

Mr. Malackowski's opinion and drawn directly from Mr. Isanhart's opinions—that Croslite

could *hypothetically* be reverse engineered—is irrelevant, and the exclusion of Mr. Isanhart's

opinions necessitates excluding Mr. Malackowski's opinion in this regard as well.

## V.    CONCLUSION

For the foregoing reasons, Crocs respectfully requests that the Court exclude

Mr. Malackowski's opinions concerning (1) Dawgs's lost profits, (2) disgorgement of Crocs's

profits, (3) Dawgs's "corrective advertising" damages, and (4) whether Croslite is "proprietary"

CROCS, INC.'S MOTION TO EXCLUDE

or "exclusive."


Dated: August 16, 2021                     */s/ Sean M. Callagy*
                                            Sean M. Callagy

                                            ARNOLD & PORTER KAYE SCHOLER, LLP
                                            Three Embarcadero Center, 10th Floor
                                            San Francisco, CA 94111
                                            Telephone: 415.471.3100
                                            Facsimile: 415.471.3400
                                            Sean.Callagy@arnoldporter.com

                                            *Counsel for Crocs, Inc.*

CROCS, INC.'S MOTION TO EXCLUDE

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 16th day of August 2021, the foregoing **MOTION TO EXCLUDE EXPERT OPINIONS OF JAMES E. MALACKOWSKI** was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Sean M. Callagy*
SEAN M. CALLAGY

CROCS, INC.'S MOTION TO EXCLUDE