IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 06-cv-00605-PAB-MEH
(Consolidated with Civil Action No. 16-cv-02004-PAB-STV)

---

Civil Action No. 06-cv-00605-PAB-MEH

CROCS, INC.,

      Plaintiff,

v.

EFFERVESCENT, INC., et al.,

      Defendants.

---

Civil Action No. 16-cv-02004-PAB-STV

U.S.A. DAWGS, INC., et al.,

      Plaintiffs,

v.

RONALD SNYDER, et al.,

      Defendants.

---

**ORDER**

---

This matter is before the Court on Counterclaim Plaintiffs' Motion to Exclude Certain Expert Testimony [Docket No. 1026]. Crocs, Inc. ("Crocs") responded, Docket No. 1059, and counterclaim plaintiffs, U.S.A. Dawgs, Inc., Double Diamond Distribution, Ltd., and Mojave Desert Holdings, LLC (collectively, "Dawgs"), replied. Docket No. 1079.

## I.  BACKGROUND

The Court assumes familiarity with this fifteen-year-long dispute and will not detail the procedural history or background facts beyond what is necessary to resolve this motion.  Additional background can be found in previous orders and recommendations.  *See, e.g.*, Docket Nos. 673, 897, 1071.

Dawgs seeks to exclude Crocs's expert from "opining about the scope of two of the asserted patents in this case or the rulings" of the United States International Trade Commission ("ITC") or United States Court of Appeals for the Federal Circuit.  Docket No. 1026 at 2.[1]  Dawgs also seeks to preclude Crocs's damages expert, Peter Schwechheimer, from testifying about (1) whether Dawgs is a "knockoff" or "fast follower," (2) the quality of Dawgs's financial statements or the intent behind its "discovery discrepancies," and (3) pre-issuance damages.  *Id.*[2]

## II.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will

---

[1] While Dawgs does not identify these opinions, Dawgs does not dispute Crocs's citation of the opinions.  Docket No. 1059 at 8.  They are *Mojave Desert Holdings, LLC v. Crocs, Inc.*, 844 F. App'x 343 (Fed. Cir. 2021) (unpublished); *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294 (Fed. Cir. 2010); *In re Certain Foam Footwear*, U.S.I.T.C. Inv. No. 337-TA-567, USITC Pub. No. 4260, 2011 WL 5997932 (Oct. 1, 2011).

[2] Dawgs initially sought to exclude additional opinions; however, the parties agreed that certain portions of Dawgs's motion to exclude are moot in light of the Court's order, Docket No. 1071, granting Crocs's motion for summary judgment. Docket No. 1079 at 1 ("Dawgs notes that the parties have agreed that certain of the arguments raised in Dawgs'[s] opening brief are mooted by the Court's recent Order granting Crocs'[s] and the Individual Defendants' motion for summary judgment.").

> help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area.  Rather, the Court must "perform[] a two-step analysis." *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). After determining whether the expert is qualified, the proffered opinions must be assessed for reliability.  *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").

In ruling on a Rule 702 motion, the district court has a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  To perform that function, a court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592–93).  Where an expert witness relies on experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably

3

applied to the facts." *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702, advisory committee notes).  When examining an expert's method, however, the inquiry should not be aimed at the "exhaustive search for cosmic understanding but for the particularized resolution of legal disputes." *Daubert*, 509 U.S. at 597.  It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant.

In addition to the witness having appropriate qualifications and methods, the proponent of the witness's opinions must demonstrate that the process by which the witness derived his or her opinions is reliable.  *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).  "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.*

While the proponent of the challenged testimony has the burden of establishing admissibility, the proffer is tested against the standard of reliability, not correctness, *see Allstate Sweeping, LLC v. City & Cnty. of Denver*, No. 10-cv-00290-WJM-MJW, 2011 WL 2173997, at *3 (D. Colo. June 2, 2011); the proponent need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied."

4

*Crabbe*, 556 F. Supp. 2d at 1221.

Assuming the standard for reliability is met, the Court must also ensure that the proffered testimony will assist the trier of fact. *See Kumho Tire*, 526 U.S. at 156; *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122-23 (10th Cir. 2006). "Relevant expert testimony must logically advance[] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (quotations and citations omitted). In assessing whether expert testimony will assist the trier of fact, a court should also consider "whether the testimony 'is within the juror's common knowledge and experience,' and 'whether it will usurp the juror's role of evaluating a witness's credibility.'" *Id.* at 476-77 (quoting *Rodriguez-Felix*, 450 F.3d at 1123).

