IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-00605-PAB-MDB

CROCS, INC.,

        Plaintiff,

v.

EFFERVESCENT, INC., *et al.*,

        Defendants.

_____

**CROCS, INC.'S REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS OF BOWDIE ISANHART (ECF NO. 1025)**
_____

**I.    MR. ISANHART'S OPINION CONCERNING HYPOTHETICAL REVERSE ENGINEERABILITY IS IRRELEVANT.**

      Central to its claim that Croslite is not "proprietary" or "exclusive" to Crocs is Dawgs' allegation that Croslite is a "variation of ethyl vinyl acetate used by many footwear companies around the world," including Dawgs and "many others." ECF No. 487 ¶ 341; Mot. at 3. Mr. Isanhart's opinions do not remotely support this contention. He does not identify Croslite's ingredients or properties, and fails to show that anyone other than Crocs ever has sold, or could sell, shoes made of an equivalent material. Mot. at 6-11. His opinion that one *could* hypothetically reverse engineer Croslite is irrelevant and unhelpful to the trier of fact. *Id.* at 9-11.

      Mr. Isanhart did not reverse engineer Croslite. He claims he *could* do so. ECF No. 1025-2 (Isanhart Report) at 15. The premise behind Dawgs' argument is that unless it is *impossible* to reverse engineer a product, or identify even one of its ingredients, it cannot be exclusive or

1
CROCS REPLY ISO MOT. TO EXCLUDE

proprietary. Dawgs offers no authority in support and ignores the case law cited by Crocs that hypothetical reverse engineerability is not relevant. *Compare* Mot. at 9-11 (citing cases from the Tenth Circuit and this District) *with* Opp. at 6-8. Even in trade secret cases (which this is not), an expert must do more than claim that reverse engineering is *possible*—he must show *how* to do so. *See* Mot. at 14-15. Coke is largely water and high-fructose corn syrup—the bottle says so—and thus might theoretically be reverse engineerable, yet the formula is a secret. Here, Mr. Isanhart provides no step-by-step description for how to reverse engineer Croslite. His claim that he could do so with additional time and resources is not a method, and in any case, Dawgs elected not to have Mr. Isanhart attempt such work. *See* ECF No. 1025-3 at 92:16-93:5; ECF No. 1025-2 at 15.

Lacking authority, Dawgs cites dictionary definitions that confirm that Croslite is both "proprietary" and "exclusive."[1] Crocs' supply agreements give Crocs the sole right to make shoes from the materials it obtains from its suppliers. *See* Mot. at 10. Dawgs and Mr. Isanhart have not shown that anyone other than Crocs has used Croslite in footwear. Thus, Mr. Isanhart's opinions do not show that Croslite-based footwear is the same as footwear from Dawgs or others. As Mr. Isanhart's irrelevant opinions about hypothetical reverse engineerability would not help the trier of fact, they are inadmissible. Fed. R. Evid. 702(a).

## II.   MR. ISANHART'S OPINION CONCERNING THE INGREDIENTS AND PROPERTIES OF CROSLITE ARE UNRELIABLE.

Mr. Isanhart's analysis is also inadmissible because Dawgs fails to show that his methods are reliable. Instead of listing ingredients, Mr. Isanhart listed high-level categories, describing his

---

[1] *See* https://www.merriam-webster.com/dictionary/proprietary ("of, relating to, or characteristic of an owner or title holder"); https://www.merriam-webster.com/dictionary/exclusive ("**a:** excluding or having power to exclude; **b:** limiting or limited to possession, control, or use by a single individual or group") (visited Nov. 21, 2025).

findings as (1) a "primarily EVA" shoe; (2) a "slightly different" EVA used in another shoe; (3) an EPDM rubber outsole; and (4) "primary materials of construction," namely "variants" of polyethylene and EVA. ECF No. 1025-2 at 2, 6; *see also* ECF No. 1025-3 at 81:24-82:13 (discussing same). Mr. Isanhart could not correlate any of the shoes he tested to specific grades of Croslite. *Id.* at 82:14-18. Thus, at best, Mr. Isanhart identifies rough matches to one or two categories of ingredients. Mr. Isanhart reached these conclusions by visually comparing FTIR scans to roughly similar "library scans." ECF No. 1025-2 at 4-5; *see also* ECF No. 1025-3 at 83:22-89:1 (discussing library scans). On that basis alone, Mr. Isanhart calls the library scans a "relatively close match" to the samples tested. ECF No. 1025-2 at 5.

