IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-00605-PAB-MDB

CROCS, INC.,

        Plaintiff,

v.

EFFERVESCENT, INC., *et al.*,

        Defendants.

_____

**CROCS, INC.'S REPLY IN SUPPORT OF CROCS, INC.'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. LYNNE J. WEBER (ECF NO. 1028)**

_____

**I.    DR. WEBER'S OPINIONS ABOUT "PATENTED" ARE IRRELEVANT.**

Dawgs fails to establish that Dr. Weber's survey is relevant. ECF No. 1058 ("Opp.") at 2-6. Dawgs claims that Dr. Weber's survey addresses "a highly relevant question—how important was Crocs' false advertising to consumer purchases." *Id.* at 3. Her survey was not designed to answer that question. Dr. Weber first purports to have measured how consumers perceive "patented," and then offers abstract opinions about the allocation of shoe value, using a "constant sum" methodology. *See* ECF No. 1028-2 (Weber Report) ¶¶ 85-90. This confirms that Dr. Weber did not test actual advertisements or product listings. Her survey is thus irrelevant to any element of Dawgs' claim, including whether (1) Crocs "made a false or misleading description of fact or representation of fact in a commercial advertisement," (2) "the misrepresentation was material," or (3) "the misrepresentation actually deceived or had the tendency to deceive a substantial segment of its audience." *See Vitamins Online, Inc. v. Heartwise, Inc.*, 71 F.4th 1222, 1233 (10th

Cir. 2023) (cleaned up). Dawgs admits that it "was not Dr. Weber's assignment to test awareness of the false message in the marketplace" and that she did not test whether the messaging caused consumers to choose Crocs over another brand. Opp. at 6.

Dawgs' concessions that Dr. Weber did not test these real-world questions, or whether a single survey respondent had seen the complained-of statements (*id.* at 4-6) are fatal because "the relevant issue in a false advertising case is the consumer's reaction to the advertisement as a whole and in context." *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002). Only if Dr. Weber had first tested or confirmed exposure to actual advertisements could she have then examined what the "message actually conveyed to consumers." *See id.*; *see also Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Polenc Rorer Pharms., Inc.*, 19 F.3d 125, 137 (3d Cir. 1994) (In a false advertising case, "a well-designed consumer survey first asks 'communication' questions to see what messages the viewer got," before posing "'comprehension' questions to determine what the viewers thought the message meant."). Dr. Weber called only a portion of a statement to respondents' attention in a setting akin to a focus-group. That makes her survey irrelevant to what message was conveyed to consumers in the real world, and her opinions about how consumers perceive "patented" statements, *see* ECF No. 1028-2 (Weber Report) ¶ 86, must be excluded. *See Scotts*, 315 F.3d at 280 (district court abused discretion by crediting survey that showed respondents only an "isolated part" of the relevant promotional material).

Recognizing this, Dawgs argues that Crocs' expert Sarah Butler did not test prior exposure, Opp. at 5, but unlike Dr. Weber, Ms. Butler used a real product listing. *See* ECF No. 1058-5. In seeking to salvage her survey in a declaration submitted with Dawgs' opposition, Dr. Weber speculates that *some* of her survey respondents "likely were exposed" to allegedly false statements

made in Crocs' advertising. ECF No. 1058-1 (Weber Decl.) ¶ 32. This guesswork only confirms that Dr. Weber's opinions are unreliable, as she did not use an actual advertisement and cannot say whether *any* respondent ever saw one.

Next, Dr. Weber did not test whether "patented" statements were misleading or deceptive. *See* Opp. at 6, 8-9. Dawgs claims that because "patented" is literally false, there was "no need to measure degree of deception or confusion." *Id.* at 9. Not so. *See Crocs, Inc. v. Effervescent, Inc.*, 119 F.4th 1, 7 (Fed. Cir. 2024) (Dawgs must show that "patented" statements "cause[d] consumers to be misled about the nature, characteristics, or qualities of [Crocs'] product."). Thus, Dr. Weber's survey is irrelevant to deception. It cannot be used to show that consumers were deceived into believing that Croslite has qualities that it does not have, and Dawgs' attempts to use it for that purpose further support exclusion. *See* ECF No. 1002 at 3-4, 7; *see also Playtex Prods., LLC v. Munchkin*, No. 14-cv-1308 (RJS), 2016 WL 1276450, at *7 (S.D.N.Y. Mar. 29, 2016) (finding survey irrelevant where it did not test whether advertising conveyed false impressions).