Finally, Federal Rule of Evidence 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## III.  ANALYSIS

As mentioned earlier, Dawgs seeks to exclude Crocs's experts from testifying about the '858 and '789 patents, the ITC decision, or the Federal Circuit decision. Docket No. 1026 at 2.  Dawgs also seeks to exclude certain opinions of Mr. Schwechheimer. *Id.*

### A.  Testimony about the Patents and Court Decisions

Dawgs argues that Crocs experts, Dr. Chiagouris, Sarah Butler, and Mr.

Schwechheimer, who are not lawyers or patent experts, should be precluded from testifying about "what they 'understand' is covered by the asserted '858 or '789 patents and what the ITC or Federal Circuit previously ruled on about the same." Docket No. 1026 at 6. Dawgs asserts that, not only are the ITC and Federal Circuit decisions highly prejudicial and irrelevant under Rule 403, none of the experts is qualified to offer legal conclusions or interpret the patents or decisions. *Id.* Dawgs identifies eight opinions that it believes should be excluded. *Id.* at 7–8.[3] These opinions are:

> 1. "[I] am informed that Crocs does have design and utility patents, including U.S. Patent No. 6,993,858 (the '858 patent), and that claims 1 and 2 of the '858 patent both claim 'a base section including an upper and a sole formed as a single part manufactured from a moldable foam material;' and a strap section made from a 'moldable foam material.' I am further informed that, in prior litigation, the Federal Circuit recognized that a key difference between Crocs and other footwear was the foam-on-foam friction created by the passive restraint system described in the '858 patent . . . . Mr. Shuster provides no reason why consumers have not also drawn the same connection between this patent-protected foam-pivoting strap and references in the marketplace like 'patented foam material, Croslite' which appear throughout the documents he relies on." Docket No. 1026-2 at 6–7, ¶ 122 (Chiagouris Report).

> 2. "I have been advised that Dawgs asserts it implemented a redesign of its accused Dawgs's Clogs so as to avoid the four corners of the '858 patent asserted by Crocs . . . . While Dawgs contends that it implemented the redesign (i.e., which I understand included the addition of washers to disrupt the direct connection, or foam-to-foam connection claimed in the '858 patent[)]." Docket No. 1026-5 at 17–18, ¶ 57 (Schwechheimer Opening Report).

> 3. "Contrary to Mr. Malackowski's claims, Dawgs didn't merely 'stop selling' its Beach Dawg clogs in the United States in 2011, it was explicitly *ordered* to cease and desist from 'importing, selling, marketing,

---

[3] Dawgs also identifies an opinion, purportedly by Ms. Butler; however, the cited language that Dawgs claims comes from Ms. Butler's rebuttal report does not appear in the version of the report that Dawgs provided as Docket No. 1026-4. The Court, therefore, cannot consider this opinion.

advertising, distributing, offering for sale . . .' its Beach/Groovy/Big DAWGS products 'for the remaining term of the relevant '858 or '789 patent' under the ITC's General Exclusion Order ('GEO') *specifically because it was determined that Dawgs infringed* Crocs's asserted patents." Docket No. 1026-6 at 17, ¶ 63 (Schwechheimer Rebuttal Report).

4. "I further agree with the United States Court of Appeals for the Federal Circuit that the '858 patent was not obvious over the prior art." Docket No. 1026-7 at 3, ¶ 58 (Whatley Opening Report).

5. "I further agree with the United States Court of Appeal[s] for the Federal Circuit that the '789 patent is valid." *Id.* at 4, ¶ 88.

6. "I further agree with the United States Court of Appeal[s] for the Federal Circuit that the '858 patent was not obvious over the prior art." Docket No. 1026-8 at 3, ¶ 33 (Whatley Rebuttal Report).

7. "[T]he United States Court of Appeal[s] for the Federal Circuit and the ITC concluded that the '789 patent is valid. I agree with the United States Court of Appeal[s] for the Federal Circuit, the USPTO, and the ITC that the '789 patent is valid." *Id.* at 4–5, ¶ 44 (citations omitted).

8. "[T]he Federal Circuit concluded 'that it was 'impossible to determine' the features of the medial view of the shoes based on the 'OA Figure 11' photos." *Id.* at 7–8, ¶ 59.