Fatally to his opinion, Mr. Isanhart provides no basis to find that identifying a rough match to a *category* of ingredients is a reliable means to test whether others have made, or could make, shoes of the *same* composition and properties. Mr. Isanhart admits that polyethylene, EVA and EPDM have many different grades, but he could not identify which is in each shoe. ECF No. 1025-3 at 82:14-18; 85:21-86:21; *see also id.* at 80:6-22 (admitting that he did not quantify the percentages of ethylene or vinyl acetate in the EVA blend he identified as a primary ingredient). Mr. Isanhart did not test shoes from Dawgs or any other shoemaker, *see* ECF No. 1025-2, so he could not have shown that the same materials were used by Dawgs or any other seller. Dawgs' claim that Mr. Isanhart "determined that Crocs are made of the same basic EVA or EPDM rubber as other shoes in the market, such as those made by Dawgs," Opp. at 6 (citing ECF No. 1025-2 at 2-10), is therefore factually false. As Mr. Isanhart's admissions make clear, there is no such thing as "the same basic EVA or EDPM rubber" used in all foam footwear, any more than "the same basic sugar" is used in all soft drinks.

In its Opposition, Dawgs fails to address the four relevant factors courts use to assess reliability of a methodology, namely "(1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community." *Basanti v. Metcalf*, 35 F. Supp. 3d 1337, 1342 (D. Colo. 2014) (Brimmer, J.) (internal quotation marks omitted), *aff'd sub nom. Basanti v. United States*, 666 F. App'x 730 (10th Cir. 2016) (unpublished). As the proponent of the testimony, Dawgs carries the burden to show its admissibility. *See* Fed. R. Evid. 702. Its failure to even acknowledge these factors illustrates Dawgs' inability to carry its burden.

Unable to defend what Mr. Isanhart did, Dawgs says FTIR analysis and certain other test methods are scientifically accepted (Opp. at 8, 10), which misses the point. The key question is whether finding a partial match to one category or attribute is a reliable means to assess a shoe's *entire* composition, or a reliable basis to claim that others have sold shoes with the *same materials and properties*—and Dawgs fails to show that they are.

Dawgs next claims that the fact that Mr. Isanhart did not reverse engineer Croslite affects the weight of his opinions. Opp. at 8-9. The case Dawgs cites, *United States v. Lujan*, No. CR 05-0924 RB, 2011 WL 13210238 (D.N.M. July 14, 2011), is readily distinguishable. There, the court admitted fiber analysis testimony—but only after the expert laid a scientific foundation, which is missing here. *Id.* at *1, *4-5. And, the expert's analysis connected fibers found on a victim's shoes to those of a "known" sample, namely a blanket in evidence that witnesses observed the defendant using to cover the victim's body. *Id.* at *1. Here, two of the three shoes were destroyed and no "known" sample of Croslite was used as a reference point, so key evidence is missing and there is

no sample to compare against. Finally, in *Lujan*, the purpose of the analysis was to corroborate eyewitness testimony that the defendant used the blanket to cover the victim's body, making it probative circumstantial evidence even if one could not definitively conclude that the fibers came from the same blanket. *Id.* at *4. Here, there is no corroborating evidence. And, Mr. Isanhart is not trying to assess *whether* a given shoe came from Crocs. He is asserting that all Croslite can be reverse engineered based on his limited matches to categories of ingredients in just three shoes. That assertion is not backed by any valid scientific methodology.

Elsewhere, Dawgs repeats that Mr. Isanhart's inability to identify what is in Croslite—or, as Dawgs puts it, "reverse engineer Croslite down to the atomic level"—goes to the weight of his opinions. Opp. at 7. Dawgs cites no authority for this contention. The problem for Dawgs is that Mr. Isanhart—and the industry outside of Crocs—does not know what Croslite is made of or how to replicate its properties. Assertions to the contrary are not "based on sufficient facts or data," Fed. R. Evid. 702(b), and leave "too great an analytical gap between the data and the opinion offered." *Estes Park Taffy Co. v. Original Taffy Shop, Inc.*, No. 15-cv-01697-CBS, 2017 WL 2472149, at *3 (D. Colo. June 8, 2017) (citation omitted).