Likewise, Dr. Weber's survey is irrelevant to whether "patented" statements were material to consumer decisions to purchase Crocs shoes. Nor does Dawgs contend that it is. Opp. at 5-6. Dawgs only argues that Dr. Weber's "constant sum" methodology "measure[d] the importance of a patented material to Crocs consumers." *Id.* at 6. What Dawgs does not argue or demonstrate is whether any statement about Croslite was likely to influence purchasing decisions, which is Dawgs' burden. *See Vitamins Online*, 71 F.4th at 1233. Nor could Dawgs show as much. Dr. Weber engaged in an abstract exercise, asking respondents first to rank the importance of different "dimensions of comfort," ECF No. 1028-2 at 47 (Q12), and then whether they would allocate additional value to that dimension, supposing the shoe material were patented, *id.* at 48

3
CROCS REPLY ISO CROCS' MOT. TO EXCLUDE

(Q14). Dawgs fails to explain how the responses to such questions translate to real-world purchasing behavior, *see* Mot. at 11-12; Opp. at 7, just as Dr. Weber's abstract conclusions regarding "average allocation of shoe value" do not address purchase decisions, ECF No. 1028-2 ¶¶ 87-89.

Tellingly, Dawgs does not cite a single case where a "constant sum" survey was used to support a false advertising claim. As Dawgs' cited authority shows, this methodology is typically seen in infringement cases where the value of an infringing product feature is assessed for damages purposes. *See* Opp. at 10 (citing *Biscotti v. Microsoft Corp.*, No. 2:13-cv-01015-JRG-RSP, 2017 WL 2536962, at *3 (E.D. Tex May 18, 2017)). Thus, while Dawgs claims that "constant sum" surveys have been "recognized" or "allowed by other courts," *id.* at 12, Dawgs does not show that such a survey is appropriate and relevant *here*.

## II.   DR. WEBER'S OPINIONS ABOUT "PATENTED" ARE UNRELIABLE.

Dr. Weber's opinions also should be excluded because serious design flaws in her survey render her opinions unreliable. *See, e.g.*, *In re Elysium Health-ChromaDex Litig.*, No. 17-cv-7394 (LJL), 2022 WL 421135, at *11-15 (S.D.N.Y. Feb. 11, 2022) (excluding materiality survey that used leading questions and failed to employ proper control).

***First***, Dr. Weber improperly used suggestive and leading questions to guide survey respondents. As Dawgs admits, Dr. Weber presented respondents with closed-ended questions, providing them with a list of product attributes that did not account for real-world conditions like price and product availability. *See* Opp. at 7 n.4. Dawgs claims that respondents were "free to list

'price' in the 'Other' option," *id.* at 7, which if they did, Dr. Weber dismissed as "not appropriate" despite numerous such responses. ECF No. 1028-2 at 22 n.36.[1]

Dawgs claims that Dr. Weber also asked open-ended questions. Opp. at 4. But the only question that could possibly be described as such improperly primed respondents to describe benefits of "patented" by asking them what "advantages or disadvantages" they "perceive[d] because the material is 'patented,'" instead of simply asking them what they perceived. ECF No. 1028-2 at 47 (Q13). And, as Dawgs concedes, Opp. at 10-11, Dr. Weber tested "patented" not on its own, but in the context of a specific statement about comfort while asking survey respondents to focus on the "dimension of comfort." ECF No. 1028-2 at 48 (Q12, Q14). Such questions were leading, such that the survey cannot reliably interpret how consumers perceive or value "patented", let alone in the context of a real product listing.

***Second***, for survey respondents who selected "Not sure or Don't know" when asked how many additional points they would assign if the material were "patented"—the overwhelming majority of respondents—Dr. Weber improperly filled in the gaps by imputing the average points allocated by a minority of respondents. Mot. at 11; *see also* ECF No. 1058-3 at 134:7-19 (discussing Dr. Weber's decision to impute the average of 57 responses to 143 respondents). This is the equivalent of removing the "not sure" response option altogether, "effectively requir[ing] the respondents to express a specific opinion, even if they did not have an opinion," thereby

---

[1] Similarly, Dr. Weber used a closed-ended "select all that apply" question when asking what respondents "perceive is true because the material is 'patented,'" suggesting to them that "patented" means "superior to other brands," "unique, special," "more technologically advanced, more innovative," "more durable," etc. ECF No. 1028-2 at 49 (Q16). And, as Dr. Weber admits in her *Daubert* opposition declaration, she only allowed respondents to answer this question if they "indicated they would have allocated *more* points if the material was patented," further evidencing an improper results-driven approach. ECF No. 1058-1 ¶¶ 16, 17.