Dawgs argues that these opinions should be excluded because the experts who offer them have no legal training or expertise to opine on legal conclusions. Docket No. 1026 at 6 (citing *Pinon Sun Condo. Assn., Inc. v Atain Specialty Ins. Co.*, 17-cv-01595-CMA-NRN, 2020 WL 1452166, *3–4 (D. Colo. Mar. 25, 2020) ("Mr. Pratt is not qualified to opine on Colorado law, including the Colorado Revised Statutes. . . . Mr. Pratt is not an attorney, has no formal legal education, and testified that he is not an expert on Colorado contract law."); *Pritchett v. I-Flow Corp.*, No. 09-cv-02433-WJM-KLM, 2012 WL 1059948, at *6 (D. Colo. Mar. 28, 2012) (finding expert witness with no formal legal training or education was not qualified to opine on legal duties or legal conclusions)).

7

Crocs does not appear to disagree that these experts are not lawyers and have no legal training or education. *See* Docket No. 1059 at 8–11. Crocs instead argues that the holdings in the ITC and Federal Circuit cases are "*facts*, not *opinions*" and are "inextricably bound to the resolution of this case," in part because the record of the proceedings before the ITC is automatically admissible in this Court by statute. *Id.* at 8 (citing 28 U.S.C. § 1659(b) ("the record of the proceeding before the United States International Trade Commission shall be transmitted to the district court and shall be admissible in the civil action.")). As such, Crocs states that its experts are not offering opinions on the scope or validity of the asserted patents but rather the experts critique "the failure of *Dawgs's* experts to consider how the patents impact their opinions." *Id.* at 10–11. Crocs also argues that Dawgs's motion mostly contains Rule 403 arguments that are more appropriate for a motion *in limine*, rather than a motion under Rule 702, and that the statements are based on sufficient facts and will help the jury understand the basis for the experts' opinions. *Id.* at 9.

"[A]n expert's testimony is not *per se* inadmissible simply because it requires discussion of the law." *Amica Life Ins. Co. v. Wetz*, No. 15-cv-1161-WJM-CBS, 2017 WL 897839, at *3 (D. Colo. Mar. 7, 2020). "[A] witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988). Such testimony "is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function. However, when the purpose of testimony is to direct the jury's understanding of the legal

8

standards upon which their verdict must be based, the testimony cannot be allowed." *Id.* at 809–10.  Testimony that "articulates the ultimate principles of law governing the deliberations of the jury" is inadmissible.  *Id.* at 808.  While an expert may refer to the law in expressing his or her opinion, the expert "may not state legal conclusions drawn by applying the law to facts."  *A.E. ex rel. Evans v. Indep. Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991) (citations omitted).

Subsection 1659(a) provides that, when there is a parallel ITC proceeding and district court action involving the same parties and same issues, the district court action shall be stayed pending final resolution of the ITC action.  28 U.S.C. § 1659(a). Subsection 1659(b) states that, "after dissolution of a stay under subsection (a), the record of the proceeding before the United States International Trade Commission shall be transmitted to the district court and shall be admissible in the civil action and shall be admissible in the civil action" to the extent permitted under the Federal Rules of Evidence and Civil Procedure.  28 U.S.C. § 1659(b).  The two subsections are to be read together and improve efficiency in the district court proceeding.  Courts have found that "the record developed in the proceeding before the [ITC] may be used to 'expedite proceedings and provide useful information to the court.'"  *SanDisk Corp. v. Phison Elecs. Corp.*, 538 F. Supp. 2d 1060, 1067 (W.D. Wis. 2008) (quoting H.R.Rep. No. 103–826(I), at 142, as reprinted in 1994 U.S.C.C.A.N. at 3914); *In re Princo Corp.*, 478 F.3d 1345, 1355 (Fed. Cir. 2007).

As to the first opinion, Crocs provides no justification for Dr. Chiagouris referencing the Federal Circuit decision.  Crocs insists it would "make[] no sense to

admit the record of the ITC Action, but not allow Crocs's experts to make any reference to it." Docket No. 1059 at 8. Crocs, however, does not explain why admitting the "record" of the ITC action would allow Dr. Chiagouris to reference the result of the proceeding or why discussion of the Federal Circuit's decision is necessary to Dr. Chiagouris's opinion about the '858 patent, Mr. Shuster's opinions, or what connections consumers may have drawn. Crocs does not explain why discussion of the Federal Circuit decision is part of an approved methodology for a marketing expert like Dr. Chiagouris with no legal training or why it is the type of information that a marketing expert would typically rely upon. Moreover, the legislative history of § 1659 confirms that the use of an ITC proceeding record is to expedite proceedings and provide useful information to the court. Crocs provides no authority that the transmission of the ITC record is designed to help experts without legal training explain ITC proceedings to the jury. The Court finds that Dr. Chiagouris is not qualified to opine on the Federal Circuit decision because he is not an attorney, has no formal legal education, and does not support his interpretation of the Federal Circuit decision with any citation to authority. *See Pinon Sun Condo. Ass'n*, 2020 WL 1452166, at *4; *Pritchett*, 2012 WL 1059948, at *6.