### III. MR. ISANHART'S DESTRUCTION OF KEY EVIDENCE RENDERS HIS OPINIONS IRREPLICABLE AND UNRELIABLE.

Dawgs seeks to excuse Mr. Isanhart's knowing destruction of two of the three shoes he had tested because "Crocs can replicate the results (or try to prove that they were wrong)." Opp. at 11. That is not possible when the shoes no longer exist. And, Dawgs' argument would improperly flip Dawgs' burden from establishing the reliability of its expert's work to forcing Crocs to prove a negative based on evidence that was destroyed years ago. Dawgs must show authenticity and

reliability as foundations to the admission of evidence. *See* Fed. R. Evid. 702, 901. That burden cannot be met when the "evidence" is gone.

Dawgs next says "there is no reason to believe the shoes [Mr. Isanhart] tested were not authentic," based on one photograph that partially depicts two shoes tested in 2017. Opp. at 11. That photograph, reproduced below, in no way lays a foundation for the authenticity of the shoes depicted, and leaves much else to be desired:



ECF No. 1025-2, at 3 (caption: "Image 1: Two Crocs shoes analyzed in 2017"). No Crocs logos or branding are visible on either shoe. The green shoe has 12 holes visible on the vamp, whereas

an authentic Crocs clog has 13 holes on the vamp (perhaps the hangtag obscures a 13th hole—there is no way to know). And the green shoe appears to have no logo at all on the left rivet, where a "Duke" crocodile logo would appear on a Crocs shoe. The logo on the white shoe's rivet is not visible, either. Finally, there is no way to know whether the "crocs" label on the hangtag is from a genuine Crocs shoe or a convincing counterfeit, and the hangtag does not appear to be attached to either shoe.

Moreover, Mr. Isanhart received the shoes directly from Dawgs and had no knowledge of when or where Dawgs obtained them. Mot. at 7; *see also* ECF No. 1025-3 at 62:22-24, 64:5-7, 64:22-65:10.[2] The shoes may have been purchased outside of the United States (Dawgs' operations are centered in Canada) or from third-party sources of dubious authenticity. Crocs' concerns here are not speculative. Dawgs previously mischaracterized the design and manufacture date of shoes in this case, and while claiming its misstatements were due to inadvertence, refused to allow Crocs to inspect the shoes in question. *See* ECF No. 741 at 2, 8 (Court order describing Dawgs' efforts to assert a "Calzuro" shoe that did not exist until 2011 as prior art to Crocs' '858 Patent filed June 23, 2003); ECF No. 787 at 4 (Court order noting Dawgs' refusal to allow Crocs to inspect Calzuro footwear).

Dawgs' effort to downplay the destruction of critical evidence falls flat—without the ability to inspect the shoes, there is no basis to conclude that they are authentic of anything, much less test Mr. Isanhart's conclusions. Dawgs cannot brush this aside as a mere "defect in the chain of custody" (Opp. at 11)—the entire chain was lost when Mr. Isanhart destroyed the shoes. That

---

[2] Mr. Isanhart further admitted that he did nothing himself to verify that the shoes were authentic Crocs shoes. ECF No. 1025-3 at 66:20-24. Nor does Mr. Isanhart claim to be qualified to distinguish genuine Crocs from counterfeits or knock-offs.

he believed the case was over due to Dawgs' bankruptcy is Dawgs' responsibility for failing to instruct its own expert to preserve evidence. The upshot is that Crocs and the trier of fact have no access to two of the three shoes underlying Mr. Isanhart's opinions, and thus cannot evaluate his claims about these shoes. This is deeply prejudicial and unfair, and further grounds to find that Mr. Isanhart's analysis is unreliable and inadmissible.

## IV.  CONCLUSION

For the foregoing reasons, Crocs respectfully requests that the Court exclude the proffered opinions of Bowdie Isanhart.

Dated: December 15, 2025

/s/ *Sean M. Callagy*
Sean M. Callagy

ARNOLD & PORTER KAYE SCHOLER, LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Telephone: 415.471.3100
Facsimile: 415.471.3400
Email: Sean.Callagy@arnoldporter.com

*Counsel for Crocs, Inc.*

# CERTIFICATE OF SERVICE

The undersigned certifies that on the 15th day of December 2025, the foregoing **REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS OF BOWDIE ISANHART (ECF NO. 1025)** was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Sean M. Callagy
SEAN M. CALLAGY