rendering the survey results unreliable. *Scotts*, 315 F.3d at 280. Dawgs argues that "this is the way the U.S. Census operates," citing inapposite authority. Opp. at 11. The decision in *Utah v. Evans* considered the narrow question whether imputation in census data fell within the ambit of "sampling" as defined by federal statute, or violated the Constitution's Census Clause, 536 U.S. 452, 465-76 (2002), questions which are not at issue here. Additionally, the cited publication expressly warns that "the extent of imputation" must be considered, ECF No. 1059-9 (Opp. Ex. G) at 22, which is notably much higher in Dr. Weber's survey than even the Census.[2] Dawgs says nothing about Dr. Weber's exceptionally high rate of imputation, and cites no authority endorsing such a practice in a false advertising survey (or any litigation survey).

***Third***, Dr. Weber's failure to use a control group is fatal here. Mot. at 9-10; *see Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197, 1203-04 (D. Kan. 2003). Dawgs argues that it was sufficient to control for bias and noise using questions in place of a control group because the survey did not test causation or deception. Opp. at 8. Rather, the survey "sought to measure how Crocs consumers apportion value among attributes of Crocs shoes." *Id.* This is an unsupported distinction. Dawgs fails to cite a single case where a purported "constant sum" survey overcame relevance and reliability challenges despite lacking a control group. *See id.* at 9-10; *cf. Biscotti*, 2017 WL 2536962, at *3 (no challenge based on lack of a control). And, other authority relied on by Dawgs supports that where, as here, "the lack of a control group [is] one of numerous

---

[2] *See, e.g.*, U.S. Census Bureau, Press Release No. CB20-CN.55, *Over 60 Percent of U.S. Households Have Responded to 2020 Census* (May 27, 2020), https://www.census.gov/newsroom/press-releases/2020/2020-census-60-percent.html (visited Nov. 24, 2025).

flaws in the survey," exclusion is appropriate. *See Cohen v. Trump*, No. 3:13-cv-2519-GPC-WVG, 2016 WL 4543481, at *7 (S.D. Cal. Aug. 29, 2016).

Dawgs' arguments, Opp. at 8-10, also fail to refute that *none* of the survey questions screened the extent to which any word modifying the shoe description would have caused respondents to "add" points. *See* Mot. at 10. And, it is undisputed that Dr. Weber's survey goes beyond mere arithmetic, purporting to measure what the addition of "patented" to "softens as it warms to better conform to your feet" causes consumers to believe about the meaning of "patented" and how they value a specific "dimension of comfort." *See* ECF No. 1028-2 ¶¶ 40, 86-88. Therefore, Dr. Weber should have used a control stimulus to determine the effect of *any modifier at all* to the description, and her failure to do so makes her survey unreliable.

Further, Dawgs does not deny that Dr. Weber failed to control for preexisting beliefs. Erroneously, Dawgs argues that such beliefs "should be *included* in the measurement." Opp. at 8. But this means that the survey results cannot account for impressions regarding the importance of various shoe attributes that respondents had based on factors having nothing to do with Crocs' advertising, such as their own experience wearing Crocs shoes. A reliable survey would have controlled for such preexisting beliefs, *see Hill's Pet Nutrition*, 258 F. Supp. 2d at 1203-04, but Dr. Weber's did not.

### III. DR. WEBER'S "ANTIMICROBIAL" OPINIONS ARE IRRELEVANT AND UNRELIABLE.

Dr. Weber's opinions about "antimicrobial" statements suffer from the same flaws identified with respect to "patented," Mot. at 12-13, a fact which Dawgs ignores, *see* Opp. at 13. At a minimum, for the same reasons, Dr. Weber's "antimicrobial" opinions, ECF No. 1028-2 ¶ 89, should be excluded as unreliable.

Dawgs has never asserted a false advertising claim based on "antimicrobial" statements, and it is too late to do so now. Dawgs asserts that "discovery revealed" that Crocs was fined for such statements, relying on a 2010 article. Opp. at 13 (citing Opp. Ex. J). But Dawgs never mentioned this article or alleged the falsity of such statements in its claims or during discovery. *See, e.g.*, ECF No. 913-22 at 5-12 (Interrogatory Responses). Nor did Dawgs ever seek leave to amend to assert such a claim. For the first time, Dawgs asserts that "antimicrobial" advertising helped Crocs "build a reputation as a superior brand," and suggests that its marketing expert Stephen Shuster will explain how "Crocs leveraged this advertising." Opp. at 2. But one will search Mr. Shuster's report in vain for an opinion regarding the alleged leveraging of "antimicrobial" statements. *See* ECF No. 1027-2 ¶¶ 11-15. Thus, Dawgs' efforts to expand the scope of its claim by testing the term "antimicrobial" in a faulty consumer survey should be rejected along with Dr. Weber's opinions.