The Court also finds that the first opinion is not relevant. The full context of the opinion is as follows:

> There is some evidence showing other reasonable inferences that consumers might draw when exposed to the "patented" messaging in the marketplace. For example, I am informed that Crocs does have design and utility patents, including U.S. Patent No. 6,993,858 (the "'858 patent"), and that claims 1 and 2 of the '858 patent both claim "a base section including an upper and a sole formed as a single part manufactured from a moldable foam material;" and a strap section made from a "moldable

10

foam material."  I am further informed that, in prior litigation, the Federal Circuit recognized that a key difference between Crocs and other footwear was the foam-on-foam friction created by the passive restraint system described in the '858 patent.  The Shuster Report cites materials documenting this same litigation, such as a news which states "the judge ruled that one of the patents – U.S. Patent No. 6,999,858, particularly noting Croc's [sic] foam-pivoting strap-was enforceable and being infringed upon by Effervescent and Double Diamond."  Mr. Shuster provides no reason why consumers have not also drawn the same connection between this patent-protected foam-pivoting strap and references in the marketplace like "patented foam material, Croslite" which appear throughout the documents he relies on.

Docket No. 1026-2 at 6–7, ¶ 122.  This opinion, therefore, appears to be a rebuttal of an opinion presented by Mr. Shuster, one of Dawgs's experts, on the issue of consumer confusion.  The Court, however, recently held that the issue of consumer confusion is immaterial.  *See* Docket No. 1071 at 9 n.7.  Therefore, the Court finds that this opinion on an immaterial issue does not "logically advance[] a material aspect of the case." *See Garcia*, 635 F.3d at 476.  Moreover, the Court finds that, even if the opinion were material, reference to prior rulings by this Court or another court would be prejudicial to Dawgs, and the Court would exclude Dr. Chiagouris's opinion on that ground because the probative value of the opinion is substantially outweighed by unfair prejudice and confusion of the issues, and could mislead the jury.  *See* Fed. R. Evid. 403; *see also Anderson v. Ford Motor Co.*, 2014 WL 12597046, at *1 (D. Utah Sept. 16, 2014) (excluding reference to prior rulings as unduly prejudicial and irrelevant); *Wytex Prod. Corp. v. XTO Energy, Inc.*, 2014 WL 12799569, at *5 (E.D. Okla. Aug. 29, 2014) (same).  The Court, therefore, will exclude the first opinion.

In the second opinion, Mr. Schwechheimer states, "I have been advised that Dawgs asserts it implemented a redesign of its accused [infringing] Dawgs's Clogs so

11

as to avoid the four corners of the '858 patent asserted by Crocs."  Docket No. 1026-5 at 17–18, ¶ 57.  Mr. Schwechheimer also states, "I estimate that the number of unit-sales of accused products sold by Dawgs in the U.S. through August 2006 is approximately 18,394."  *Id*.  However, neither Mr. Schwechheimer nor Crocs explains why his estimation of the unit-sales of accused Dawgs products depends on what Mr. Schwechheimer may have been "advised" about Dawgs's redesign or why Dawgs may have redesigned its clogs.  Similarly, Mr. Schwechheimer and Crocs also fail to explain why it is necessary to use a prejudicial legal conclusion, namely, that Dawgs redesigned its clogs to avoid the bounds of the '858 patent, in order to provide an estimate on the number of accused products that Dawgs may have sold.  Additionally, the final sentence of this opinion, "[w]hile Dawgs contends that it implemented the redesign (i.e., which I understand included the addition of washers to disrupt the direct connection, or foam-to-foam connection claimed in the [']858 patent," *see* Docket No. 1026-5 at 18, ¶ 57, appears to be incomplete, and it is not clear what Mr. Schwechheimer meant by it.  Therefore, the Court will exclude the second opinion as irrelevant and unduly prejudicial.