## IV.   DR. WEBER'S ANALYSIS OF MS. BUTLER'S SURVEY RESULTS IS UNRELIABLE.

Dr. Weber's rebuttal opinions, ECF No. 1028-5 ¶¶ 126-31, that Ms. Butler's survey results are consistent with and support Dr. Weber's own opinions should be excluded as unreliable. Mot. at 13-14. Dawgs argues that such opinions are proper because the two experts reached "similar results (e.g., demonstrating that 'patented material' is important to consumers)." Opp. at 13. Dawgs does not cite Ms. Butler's survey results, relying instead on Dr. Weber declaration describing an "apportionment of value . . . using the Butler Survey's feature importance question," Opp. at 13 (citing Weber Decl. ¶ 35), which confirms that Dr. Weber's opinion is not based on Ms. Butler's survey results. Indeed, Dr. Weber ignores Ms. Butler's actual findings, including that a near equal number of respondents indicated that the removal of "patented" or "proprietary" would make them

*more* likely to purchase Crocs shoes. *See* ECF No. 1002-4 at 6. That negates the so-called "feature importance question" cited by Dr. Weber, illustrating why her analysis is unreliable.

V. **DR. WEBER'S OPINIONS ABOUT WHAT CROCS "BELIEVED" ARE INADMISSIBLE.**

Dr. Weber's opinions that Crocs "believed 'patented'" and "believed 'proprietary'" would "have a positive impact on consumers' interest in purchasing Crocs footwear" are unreliable. Mot. at 14-15 (citing ECF No. 1028-5 (Weber Rebuttal Report) ¶ 87 n.96, ¶ 91 n.99). Dawgs does not deny that such opinions are based on Dr. Weber's industry experience only, not on facts or documents produced in this lawsuit. Opp. at 14-15. This is not a case where an expert seeks to opine on the impact of marketing based on that "marketing professional's review and analysis of company documents to extrapolate marketing strategies." Opp. at 14 (quoting *In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 2436, 2016 WL 807377, at *5 (E.D. Pa. Mar. 2, 2016)). The cases relied on by Dawgs confirm exclusion is warranted.

Dawgs says Dr. Weber "merely articulates opinions well-known to those experienced in marketing strategy that companies choose advertising messaging that they expect to have a positive impact on consumers." Opp. at 14-15. Not so. Dr. Weber's opinions purport to express what Crocs "believed" without any evidence regarding Crocs' beliefs or strategies. Thus, this case is akin to *Fisher v. BMW of North America, L.L.C.*, where this Court held that an expert was not qualified to opine on the defendant's intent where that expert had no direct knowledge and failed to identify documents supporting his conclusion, relying on his experience alone. No. 18-cv-00120-PAB-MEH, 2020 WL 9259705, at *5-6 (D. Colo. Mar. 10, 2020). The Court should reach the same result here.

## VI. DR. WEBER'S DECLARATION IS IMPROPER.

In support of its Opposition, Dawgs attaches a declaration by Dr. Weber. ECF No. 1058-1. The declaration is not a proper evidentiary submission, as it goes beyond providing factual support for Dawgs' Opposition. For instance, Dr. Weber summarizes arguments made in the Motion, repeatedly asserting that each "is incorrect," *see id.* ¶¶ 20-22, while in other instances, characterizing the Motion, *id.* ¶ 23 ("the Motion complains"); *see also id.* ¶ 27 ("The Motion does not articulate what pre-existing beliefs I would need to control for"). In short, the declaration is an improperly argumentative piece of advocacy beyond Dawgs' page limits, and should be given no weight. *See Redwind v. Western Union, LLC*, No. 3:14-cv-01699-AC, 2016 WL 1732871, at *5 (D. Or. May 2, 2016) (excluding portion of declaration that was "argumentative" and "should have [been] included in [the] brief").

## VII. CONCLUSION

For the foregoing reasons, Crocs respectfully requests that the Court grant Crocs' Motion.

Date: December 15, 2025                      Respectfully submitted,

/s/ Sean M. Callagy
Sean M. Callagy

ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Telephone: 415.471.3100
Facsimile: 415.471.3400
Email: Sean.Callagy@arnoldporter.com

*Counsel for Crocs, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 15th day of December 2025, the foregoing **REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS OF DR. LYNNE J. WEBER (ECF NO. 1028)** was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Sean M. Callagy*
Sean M. Callagy