The third opinion, part of the seventh opinion, and eighth opinion are also descriptions of the ITC and Federal Circuit decisions.  In the third opinion, Mr. Schwechheimer states that Dawgs was "explicitly ordered to cease and desist from 'importing, selling, marketing, advertising, distributing, offering for sale . . .' its [shoes] . . . specifically because it was determined that Dawgs infringed Crocs's asserted patents."  Docket No. 1026-6 at 17, ¶ 63.  Like Dr. Chiagouris, Mr. Schwechheimer is not a lawyer and has no legal training to opine on court decisions.  However, this

opinion directly rebuts an opinion by one of Dawgs's experts.  According to Mr. Schwechheimer, that expert calculated Dawgs's lost profits resulting from Crocs's allegedly false or misleading advertising, but the expert states that his calculation is "conservative" because Dawgs stopped selling a clog "as a result of an ITC ruling." *Id.*, ¶ 62.  Mr. Schwechheimer's opinion is that Dawgs did not "merely" stop selling a clog because of an ITC ruling, but rather that Dawgs was ordered to do so because it had infringed Crocs's patents.  *Id.*, ¶ 63.  Dawgs does not argue that this characterization by Mr. Schwechheimer is inaccurate.  However, Crocs does not explain why the second part of the opinion, i.e., "it was determined that Dawgs infringed," is necessary to rebut Dawgs's expert.  Furthermore, the Court agrees with Dawgs that testimony about ITC decisions may be inadmissible under Rule 403.  Although the cases that Dawgs relies upon pertain to ITC initial determinations, *see Realtek Semiconductor Corp. v. LSI Corp.*, 2014 WL 46997 (N.D. Cal. Jan. 6, 2014), and decisions by Federal Trade Commission administrative law judges, *see Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 101 (E.D. Va. 2004), the Court is persuaded that the same conclusion under Rule 403 may apply to ITC decisions and the ITC rulings like the General Exclusion Order when referenced by expert witnesses.[4]  *See also  Magna Elecs., Inc. v. TRW Auto. Holdings Corp.*, 2016 WL 4238769, at *3 (W.D. Mich. Jan. 28, 2016) ("With respect to the ITC proceedings, the Court finds that the outcome is largely not relevant,

---

[4] "A general exclusion order broadly prohibits entry of articles that infringe the relevant claims of a listed patent without regard to whether the persons importing such articles were parties to, or were related to parties to, the investigation that led to issuance of the general exclusion order."   *VastFame Camera, Ltd. v. ITC*, 386 F.3d 1108, 1114 (Fed. Cir. 2004).

and to the extent it is minimally relevant, the introduction of additional proceedings needlessly cause jury confusion and waste time.")

In the seventh opinion, Mr. Whatley states, in part, "the United States Court of Appeal[s] for the Federal Circuit and the ITC concluded that the '789 patent is valid." Docket No. 1026-8 at 4–5, ¶ 44. In the eighth opinion, Mr. Whatley states, "the Federal Circuit concluded 'that it was 'impossible to determine' the features of the medial view of the shoes based on the 'OA Figure 11' photos." *Id.* at 7–8, ¶ 59. These opinions are not factual issues that the jury will be asked to decide or statements of the law on which the Court will instruct the jury. *See O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 928 (D. Colo. 2017). However, the Court will exclude this part of the seventh opinion and the eighth opinion for the reasons discussed with respect to the first opinion. Mr. Whatley, like Dr. Chiagouris, has no legal training to opine on legal conclusions or court decisions. As a result, Crocs has failed to carry its burden of showing the appropriateness of these opinions under Rule 702, which requires that witness be both qualified to render an opinion by knowledge, skill, experience, training, or education, *see* Fed. R. Evid. 702, and that the witness explain how the experience or training is a "sufficient basis for the opinion." *See Medina-Copete*, 757 F.3d at 1104. Moreover, the probative value of these opinions is substantially outweighed by unfair prejudice and confusion of the issues, and the opinions could mislead the jury. *See* Fed. R. Evid. 403.

The fourth, fifth, sixth, and the remainder of the seventh opinions, all by Mr. Whatley, express agreement with the ITC and Federal Circuit opinions. Docket No.

1026-7 at 3, ¶ 58; *id.* at 4, ¶ 88; Docket No. 1026-8 at 3, ¶ 33; *id.* at 4–5, ¶ 44; *id.* at 6–7, ¶ 59.  The Court finds that these opinions would not be helpful to the jury because it is irrelevant whether Mr. Whatley agrees or disagrees with the ITC and Federal Circuit.  Although Crocs is correct that "issues of infringement and validity are analyzed in great part from the perspective of a person of ordinary skill in the art, and testimony explaining some technical evidence from that perspective may be of great utility to the factfinder," Docket No. 1059 at 10–11 (quoting *Two Moms & a Toy, LLC v. Int'l Playthings, LLC*, No. 10-cv-02271-PAB-BNB, 2012 WL 5249459, at *6 (D. Colo. Oct. 24, 2012) (quotation omitted)), Mr. Whatley's opinions that he agrees with the ITC and Federal Circuit are not expressions of "technical evidence" that would be "of great utility" to the jury.  Because these opinions of Mr. Whatley are irrelevant, the Court will exclude them.  *See Garcia*, 635 F.3d at 476 ("Relevant expert testimony must logically advance[] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.").

### B.  Mr. Schwechheimer's Opinions that Dawgs is a "Knockoff" or "Fast Follower" Brand

Dawgs also seeks to exclude Mr. Schwechheimer from rendering any opinions that "Dawgs is a 'knockoff' or a 'fast follower,' opinions related to 'knockoffs' or 'fast followers' generally . . . and from testifying via 'assumption' that Dawgs is a 'knockoff' or a 'fast follower.'"  Docket No. 1026 at 8.  Dawgs argues that Mr. Schwechheimer lacks the necessary qualifications to render such opinions and that these opinions are irrelevant, unreliable, and "incredibly prejudicial."  *Id.*  Dawgs identifies numerous instances of Mr. Schwechheimer's use of the terms knockoff and fast follower in his

opening and rebuttal reports.  *Id.* (citing Docket No. 1026-5 at 4–17, ¶¶ 6, 6 n.2, 9, 10, 23–26, 30, 32, 50, 54, 55; Docket No. 1026-6 at 4–22, ¶¶ 18, 50, 55, 68, 73).

Crocs claims that Dawgs's arguments are more appropriate for a motion *in limine* rather than a motion brought under Rule 702.  Docket No. 1059 at 11.  Crocs contends that Mr. Schwechheimer should not be precluded from describing Dawgs as a fast follower or knockoff because those statements are facts, not opinions, as Dawgs's investment banker referred to Dawgs as a "fast follower" in a widely distributed presentation to show that there were no design risks investing in Dawgs because Dawgs does not create its own designs.  *Id.* at 11–12.  Crocs also argues that Dawgs's investment banker's statements are admissible under Federal Rules of Evidence 404(b)(2) and 801(d)(2) and highlights the Federal Circuit's holding that "an ordinary observer, familiar with the prior art designs, would be deceived into believing the accused products are the same as the patented design."  *Id.* at 12 (quoting *Crocs*, 598 F.3d at 1304–06).

As an initial matter, the Court agrees with Crocs that Dawgs's argument that "knockoff" and "fast follower" are prejudicial is an argument more commonly raised in a motion *in limine*.  *See Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, No. 09-cv-00970-PAB-KMT, 2014 WL 348637, at *2 (D. Colo. Jan. 31, 2014) (stating that the purpose of a motion in limine is "to streamline the trial by providing a forum for resolving certain evidentiary issues outside the presence of the jury and the heated atmosphere of the courtroom").  However, the Court finds that Dawgs's other arguments, namely, those concerning Mr. Schwechheimer's qualifications and the relevance and reliability of his opinions, may be considered through a Rule 702 motion.  Moreover, even as a motion

16

*in limine*, Crocs states no convincing reason why the issue cannot be decided now.

Although Dawgs did not attach a copy of Mr. Schwechheimer's *curriculum vitae*, which would have enabled the Court to more thoroughly review Mr. Schwechheimer's qualifications, both of Mr. Schwechheimer's reports provide an overview of his qualifications and experience.  *See* Docket No. 1026-5 at 3–4, ¶¶ 3–5; Docket No. 1026-6 at 3, ¶ 3.  As relevant here, Mr. Schwechheimer states that he has 25 years of experience as an economic consultant in intellectual property and patent licensing. Docket No. 1026-5 at 3, ¶ 3.  His expertise is in the calculation and analysis of economic damages in patent, copyright, trade dress infringement, trade secret misappropriation, antitrust, and breach of contract disputes.  *Id.* at 4, ¶ 3.  He is also an adjunct professor of economics in applied economics, intellectual property strategy, and microeconomics.  *Id.*, ¶ 4.

Under Rule 702, an expert's qualifications may derive from knowledge, skill, experience, training, or education.  "[A]s long as an expert stays within the reasonable confines of his subject area, our case law establishes a lack of specialization does not affect the admissibility of the expert opinion, but only its weight."  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (quoting *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1520 (10th Cir. 1996)) (quotations and alterations omitted); *see also Zuchowicz v. United States*, 140 F.3d 381, 387 (2d Cir. 1998) ("[D]isputes as to the strength of his credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility of his testimony.").

Neither Crocs nor Mr. Schwechheimer has shown that Mr. Schwechheimer is qualified to determine whether Dawgs's business model involves selling "knockoffs" or that Dawgs is a "fast follower."  Mr. Schwechheimer's experience is in calculating and analyzing economic damages, Docket No. 1026-5 at 4, ¶ 3, and, although Mr. Schwechheimer teaches a course in "applied economics, intellectual property strategy, and microeconomics," *see id.*, ¶ 4, there is no indication that he is qualified to characterize Dawgs's business model.  As discussed below, Mr. Schwechheimer has not provided a methodology by which he has determined that Dawgs is a knockoff or fast follower.  Crocs does not address this argument directly in its response.  *See generally* Docket No. 1059.

As to Mr. Schwechheimer's use of the term "knockoff," in the summary of opinions from his first report, Mr. Schwechheimer explains that "Dawgs's business model appears to be based on adopting the designs of footwear and apparel products already established in the marketplace, which Dawgs then manufactures, imports, and sells in the United States.  These brand knockoff products include the accused foam clogs, which are 'deceptively similar' and 'nearly identical' to Crocs's claimed patented designs."  Docket No. 1026-5 at 4, ¶ 6.  Although the Federal Circuit found Dawgs's shoes nearly identical to Crocs's, *see Crocs*, 598 F.3d at 1306 ("In one comparison after another, the shoes appear nearly identical.  If the claimed design and the accused designs were arrayed in matching colors and mixed up randomly, this court is not confident that an ordinary observer could properly restore them to their original order without very careful and prolonged effort."), Crocs and Mr. Schwechheimer have not shown why the use of the term "knockoffs" is necessary to Mr. Schwechheimer's

18

opinion about Dawgs, Dawgs's alleged infringement, or Crocs's alleged economic damages.  Mr. Schwechheimer defines "knockoff behavior" as infringement, *see* Docket No. 1026-5 at 5, ¶ 10, and he later states that Dawgs's alleged knockoffs are "products copying the ornamental design or 'look and feel' of the Crocs brand to confuse or closely associate with Crocs but not outright deceive that it is, in fact, an original Crocs." *Id.* at 6, ¶ 23.  But neither Mr. Schwechheimer nor Crocs justifies his use of the term "knockoff" in light of the term's disparaging connotation.  The Court finds that probative value of this term to describe an infringing product is substantially outweighed by the danger of unfair prejudice.  *See* Fed. R. Evid. 403.

For Mr. Schwechheimer's use of the term "fast follower," he cites to a presentation from Dawgs's investment banker that Dawgs is "[a] 'fast follower' rather than a trendsetter."  Docket No. 1026-5 at 4, ¶ 6 n.2 (quoting Docket No. 1059-9 at 6).  Mr. Schwechheimer therefore equates the use of "fast follower" in this presentation with what he takes to be Dawgs's business model.  He did not reach this conclusion himself, but rather his use of "deceptively similar" and "nearly identical" comes from Mr. Whatley's opening report.  *See id.* (citing "Opening Infringement Expert Report of Ian H. Whatley, ¶¶ 95–97, 120–122).  Neither party has provided the Court with this portion of Mr. Whatley's report.

Crocs argues that Mr. Whatley's report is an admission by Dawgs and is admissible under Federal Rule of Evidence 801(d)(2) as an opposing party's statement.  Docket No. 1059 at 12.  Crocs, however, does not explain the context of this report by Mr. Whatley, whether he is or was a representative of Dawgs, or whether he has or had the authority, as a Dawgs representative, for his statements to be considered

admissions.  *See* Fed. R. Evid. 801(d)(2)(A)–(E).  Crocs has also not explained why or whether damages experts like Mr. Schwechheimer commonly rely on investment bankers' statements for the characterization of business models or why Mr. Whatley is a source commonly relied upon by damages experts for the same.  Moreover, Mr. Schwechheimer has not shown why he needs to use the term "fast follower," which he has not defined, and which could confuse the issues or mislead the jury.

### C.  Mr. Schwechheimer's Opinions on the Quality of Dawgs's Financials

Dawgs next seeks to exclude Mr. Schwechheimer's "pejorative inferences about Dawgs'[s] sales data that Dawgs 'under-reported' sales and made 'unsubstantiated deletions' that were 'most likely not the product of chance or error; they had an obvious expected result.'"  Docket No. 1026 at 11 (quoting Docket No. 1026-5 at 12–13, ¶¶ 38 n.57, 39–40).  Dawgs argues that Mr. Schwechheimer did not audit Dawgs's financials, did not provide a methodology to conclude that Dawgs engaged in "nefarious conduct as opposed to . . . a mistaken calculation."  *Id.*  Dawgs also argues that his statements are prejudicial and lack probative value.  *Id.*

Crocs responds that Mr. Schwechheimer's observations "rest on his review and analysis of Dawgs's financial production and interrogatory responses."  Docket No. 1059 at 14.  The Court assumes "financial production" means financial documents produced in discovery.  Crocs also explains that Dawgs produced sales summaries in early 2017 and then, a few months later, produced two sets of updated summaries.  *Id.* Mr. Schwechheimer found discrepancies in Dawgs's claimed sales during his review of these documents, which Crocs insists he explains in his report.  *Id.*

Mr. Schwechheimer states that he reviewed Dawgs's corporate financial statements, interrogatory responses, and fiscal year 2008 income statement.  Docket No. 1026-5 at 11–12, ¶ 38.  He states that he reviewed invoices to CVS, which Dawgs stated accounted for 91% of its sales, from fiscal year 2008 to 2010.  *Id.* at 12, ¶ 38 n.57.  He compared the CVS invoices to reports in Dawgs's financial statements and the two versions of Dawgs's sales summaries.  *Id.*  He then determined that Dawgs had "significantly under-reported" its figures in the second version of its sales summaries because the second version of the sales summaries omits income earned through sales of certain kinds of accused product.  *Id.*  The Court finds that this is a reliable methodology to calculate Crocs's damages since the damages are related to Dawgs's infringement-based income, as "[t]he purpose of a damage award for patent infringement is to give the plaintiff reasonable and full compensation for the loss incurred because of the patent infringement."  *Milgo Elec. Corp. v. United Bus. Commc'ns, Inc.*, 623 F.2d 645, 664 (10th Cir. 1980).  Mr. Schwechheimer provided damages figures based on multiple patents and royalties, arising, in part, on what he assumed was Dawgs's infringing, fast follower business strategy.  Reviewing Dawgs's income is reasonable because, if Dawgs infringed, its income due to the infringement contributes to Crocs's damages.  The Court also finds that Mr. Schwechheimer's experience in damages analysis and calculations enable him to express his opinion about why the two versions of Dawgs's sales summaries were different, even though Dawgs may disagree with that opinion.  *See Allstate Sweeping*, 2011 WL 2173997, at *3 (explaining that an expert's proffer is tested against the standard of reliability, not

correctness).  The Court will deny Dawgs's motion on this issue and permit Mr. Schwechheimer to testify about Dawgs's financials.

### D.  Mr. Schwechheimer's Opinions on Pre-Issuance Damages

Finally, Dawgs seeks to exclude Mr. Schwechheimer's opinion on "pre-issuance damages," which is "[f]rom an economic perspective, Dawgs's infringement-based, 'fast follower' business strategy provides a textbook case for awarding Crocs's pre-issuance damages under 35 U.S.C. § 154(d)."  Docket No. 2016 at 12 (quoting Docket No. 1026-5 at 5, ¶ 9).  Section 154(d) states, in part, that a patent owner has the right to royalty damages from an infringer beginning on the date of publication of the application of the patent and ending on the date that the patent is issued if the infringer "had actual notice of the published patent."  35 U.S.C. § 154(d)(1)(B).  Dawgs argues that Mr. Schwechheimer's opinion on pre-issuance damages should be excluded because "[t]here is no evidence whatsoever of any actual knowledge, rendering Mr. Schwechheimer's opinion irrelevant."  Docket No. 1026 at 12.

In its response, Crocs does not rebut the notion that there is no evidence of notice to Dawgs, but says that it will address these issues in response to Dawgs's motion for summary judgment.  *See* Docket No. 1059 at 15.  Crocs asserts, however, that Mr. Schwechheimer does not "opine that Dawgs had notice of the '465 patent," but rather "assumes liability, and opines on the damages that would be owed to Crocs."  *Id.* Crocs states that it will respond to Dawgs's arguments on this issue in its response to Dawgs's motion for partial summary judgment.  Accordingly, the Court will address this dispute in resolving that motion.

22

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Counterclaim Plaintiffs' Motion to Exclude Certain Expert

Testimony [Docket No. 1026] is **GRANTED in part** and **DENIED in part**.

DATED March 30, 2022.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge